UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- --------------------------------------------------------------------- X

**SARATOGA BLACK LIVES MATTER, INC.;**
**ALEXUS BROWN;**
**MOLLY B. DUNN;**
**GABRIELLE C. ELLIOTT;**
**ALEXIS A. FIGUEREO;**
**MARCUS FILIEN;**
**CHANDLER M. HICKENBOTTOM;**
**SAMIRA K. SANGARE;** and
**TIEMOGO J. SANGARE;**

                    Plaintiffs,

    -against-

**THE CITY OF SARATOGA SPRINGS;**
**JOHN F. SAFFORD,** Mayor of the City of Saratoga Springs, sued in his individual and official capacity;
**MEG KELLY,** former Mayor of the City of Saratoga Springs, sued in her individual and official capacity;
**TIM COLL,** Commissioner of Public Safety of the City of Saratoga Springs, sued in his official capacity;
**ROBIN DALTON,** former Commissioner of Public Safety of the City of Saratoga Springs, sued in her individual capacity;
**JAMES MONTAGNINO,** former Commissioner of Public Safety of the City of Saratoga Springs, sued in his individual capacity;
**TYLER McINTOSH,** Chief of Police of the City of Saratoga Springs, sued in his individual and official capacity;
**SHANE L. CROOKS,** former Chief of Police of the City of Saratoga Springs, sued in his individual capacity;
**JOHN T. CATONE,** former Assistant Chief of Police of the City of Saratoga Springs, sued in his individual capacity;
**ROBERT JILLSON,** Lieutenant in the City of Saratoga Springs Police Department, sued in his individual and official capacity;
**TIMOTHY SICKO,** Sergeant in the City of Saratoga Springs Police Department, sued in his individual and official capacity,
**ANDREW STREIM,** Sergeant in the City of Saratoga Springs Police Department, sued in his individual and official capacity;
**PAUL VEITCH,** Sergeant in the City of Saratoga Police Department, sued in his individual and official capacity;

**FIRST AMENDED
COMPLAINT**

JURY DEMAND

**MEGAN DAVENPORT,** Investigator in the City of Saratoga Springs Police Department, sued in her individual and official capacity;

**JOHN GUZEK**, Investigator in the City of Saratoga Springs Police Department, sued in his individual and official capacity;

**MATTHEW MILLER**, Investigator in the City of Saratoga Springs Police Department, sued in his individual and official capacity;

**STEVEN RESIDE**, Investigator in the City of Saratoga Springs Police Department, sued in his individual and official capacity;

**GLENN A. BARRETT,** police officer in the City of Saratoga Springs Police Department, sued in his individual and official capacity;

**WILLIAM COYNER**, police officer in the City of Saratoga Springs Police Department, sued in his individual and official capacity;

**YEVGENIY KHUTORYANSKIY,** police officer in the City of Saratoga Springs Police Department, sued in his individual and official capacity; and

**"JOHN DOES" 1 -100,** whose identities and the precise numbers of which are not known by plaintiffs, but who are intended to represent City of Saratoga Springs police officers or officials who either directly participated in violating the constitutional rights of one or more of the plaintiffs herein during the period of July 14, 2021 to the present, as described herein and/or who failed to intervene to stop or prevent the violation of the rights of one or more of the plaintiffs during this period, and who are sued in their individual and official capacities,

Defendants.

- --------------------------------------------------------------------- X

Plaintiffs Saratoga Black Lives Matter, Inc., Alexus Brown, Molly B. Dunn, Gabrielle C. Elliott, Alexis A. Figuereo, Marcus Filien, Chandler M Hickenbottom, Samira K. Sangare, and Tiemogo J. Sangare**,** by their attorneys, Law Office of Mark S. Mishler, P.C., Cohen&Green P.L.L.C., and Gideon Orion Oliver, state as their Complaint:

## I. <u>INTRODUCTION / SUMMARY OF CASE</u>

1.    Plaintiffs bring this action to vindicate their constitutionally protected rights, to obtain compensation for the egregious and persistent violations of their rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution, for the harm caused to them by the defendants from July 14, 2021 to the present, and to hold the individual defendants and the City of Saratoga Springs accountable for their unlawful, wanton, willful, racist, and unconstitutional actions to retaliate against and to silence, stigmatize, isolate, and penalize racial justice activists in the City of Saratoga Springs due to the content of their First Amendment protected activities and due to their race (for the plaintiffs who are Black) and/or their association with Black people (for the plaintiffs who are white.) The City of Saratoga Springs is liable under principles of municipal liability, the individual defendants are each individually liable for their actions, and the defendants are all liable for their involvement in a conspiracy to interfere with the plaintiffs' civil rights. The facts and claims are summarized in this section and are described in detail below in the Statement of Facts and the Causes of Action.

2.    Saratoga Black Lives Matter, Inc. ("Saratoga BLM") is an activist and advocacy organization started informally as an unincorporated association in 2020 (it was incorporated in 2021) in the midst of the nation-wide  collective expression of grief and anger and the demands for racial justice and demands for police accountability following the police murder of George

Floyd, a Black man, in Minneapolis, Minnesota on May 25, 2020, of Breonna Taylor, a Black

woman, in Louisville, Kentucky on March 13, 2020, the racially motivated murder of Ahmaud

Aubery, a Black man, in Glynn County, Georgia on February 23, 2020, and numerous other

examples in recent years throughout the country of racist violence and/or police use of excessive

force against Black people and others.

3.      The eight individual plaintiffs – Alexus Brown, Molly B. Dunn, Gabrielle C. Elliott,

Alexis A. Figuereo, Chandler M. Hickenbottom, Marcus Filien, Samira K. Sangare, and Tiemogo

J. Sangare – are founders, members, leaders, activists, and/or allies of Saratoga BLM.

4.      Saratoga BLM and each of the individual plaintiffs have been vocal, visible, persistent in

their activism and advocacy since 2020. They have demanded justice in particular cases,

including in regard to the death of Darryl Mount which plaintiffs and other believe was the result

of misconduct on the part of the Saratoga Springs police, as well as justice and meaningful

change in general regarding how the City of Saratoga Springs and its police department operate

and how they treat Black people and other people of color. Plaintiffs also speak out regarding

racism and police misconduct in other cities and states as well as issues of justice internationally.

Plaintiffs speak out and voice their demands strongly.

5.      This case is about how the City of Saratoga Springs and the individually named

defendants have responded to the organizing and advocacy efforts of Saratoga BLM and the

individual plaintiffs and how the defendants have been so antagonistic and resistant to the issues

raised by plaintiffs as to have engaged in a long process of retaliation and attack using the powers

of the City and the police department to try to silence Saratoga BLM and the individual plaintiffs.

A.    _Attorney General's Investigation_.

6.      The improper and unconstitutional character of how the City and the individual

defendants have acted is not just plaintiffs' opinion.

7.      The City's actions have been investigated thoroughly by the New York State Office of

the Attorney General, which has agreed with this characterization.

8.      Starting in 2021, the New York State Office of the Attorney General conducted a multi-

year investigation pursuant to NY Executive Law § 75(3) regarding the manner in which

defendant City of Saratoga Springs ("City"), its officials, and its police department responded to

protest activities organized and/or supported by Saratoga BLM.

9.      In the course of their investigation, the NYS Office of the Attorney General ("OAG")

issued subpoenas to defendants City, Mayor Kelly, Commissioner of Public Safety Dalton,

Police Chief Crooks, and others, reviewed over 276,000 documents, took nine sworn oral

examinations, and interviewed many members of the public.

10.      On February 20,  2024, the OAG  issued a report titled, _A Report on the Saratoga Springs_

_Police Department's Response to Protests in 2021_. A copy is attached to this Complaint as

Exhibit A, and incorporated herein, and will be referred to as the "OAG 2024 Report".

11.      The OAG determined that in 2021 defendant City, acting by and through high-level

decision makers in City government, including defendants Mayor Kelly, Commissioner of Public

Safety Dalton, and Police Chief Crooks, and with the direct involvement of other defendant

officers and officials, had implemented an unconstitutional official municipal policy of

retaliating against Saratoga BLM protesters based on the content of their speech and advocacy.

12. The OAG concluded that the City's actions were "caused by official hostility to the protesters and their message" (OAG 2024 Report, pp. 1, 19-23).

   B.   _Examples of the City's unconstitutional content-based official hostility._

13. As _examples_ of what the OAG characterized as "official hostility" by defendant City's high level officials and decision-makers towards plaintiffs and others engaged in the racial justice protests and organizing activities, the OAG investigation revealed that:

> •     Prior to July 14, 2021, defendant City's high level officials publicly expressed extreme and unjustified hostility and antagonism towards Saratoga BLM and its members and leaders. For example, defendant Commissioner of Public Safety Dalton texted that she wanted to "find [plaintiff] Molly Dunn and kick her in the fucking mouth repeatedly" due to comments plaintiff Dunn had made about Dalton. Dalton also texted that she wanted to "punch" plaintiff Hickenbottom "in the mouth" because she had called police officers murderers and Dalton a racist. And, at a June 28, 2021 press conference held by defendants Commissioner of Public Safety Dalton and Assistant Police Chief Catone, where Catone made baseless, insulting, and demeaning allegations blaming plaintiff Saratoga BLM, its members, and leaders for an alleged increase in crime in Saratoga Springs and threatened to "stop [BLM's] narrative". OAG 2024 Report, pp. 4, 6-7.
>
> •     Prior to July 14, 2021, defendant Commissioner of Public Safety Dalton – who possessed exclusive power to hire, fire, and discipline police officers and whose authority over police policies and rules superceded those of the police chief – repeatedly demanded of defendant Police Chief Crooks that Saratoga BLM and related protesters be arrested even though they were participating in peaceful constitutionally protected protests. This occurred in March 2021, when she ordered defendant Crooks to make arrests of protesters when no offenses had taken place. She did the same in regard to a May 16, 2021 Saratoga BLM protest and publicly criticized the police for not making arrests that day, even though, as a high-ranking officer later said, there was "absolutely no reason to arrest anybody". And, she did the same in regard to a Saratoga BLM protest on May 25, 2021, again, despite the fact that it was, as always, a peaceful, constitutionally protected protest. OAG Report, pp. 3-6, 20-21.
> •     On July 14, 2021, during the course of a peaceful Saratoga BLM protest in downtown Saratoga Springs, defendant City's high level officials made bizarre, hostile, retaliatory, baseless, and

unconstitutionally motivated statements relating to plaintiffs, including improper texts from officials such as defendants Mayor Kelly and Commissioner of Public Safety Dalton who demanded of defendant Police Chief Crooks that the police arrest peaceful protestors, including plaintiffs Molly B. Dunn, Alexis A. Figuereo, and Chandler M. Hickenbottom. OAG 2024 Report, pp. 9-11, 20-21 (Dalton demanding of Crooks that arrests be made), 11 -12, 21 (Kelly demanding arrests and filing a false complaint).[1]

•    On July 14, 2021, in response to the demands from defendants Mayor Kelly and Commissioner of Public Safety Dalton that the police arrest the peaceful Saratoga BLM protesters, and upon the orders of defendant Police Chief Crooks, as the group of peaceful protesters was in the process of dispersing,  police in riot gear rushed the crowd and violently arrested five individual peaceful protestors. OAG 2024 Report, p. 9.

•    On July 14, 2021, pursuant to direction from defendant Police Chief Crooks (who, himself, was acting pursuant to direction and orders from defendants Mayor Kelly and Commissioner of Public Safety Dalton), and pursuant to a "plan" developed by defendant Jillson and other defendants, the police conducted unlawful surveillance of peaceful protesters throughout the protest, including monitoring, tracking, and reporting on the locations of plaintiffs Brown, Figuereo, Filien, and other plaintiffs. OAG 2024 Report, pp. 13-15, 23-25.

•    On July 14, 2021, defendants Investigator Guzek and Investigator Miller followed  plaintiffs Alexus Brown and Marcus Filien and, after they had gotten into their car and driven away, caused them to be subjected to a baseless and unconstitutional traffic stop, detention, and search by defendants Coyner and Khutoryanskiy after the protest was over because of and in retaliation for their constitutionally protected participation in the peaceful protest activities. OAG  2024 Report, pp. 13-15, 23-25.

•    On July 14, 2021, defendant Mayor Kelly directed defendant Police Chief Crooks to "call CPS" (child protective services) on plaintiff Figuereo to "make sure his kids are being cared for correctly", though there was no legal or factual basis for such a concern or direction.

•    On or about September 7, 2021, upon the direction of a

---

[1] As described below, as demanded by defendants Mayor Kelly and Commissioner of Public Safety Dalton, all three of those individual plaintiffs, along with others, were ultimately arrested by the Saratoga Springs Police Department on false charges relating to their participation in the July 14, 2021, peaceful protest activities.

supervisory Saratoga Springs Police Department official, an officer did file a CPS complaint against and/or implicating plaintiffs Elliott and Figuereo relating to the care of their children, falsely alleging that they had acted in a manner to endanger their children, when, in fact, the complaint was made in retaliation for Elliott's and Figuereo's participation in constitutionally protected Saratoga BLM related actions. OAG 2024 Report, pp. 12, 23.

•        On or about September 7, 2021, the Saratoga Springs police arrested twelve racial justice and police accountability protesters, including plaintiffs Dunn, Figuereo, Hickenbottom, Samira Sangare, and TJ Sangare on false charges relating to the July 14th peaceful protest. OAG 2024 Report, pp. 15-17, 22.

•        The defendants engaged in numerous other acts of misconduct in retaliation for the plaintiffs' exercise of their constitutionally protected rights that were intended to and did violate and interfere with plaintiffs' individual and collective exercise of their rights protected under the First Amendment. See, generally, OAG 2024 Report.

C.        _Unconstitutional arrests and malicious prosecutions_.

14.    The actions taken by defendant City and high-ranking officials of the City to implement their ongoing unconstitutional official policy and practice of retaliating against Saratoga BLM protestors based on the content of their speech – which has now extended through three successive City administrations – included the initiation by defendants Barrett, Davenport, Montagnino, Veitch, Reside Sicko, and Streim, of improper, retaliatory, unconstitutional, and baseless arrests and malicious prosecutions of racial justice and police accountability protesters, including plaintiffs Molly B. Dunn, Gabrielle C. Elliott, Alexis A. Figuereo, Chandler M. Hickenbottom, Samira K. Sangare, and Tiemogo J. Sangare and others in violation of their rights as protected by the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

15.    These arrests and prosecutions were initiated based on malice and without reasonable suspicion, probable cause, or any other lawful basis, and without any reasonable expectation that

the prosecutions would be successful, all in retaliation for plaintiffs' engaging in lawful and peaceful protest and advocacy activities which were constitutionally protected exercises of their rights to freedom of speech, freedom of assembly, freedom of association, and freedom to petition the government for redress of grievances.

16.    Defendants publicized the substance of each false charge initiated and prosecuted against plaintiffs – including, for example, the false allegation made against plaintiffs  Molly B. Dunn, Alexis A. Figuereo, Chandler M. Hickenbottom, Samira Sangare, and Tiemogo J. Sangare, that by *allegedly* briefly blocking traffic they had prevented a person suffering a health crisis from getting access to his medication, the false allegation made against plaintiff Gabrielle Elliott that she endangered the welfare of her children, the false allegations made against plaintiffs Alexis A. Figuereo and Chandler M. Hickenbottom that they had unlawfully interfered with or obstructed City Council meetings, and the false allegations made against plaintiff Alexis A. Figuereo that he had violated the law by not seeking allegedly required advance permission from defendant City to allegedly organize First Amendment protected activities – all intended to cause, and, in fact, causing significant injury to the reputations of each of those plaintiffs.

17.    Every protest or advocacy related charge commenced against these plaintiffs from 2021 to the present date by the City and individual defendants has been dismissed in Saratoga City Court, with the exception of three more recently filed and still pending maliciously prosecuted retaliatory and unconstitutional charges against plaintiff Alexis A. Figuereo, filed by or at the instigation or direction of defendants Commissioner of Public Safety Montagnino, Mayor Safford, Commissioner of Public Safety Tim Coll, Police Chief McIntosh, Police Officer Barrett, Sgt. Streim, and/or Investigator Reside.

18.     Each plaintiff who was the subject of these false and malicious charges was physically seized, handcuffed, subjected to unlawful and unreasonable force in the process of arrest, arrested, spent time in custody, was conscious of their confinement, and/or their liberty was curtailed by being required to return to court in order to face these charges.

19.     None of the protest or advocacy related charges against plaintiffs has resulted in a conviction. Each charge that has been resolved was terminated in favor of the plaintiffs.

      D.     *Equal Protection.*

20.     Defendants' actions were also undertaken and motivated by intentional and unlawful racial bias and discrimination against plaintiffs, either based on the racial background of the individual plaintiffs (all but two of whom are Black) and/or because of their association with Black people and advocacy against racism, in violation of plaintiffs' rights as protected by the equal protection clause of the Fourteenth Amendment.

      E.     *Unlawful seizures and deprivation of property.*

21.      Defendants also unlawfully seized plaintiff Alexis A. Figuereo's cell-phone after his arrest in September 2021, deprived him of his phone for months during which time they turned it over to the FBI with the knowledge that the FBI intended to engage in an unlawful forensic examination of the phone, all without any lawful basis and with the intention of intimidating plaintiff Alexis A. Figuereo, interfering with his First Amendment protected rights, and, further, interfering with the First Amendment protected rights of plaintiff Saratoga BLM and each of the other plaintiffs, whose information and communications may also have been obtained and reviewed by the FBI during the time they held the phone and engaged in a forensic analysis of the phone.

      F.     *Continued retaliatory and unconstitutional acts by the City after the*

*issuance of the OAG 2024 Report.*

22.    Even *after* the NYS Office of the Attorney General issued their Report in February 2024 in which they found the City and some of the individual defendants had engaged in and established unconstitutional targeting of Saratoga BLM and individual plaintiffs due to the content of their message, and as a clear indication of the malicious and unconstitutional intent of the City and other defendants, defendant City, in May 2024, acting by, and in concert with defendants Mayor John F. Safford, Commissioner of Public Safety Tim Coll, Police Chief Tyler McIntosh, Sgt. A. Streim, and Investigator Steven Reside continued their retaliatory and unconstitutional actions by causing plaintiff Alexis A. Figuereo to be charged with alleged violations of the Saratoga Springs City Code by allegedly "organizing" "parades" or "demonstrations" on two occasions in May 2024 without advance filing of "demonstration declarations" or "Parade" permits, despite the fact that there have been many "demonstrations" or "parades" held in the City of Saratoga Springs over a period of many years by many different organizations without such "declarations" or "permits" and that, on information and belief, no individual has ever previously been charged with these offenses (that carry a potential 15 day jail sentence), and despite the fact that the two events referenced in these charges (which were peaceful events in which their were no reports of violence or property damage) were each organized by coalitions consisting of multiple organizations, including organizations not primarily made up of Black people or other people of color, yet no other individual and no other representative of an organization other than Saratoga BLM was charged in relation to these May 2024 events.

23.    The May 2024 conduct of defendants was so unusual and egregious that the NYS Office of the Attorney General ("OAG") issued a letter, dated June 13, 2024, to the City's attorneys,

expressing OAG's concern that "the City of Saratoga Springs has resumed its unconstitutional retaliation against protesters" in light of issuing tickets to an alleged protest organizer alleging "violations of Saratoga Springs ordinances that purportedly require individuals to give notice to the City before engaging in First Amendment-protected activity." A copy of the OAG June 13, 2024 letter is attached as Exhibit B and is incorporated herein.

24.     The OAG further expressed in the June 13th letter that any settlement of the OAG's potential civil rights lawsuit against the City of Saratoga Springs would require, as a "starting point", the prevention of "further retaliation against protesters" and that the OAG's proposed settlement would "prohibit the SSPD from seeking criminal penalties against protesters in such circumstances – where there was no reported violence or significant property damage."

G.     _Lack of accountability._

25.     Despite numerous instances of improper and unconstitutional conduct by City officials and officers relating to their actions towards plaintiffs since 2020, not one official or officer of the City of Saratoga Springs has been disciplined or held accountable through any internal City or police department process for their improper conduct or actions.

26.     That is because the conduct by City officials and officers is the de facto and deliberate policy and practice of the City.

H.     _Harm caused by defendants._

27.     The defendants' years of unlawful, and unconstitutional policies and actions, as summarized above and described in greater detail below, caused significant harm to plaintiffs.

28.     For the individual plaintiffs, these injuries included: unlawful detention, unlawful arrests, unlawful custody, confinement, malicious prosecution, humiliation, stigmatization, damage to professional and personal reputations, unlawful stops, physical harm and injury, racial

discrimination, false accusations of child neglect or abuse, medical and other expenses, interference with familial association, interference with the exercise of First Amendment protected rights of freedom of speech, assembly, association, and to petition the government for redress of grievances, violation of Fourth Amendment protected rights to be free from unlawful and unreasonable seizures, and violation of Fourteenth Amendment protected rights to equal protection and due process.

29.    Each individual plaintiff suffered severe emotional pain and distress, and other injuries, including, for some, physical injury.

30.    Plaintiff Saratoga BLM, suffered unconstitutional interference, stigmatization, and attacks by governmental officials and officers in regard to its protected rights of speech, assembly, association, and to petition the government for redress of grievances.

## II.    JURISDICTION and VENUE

31.    Plaintiffs bring this lawsuit pursuant to 42 U.S.C. § 1983 (authorizing actions to redress deprivations under color of state law of rights, privileges and immunities secured by the Constitution and laws of the United States), 42 U.S.C. § 1985(3) (authorizing actions to redress conspiracies to deprive individuals or classes of persons of the equal protection of the law),  and 42 U.S.C. § 1988 (authorizing the award of attorney's fees and costs to prevailing plaintiffs in actions under § 1983 and § 1985(3) ) and the First, Fourth, Fifth, and Fourteenth, Amendments to the United States Constitution.

32.    Subject matter jurisdiction of this lawsuit is based on 28 U.S.C. §§ 1331 (federal question), 1343(3) (equal rights).

33.    The Federal Declaratory Judgment Act, 28 USC §§ 2201 and 2202, authorizes this Court to grant plaintiffs the declaratory relief they pray for herein.

34.    Rule 65 of the Federal Rules of Civil Procedure authorizes this Court to grant plaintiffs the injunctive relief they pray for herein.

35.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, et seq., as all of the plaintiffs reside within the Northern District of New York, defendant City has offices in this District, and all or the majority of actions complained of herein occurred.

### III.   PARTIES

36.    Plaintiff **SARATOGA BLACK LIVES MATTER, INC.** ("Saratoga BLM") is a not-for- profit corporation under the laws of the State of New York, which was initially formed in 2020 as an unincorporated association, with the purpose of organizing and advocating in and around the City of Saratoga Springs regarding issues of racism, police brutality, the lack of accountability for acts of police misconduct, and for justice.

37.    Saratoga BLM also engages in educational and cultural activities in the Saratoga Springs community and beyond.

38.    The individual plaintiffs are founders, members, leaders, activists, and/or allies associated with Saratoga BLM.

39.    The mission statement of Saratoga BLM states:

> Saratoga Black Lives Matter was created to empower and fight for the liberation of the Black community in the United States, starting in our own community. We are dedicated to dismantling systemic racism, challenging oppressive structures, and fostering a society where every Black individual can thrive without fear of discrimination or injustice.

> Through advocacy, education, and community engagement, Saratoga BLM strives to amplify the voices of Black people, address historical and ongoing inequalities, and promote social, economic, and political equity.

> Our ultimate goal is to create a nation that recognizes, values, and

celebrates the richness, diversity, and contributions of the Black community, ensuring a future where Black liberation is fully realized.

40.     Saratoga BLM has organizational standing as its constitutionally protected expressive and associational activities were directly and intentionally harmed and violated by defendant City and the other defendants due to the content of its activism and advocacy.

41.     Saratoga BLM has diverted resources it would use for other purposes to address the conduct of Defendants alleged herein, as detailed below.

42.     Plaintiff **ALEXUS BROWN** is a citizen of the United States and a resident of the State of New York. Ms. Brown is African American. She is a member and leader of Saratoga BLM and has been an active participant in the organizing and advocacy work of Saratoga BLM since 2020. She grew up in Saratoga Springs.

43.     Plaintiff **MOLLY B. DUNN** is a citizen of the United States and a resident of the State of New York. Ms. Dunn has been an active supporter of and participant in the organizing and advocacy work of Saratoga BLM since 2020. She grew up in New York City and in the capital region of New York State.

44.     Plaintiff **GABRIELLE C. ELLIOTT** is a citizen of the United States and a resident of the State of New York. Ms. Elliott has been an active supporter of and participant in the organizing and advocacy work of Saratoga BLM since 2020.

45.     Plaintiff **ALEXIS A. FIGUEREO** is a citizen of the United States and a resident of the State of New York. Mr. Figuereo is African American. He is a member and leader of Saratoga BLM and has been an active participant in the organizing and advocacy work of Saratoga BLM since 2020. He grew up in Saratoga Springs.

46.     Plaintiff **MARCUS FILIEN** is a citizen of the United States and a resident of the State of New York. Mr. Filen is African American. He is a member of Saratoga BLM and has been an active participant in the organizing and advocacy work of Saratoga BLM since 2020. He grew up in the capital region of New York State.

47.     Plaintiff **CHANDLER M. HICKENBOTTOM** is a citizen of the United States and a resident of the State of New York. Ms. Hickenbottom is African American. She is a member and leader of Saratoga BLM and has been an active participant in the organizing and advocacy work of Saratoga BLM since 2020. She grew up in Saratoga Springs.

48.     Plaintiff **SAMIRA K. SANGARE** is a citizen of the United States and a resident of the State of New York. Ms. Sangare is African American. She is a member and leader of Saratoga BLM and has been an active participant in the organizing and advocacy work of Saratoga BLM since 2020. She grew up in Saratoga County.

49.     Plaintiff **TIEMOGO J. SANGARE** ("TJ Sangare") is a citizen of the United States and a resident of the State of New York. Mr. Sangare is African American. He is a member and leader of Saratoga BLM and has been an active participant in the organizing and advocacy work of Saratoga BLM since 2020. He grew up in Saratoga County.

50.     Defendant **CITY OF SARATOGA SPRINGS** ("City") is a municipal corporation formed under and pursuant to the laws of the State of New York, with its principal place of business being Saratoga Springs, New York. Defendant City was the employer of all of the named defendants as well as of all "John Doe" defendants.

51.     Defendant **JOHN F. SAFFORD**, sued in his individual and official capacity, is the current elected Mayor of the City, who took office in January 2024. At all times relevant to his

actions as set forth in this Complaint, he was the elected Mayor of the City, a member of the City Council, a policy-maker for the City with oversight, supervisory responsibilities, and policy-making authority over all aspects of the government of the City including the Saratoga Springs Police Department. Defendant Safford is a white person.

52.    Defendant Safford is only sued in his individual capacity for claims that accrued because of conduct after his assumption of office in January 2024.

53.    Defendant **MEG KELLY**, sued in her individual and official capacity, is a former elected Mayor of the City, who served in that capacity from 2018 through 2021. At all times relevant to her actions as set forth in this Complaint, she was the elected Mayor of the City, a member of the City Council, a policy-maker for the City with oversight, supervisory responsibilities, and policy-making authority over the City of Saratoga Springs Police Department. Defendant Kelly is a white person.

54.    Defendant **TIM COLL**, sued in his individual and official capacity, is the current elected Commissioner of Public Safety of the City, who took office in January 2024. At all times relevant to his actions as set forth in this Complaint, he was the elected Commissioner of Public Safety of the City, a member of the City Council, a policy-maker for the City with oversight, supervisory responsibilities, and policy-making authority over the City of Saratoga Springs Police Department. Defendant Coll is a white person.

55.    Defendant **JAMES MONTAGNINO**, sued in his individual and official capacity, is a former elected Commissioner of Public Safety of the City, who held office in 2022 and 2023. At all times relevant to his actions as set forth in this Complaint, he was the elected Commissioner of Public Safety of the City, a member of the City Council, a policy-maker for the City with

oversight, supervisory responsibilities, and policy-making authority over the City of Saratoga Springs Police Department. Defendant Montagnino is a white person.

56.     Defendant **ROBIN DALTON**, sued in her individual and official capacity, is a former elected Commissioner of Public Safety of the City, who held office in 2020 and 2021. At all times relevant to her actions as set forth in this Complaint, she was the elected Commissioner of Public Safety of the City, a member of the Council, a policy-maker for the City with oversight, supervisory responsibilities, and policy-making authority over the City of Saratoga Springs Police Department. Defendant Dalton is a white person.

57.     Defendant **TYLER McINTOSH**, sued in his individual and official capacity, is the current Chief of Police of the City, who took office in 2023. Prior to assuming the position of Chief, he was a supervisory officer within the Saratoga Springs Police Department. At all times relevant to his actions as set forth in this Complaint, he was either the Chief of Police or a supervisor officer, a policy-maker for the City with oversight, supervisory responsibilities, and policy-making authority over the City of Saratoga Springs Police Department. Defendant McIntosh is a white person.

58.     Defendant McIntosh is only sued in his individual capacity for claims that accrued because of conduct after his assumption of office in 2023.

59.     Defendant **SHANE L. CROOKS**, sued in his individual and official capacity, was the Chief of Police of the City from 2019 to 2023. At all times relevant to his actions as set forth in this Complaint, he was the Chief of Police, a policy-maker for the City with oversight, supervisory responsibilities, and policy-making authority over the City of Saratoga Springs Police Department. Defendant Crooks is a white person.

60.     Defendant **JOHN T. CATONE**, sued in his individual and official capacity, was the Assistant Chief of Police of the City between 2013 and 2022. At all times relevant to his actions as set forth in this Complaint, he was the Assistant Chief of Police, a policy-maker for the City with oversight, supervisory responsibilities, and policy-making authority over the City of Saratoga Springs Police Department. Defendant Catone is a white person.

61.     Defendant **ROBERT JILLSON**, sued in his individual and official capacity, was a Lieutenant with the Saratoga Springs Police Department for a period of years, including in 2021. Defendant Jillson is a white person.

62.     Defendant **TIMOTHY SICKO**, sued in his individual and official capacity, was a Sergeant with the Saratoga Springs Police Department for a period of years, including in 2021. Defendant Sicko is a white person.

63.     Defendant **ANDREW STREIM**, sued in his individual and official capacity, is a Sergeant with the Saratoga Springs Police Department. Defendant Streim is a white person.

64.     Defendant **PAUL VEITCH**, sued in his individual and official capacity, was a Sergeant with the Saratoga Springs Police Department for a period of years, including in 2021. Defendant Veitch is a white person.

65.     Defendant **MEGAN DAVENPORT**, sued in her individual and official capacity, was an Investigator with the Saratoga Springs Police Department for a period of years, including in 2023. Defendant Davenport is a white person.

66.     Defendant **JOHN GUZEK**, sued in his individual and official capacity, was an Investigator with the Saratoga Springs Police Department for a period of years, including in 2021. Defendant Guzek is a white person.

67.    Defendant **MATTHEW MILLER**, sued in his individual and official capacity, was an Investigator with the Saratoga Springs Police Department for a period of years, including in 2021. Defendant Miller is a white person.

68.    Defendant **STEVEN RESIDE**, sued in his individual and official capacity, is an Investigator with the Saratoga Springs Police Department. Defendant Reside is a white person.

69.    Defendant **GLENN A. BARRETT**, sued in his individual and official capacity, was a police officer with the Saratoga Springs Police Department for a period of years, including in 2023. Defendant Barrett is a white person.

70.    Defendant **WILLIAM COYNER**, sued in his individual and official capacity, was a police officer with the Saratoga Springs Police Department for a period of years, including in 2021. Defendant Coyner is a white person.

71.    Defendant **YEVGENIY KHUTORYANSKIY**, sued in his individual and official capacity, was a police officer with the Saratoga Springs Police Department for a period of years, including in 2021. Defendant Khutoryanskiy is a white person.

72.    Defendants **"JOHN DOES"** 1 -100, whose identities and the precise numbers of which are not known by plaintiffs, but who are intended to represent City of Saratoga Springs police officers or officials who either directly participated in violating the constitutional rights of one or more of the plaintiffs herein during the period of July 14, 2021 to the present, as described herein, and/or who failed to intervene to stop or prevent the violation of the rights of one or more of the plaintiffs during this period, and who are sued in their individual and official capacities.

73.    At all times relevant to their conduct alleged in this Complaint, each of the defendants was acting under color of state law.

74.     At all times relevant to their conduct alleged in this Complaint, each of the individual defendants was acting within the scope of their authority and employment.

75.     At all times relevant to the acts alleged in this Complaint, each of the individual defendants had the individual and affirmative legal duty and obligation to uphold the constitutionally protected rights of all individuals encountered in the course of their employment as municipal officials or law enforcement officers of and for the City of Saratoga Springs, including the plaintiffs.

76.     At all times relevant to the acts alleged in this Complaint, each of the individual defendants also had the individual and affirmative legal duty to intervene to prevent or halt actions by other municipal officials or law enforcement officers of the City of Saratoga Springs that infringed upon or violated the constitutionally protected rights of individuals in Saratoga Springs, including the constitutionally protected rights of the plaintiffs.

## IV.    STATEMENT OF FACTS

A.    *Background*.

77.     This Complaint addresses actionable conduct on the part of defendants from July 14, 2021 to the present.

78.     Defendants' individual and joint acts throughout this period, described herein, constitute a series of separate, but related, violations of the constitutional rights of plaintiffs.

79.     Defendants' individual and joint acts in their official capacities also constitute a series of separate, but related, instances of defendant City's unconstitutional official municipal policies, practices, and/or customs.

80.     Defendants' individual acts, in the aggregate, also constitute and represent a pattern of an ongoing official policy, practice, and/or custom of defendant City to interfere with and violate the

First Amendment protected rights of the plaintiffs, to retaliate against plaintiffs for their exercise of their constitutionally protected rights, to scare or intimidate the plaintiffs and others from exercising their rights under the Untied States Constitution, and to deny plaintiffs the equal protection of the law.

81.    Defendants' acts further constitute a conspiracy to deprive the plaintiffs and others of the equal protection of the laws and of the equal privileges and immunities under the laws.

82.    While this Complaint covers defendants' actionable conduct from July 14, 2021 to the present, there were acts prior to July 14, 2021 that set the stage for the actions that occurred during that period, are relevant as background information, provide the context necessary in order to understand the actionable events that occurred from July 14, 2021 to the present.

83.    The unconstitutional hostility, intimidation, and persecution by defendant City and defendant individual officials of the City towards Saratoga BLM, its members and supporters, and other racial justice and police accountability activists started long before July 14, 2021.

84.    Additionally, defendant City's actions prior to July 14, 2021 and after that date must be understood within the long history in this country of systemic racism, police brutality, violations of First Amendment protected rights of racial justice activists, and a general lack of accountability in regard to such actions on the part of police and other governmental officials working on behalf of the City.

85.    In 2021, the City of Saratoga Springs had a year-round population of approximately 28,200, of whom approximately 90% were white.

86.    But in 2021, the Saratoga Springs Police Department had approximately 70 sworn officers, close to 100% of whom were white.

87.    Due to the small size of the Police Department, the command staff and elected officials

with control over the department, including, during their respective terms, defendants Mayors Kelly (2018-2021) and Stafford (2024), Commissioners of Public Safety Dalton (2020-2021), Montagnino (2022-2023), and Coll (2024), and Chiefs and Assistant Chiefs Crooks (2020-2023) Catone (2013-2022), and McIntosh (2023-2024) are involved in a detailed manner with the day-to-day operation, oversight, policy-making, and operational decision-making on behalf of defendant City relating to the work, practices, and functioning of the department.

88.    The events relevant to this case arose in the context of an historically unprecedented wave of protests that swept the nation in the Spring and Summer of 2020 following the police murders that Spring of George Floyd and Breonna Taylor, who were but the latest in a long list of Black people summarily killed by law enforcement officers in the United States over a period of many years without any legal basis or justification.

89.    There is also a particular history in the City of Saratoga Springs that long predates 2020 of excessive force and other misconduct by the Saratoga Springs Police Department directed towards people of color.

90.    As one example that has motivated plaintiffs in their advocacy:

91.    Plaintiffs and others have consistently expressed their position that the 2014 death of a young Black man, Darryl Mount, Jr. (from injuries incurred in 2013 after being chased by members of the Saratoga Springs Police Department) was caused by improper actions of the police.

92.    The City should have held the officers and the department accountable for Mr. Mount's death.

93.    The City never did hold those officers accountable for Mr. Mount's death.

94.    The history of unjustified police murders of Black people and police use of excessive

force against Black people in this country and in the City of Saratoga Springs is also a history of an almost complete lack of official accountability for such killings or misconduct.

95.    The grief, anger, and demands for meaningful and transformational change that emerged out of this history and that engulfed the nation in the Spring and Summer of 2020 reached every state and hundreds of cities and towns, including the City of Saratoga Springs.

96.    As in other cities and towns around the country, the City of Saratoga Springs saw the emergence of protests and of a movement for racial justice and police accountability during the Spring and Summer of 2020.

97.    In Saratoga Springs, one component of this movement in 2020 was the creation of Saratoga BLM.

98.    All of the individual plaintiffs have been involved in and active as founders, leaders, members or supporters of Saratoga BLM starting in 2020.

99.    Starting in 2020 and continuing to the present, plaintiff Saratoga BLM, the individual plaintiffs, and others, planned and engaged in community organizing, protests, rallies, marches, and educational and cultural programs.

100.    Plaintiff Saratoga BLM, the individual plaintiffs, and others, also participated in advocacy within the existing governmental structures of the City of Saratoga Springs with the goal of meaningfully addressing the history and present manifestations of systemic racism, injustice, and lack of accountability in Saratoga Springs and elsewhere.

101.    For example, plaintiff Saratoga BLM and individual plaintiffs actively engaged in the police reform process in the City of Saratoga Springs in 2020 and 2021 which was mandated by Executive Order 203 issued by the New York State Governor on June 12, 2020.

102.    Executive Order 203 explicitly recognized a "long and painful history in New York State

24

of discrimination and mistreatment of black and African-American citizens dating back to the arrival of the first enslaved Africans in America . . ." and that "this recent history includes a number of incidents involving the police that have resulted in the deaths of unarmed civilians, predominantly black and African-American men, that have undermined the public's confidence and trust in our system of law enforcement and criminal justice, and such condition is ongoing and urgently needs to be rectified . . .".

103.    The Executive Order further noted that "urgent and immediate action is needed to eliminate racial inequities in policing, to modernize policing strategies, policies, procedures, and practices and to develop practices to better address the particular needs of communities of color to promote public safety, improve community engagement, and foster trust . . .".

104.    Executive Order 203 required each municipality in the state to engage in a collaborative police reform process to develop a plan to address, among other things, racial bias in policing, use of force, and community engagement.

105.    In Saratoga Springs, as required by EO 203, a Police Reform Task Force was created in 2020 which held public multiple meetings.

106.    Eventually, with the active participation of plaintiff Saratoga BLM and the individual plaintiffs, the Task Force developed and adopted a comprehensive 50 point plan for police reform.[2]

107.    The Task Force presented the 50 point plan to the City Council in March 2021.

108.    More than three years later, many of the recommendations of the Task Force have still

---

[2] The Plan is posted at:
https://www.saratoga-springs.org/DocumentCenter/View/12570/Saratoga-Springs-Police-Review-and-Reinvention-Task-Force-Recommendations-and-Plan.

not been fully implemented, or implemented at all, by the City of Saratoga Springs.

Despite being required by the terms and intention of Executive Order 203 to at least appear to

take the history of racism in policing seriously and to collaboratively seek solutions, in reality, the

local municipal and law enforcement authorities in the City of Saratoga Springs during this

period, including defendants Mayor Kelly, Commissioner Dalton, Chief Crooks, and Assistant

Chief Catone were openly and without justification hostile to the emergence and growth in 2020

and 2021 of this movement for an end to racism in policing and for police accountability.

109.    In particular, the elected and appointed leaders of the City of Saratoga Springs and the

Saratoga Springs Police Department at the time, including defendants Kelly, Dalton, Crooks, and

Catone, consistently expressed significant, persistent, and unjustified hostility towards the racial

justice and police accountability movement in Saratoga Springs from the beginning of this

movement in the late Spring of 2020 through, at least, the end of 2021, when Kelly and Dalton

left office.[3]

---

[3] For example, on July 30, 2020, the City and individual defendants who were in office at that time, planned and implemented an extreme and unjustified use of police force against peaceful protestors, including plaintiff Figuereo, including the use of pepper projectiles fired at peaceful protestors and shoving, tackling, and forcibly dispersing protestors. See: OAG 2024 Report, pp 2-3. This incident is the subject of a separate pending action in this Court involving one of the plaintiffs in this action and five of the defendants named herein, *Figuereo v. The City of Saratoga Springs, Meg Kelly, Robin Dalton, Shane L. Crooks, John T. Catone*, et al., Case No. 1:23-cv-922 (TJM/CFH) (NDNY) ("Figuereo #1"). In that case, Defendants' motions to dismiss have largely been denied. *Id.*, ECF No. 59 ("*Figuereo I MTD*").

As another example, in March 2021 and May 2021, defendant Dalton repeatedly demanded and ordered that her subordinates in the Saratoga Springs Police Department arrest Saratoga BLM protestors and their allies even though they were engaged in peaceful protests. OAG 2024 Report, pp. 3-6. As another example from this period that demonstrates the state of mind and maliciousness of certain defendants, Dalton used violent language and threats in text messages referencing particular plaintiffs in this case, including plaintiff Dunn (whom Dalton wrote she wanted to "find . . . and kick her in the fucking mouth repeatedly" because of comments Dunn had made about Dalton), and plaintiff Hickenbottom (whom Dalton wrote that she wanted to "punch . . . in the mouth", in response to Hickenbottom calling police officers murders and Dalton a racist.) OAG 2024 report, p. 4. The present case does not directly encompass acts that occurred prior to July 14, 2021, but the allegations contained in Figueroo #1 relating to the use of force in 2020, and the conduct and statements by Dalton in the Spring of 2021 are all relevant as background to the allegations in this case.

110.    The expression of such unjustified hostility by the elected and appointed leaders of the City towards the racial justice and police accountability activists, including plaintiffs, was such a clear and consistent practice over this period of time as to have constituted an official unconstitutional municipal policy, practice, and/or custom of defendant City.

        B.    *June 28, 2021 press conference.*

111.    The events of July 14, 2021 and their aftermath, all described below, have their immediate genesis in a press conference held on June 28, 2021 by defendants Public Safety Commissioner Dalton and Assistant Police Chief Catone, acting as individuals and in their official capacities.

112.    At the June 28th press conference, defendant Catone, with the approval of defendant Dalton, angrily expressed impatience with and hostility towards the racial justice and police accountability activists in the City, including plaintiffs, blamed them for an alleged increase in crime in the City, and proclaimed that he was going to "pull out every single connection my family has made over the last 130 years, and . . . stop the narrative" of the protesters. (OAG 2024 Report, at p. 6.)

113.    In claiming there was supposedly some increase in crime in the City, he referenced a recent incident that had absolutely nothing to do with Saratoga BLM, any of the individual plaintiffs, or with racial justice and police accountability advocacy. (*Id.*)

114.    He further stated, in reference to the protestors, "You're either with us or you're not. And if you're not, then you're part of the problem." (*Id.*)

115.    Explaining what he meant by the "narrative" that had to be stopped, defendant Catone said:

        "We're here today because we have become a city at times filled

> with hate and lies and misinformation, a city where the voice of a few have created a narrative that labeled the men and women of this police department as racist killers who should be defunded . . . promoting such a narrative does nothing more than erode relationship between the community and the police . . . until the narrative changes the only thing this type of narrative is doing is strengthening the criminal behavior while ignoring law and order and a safe community."[4]

116.   He then said:

> "Today's the day we change the narrative  . . . and let's be clear I'm going to fight back and I'm going to lead them and Chief Crooks is going to lead them and we are going to do everything in our power to take it back. I'm going to be bold about it I'm going to be vocal about it."

117.   Defendant Dalton also spoke at the June 28th press conference and affirmatively indicated her approval of the statements by defendant Catone.

118.   Defendant Catone's plan and actions taken to "fight back" were the official policy and practice of the City.

119.   Defendant Dalton – the elected Public Safety Commissioner, with authority under the City Charter over the Saratoga Springs Police Department – together with the defendant Catone – the Assistant Chief of Police –  publicly defamed, attacked, and threatened people, including the plaintiffs, whose apparent "offenses", in the opinion of defendants Dalton and Catone, were their continued exercise of their First Amendment protected rights to voice their opinions (i.e., their "narrative") about racism and lack of accountability in the Police Department and the City.

120.   Shortly after the press conference, defendant Dalton responded to a text from a local political leader who said, "Catone nailed it", by stating. "Killed it." OAG 2024 report, p. 7.

---

[4] This quote and the quote in the following paragraph are taken directly from the video recording of the June 28, 2021 press conference.

121.    According to defendants Dalton and Catone, plaintiffs' "narrative" had to be stopped.

122.    That perspective was the official policy and practice of the City.

123.    As accurately characterized in the OAG 2024 Report, defendant Catone, at the June 28, 2021 press conference, with defendant Dalton by his side, "said aloud what other Saratoga Springs officials expressed only privately, that the city should use its police force to silence the BLM protesters." OAG 2024 Report, p. 1.

124.    That is, it was the official policy and practice of the City to "use its police force to silence the BLM protesters."

125.    That policy and practice was based on, among other things, the "narrative" advanced by BLM protester including Plaintiffs.

126.    That is, it was based on the content of Plaintiffs' speech.

127.    Defendant Catone's statements and threats displayed his individual intention to violate the constitutionally protected rights of plaintiffs.

128.    Defendant Catone's public statements and threats, approved by defendant Dalton who sat next to him at the press conference, violated three different written policies of the Saratoga Springs Police Department, as found by the Office of the Attorney General, yet he was never subjected to discipline by the Department or City. OAG 2024 Report, pp. 6-7.

129.    The statements and threats of defendant Catone, and defendant Dalton's approval of them, were ratified by defendants Kelly, Crooks, and City.

130.    The June 28th statements and threats of defendant Catone, approved of and ratified by defendants Dalton, Kelly and Crooks, reflected, constituted, and became statements of defendant City's unconstitutional official municipal policy, practice, and/or custom to violate the constitutionally protected rights of plaintiffs.

C.    *July 6, 2021 City Council Meeting*.

131.    The first meeting of the City of Saratoga Spring's City Council following the Catone and

Dalton June 28, 2021 press conference took place on July 6, 2021.

132.    In Saratoga Springs, the City Council is composed of five city-wide elected officials,

the Mayor, the Commissioner of Public Safety, the Commissioner of Finance, the Commissioner

of Accounts, and the Commissioner of Public Works. In July of 2021, the Council included

defendants Mayor Kelly and Commissioner of Public Safety Dalton.

133.    Between June 28, 2021 and July 6, 2021, not one elected official or police official of

defendant City publicly expressed any concern or criticism of the statements made by Catone and

Dalton at the June 28, 2021 press conference.

134.    Meetings of the City of Saratoga Springs City Council are open to the public (except

when the Council lawfully, in accordance with the NYS Open Meetings Law, goes into an

Executive Session).  Meetings of the City Council include an opportunity for "public comment".

135.    Many Saratoga BLM members and leaders, along with other advocates for racial justice

and police accountability, held a press conference on the front steps outside of Saratoga Springs

City Hall, on Broadway, prior to the July 6, 2021 City Council meeting, during which they

expressed their disagreement with the statements that had been made by defendants Dalton and

Catone at the June 28, 2021 press conference and also expressed their continued commitment to

exercising their constitutionally protected rights and to continue speaking out for racial justice

and police accountability.

136.    After the press conference, Saratoga BLM members and leaders attempted to enter

Saratoga Springs City Hall through the front entrance on Broadway to proceed to the City

Council meeting which was about to start.

137.    Saratoga BLM members and supporters had entered City Hall through the front entrance on Broadway on many previous occasions.

138.    It is the main entrance to the building.

139.    On July 6, 2021, they were not allowed into the building through the front entrance, and, instead were directed by police or other security to use the side entrance to City Hall off of Lake Avenue, which is also the entrance to the headquarters of the Saratoga Police Department. Entering through the side entrance requires walking through the lobby of the police department.

140.    Saratoga BLM members and supporters proceeded to the side entrance.

141.    Upon entering City Hall through the side entrance, they observed a security rope stretched across and blocking the staircase that led from the side entrance up to the 2nd floor where the City Council chamber is located.

142.    There were three uniformed Saratoga Springs police officers standing by the staircase. On information and belief, one was defendant Streim. He told the Saratoga BLM members and supporters that they were not allowed in and could not go up the stairs to the Council chamber.

143.    From the bottom of the staircase, it was visible that other members of the public had been permitted to enter the building and were on the 2nd floor heading to the City Council chamber.

144.    The police officer, who, on information and belief was defendant Streim, said he was "following orders" and that the group would not be permitted to enter unless his supervisor allowed it.

145.    An attorney who was with the Saratoga BLM members and supporters told the police

officers that if members and supporters of Saratoga BLM were being denied access to a public meeting of the City Council based on their political affiliation, that would be a violation of their First Amendment protected rights.

146. Despite being advised that the denial of access was likely a violation of the First Amendment protected rights of Saratoga BLM members and supporters, the police officers did not respond and did not take steps to allow the BLM members and supporters to gain access.

147. Eventually the Saratoga BLM members and supporters moved the security rope themselves and were then able to ascend the staircase and access the City Council chamber.

148. Other members of the public had already been let into the building and into the City Council chamber before the Saratoga BLM members and supporters were allowed in.

149. The targeted denial of equal access to the public meeting of the City Council to plaintiff Saratoga BLM and other individual plaintiffs reflected, constituted, and became part of defendant City's unconstitutional official municipal policy, practice, and/or custom to violate the constitutionally protected rights of plaintiffs.

150. During the Public Comment portion of the meeting, one of the first speakers was a local clergy member, Rev. Joe Cleveland.

151. He expressed "outrage at the immorality of Assistant Chief Catone's remarks", and said that the "remarks were a shocking betrayal of community trust."[5]

152. While Rev. Cleveland was speaking, there were some murmurs of approval from some

---

[5] Quotes of Rev. Cleveland in this and subsequent paragraphs are taken from a March 7, 2022 sworn affidavit by Rev. Cleveland submitted in support of pretrial motions filed by plaintiff Alexis A Figuereo in Saratoga Springs City Court regarding docket # CR-02892-21, which was a criminal charge filed against plaintiff Figuereo by defendant Sicko alleging that he had obstructed governmental administration at the July 6, 2021 City Council meeting. This charge was ultimately dismissed by Saratoga City Court.

of the other members of the public.

153.    Rev. Cleveland described these murmurs of support as a few "gentle mm-hmm noises" from others in attendance.

154.    He heard, and correctly understood those to be "soft expressions of agreement" with his comments and to have been made by "a handful of Black Saratogians, following in the culture and tradition of the Black Church."

155.    These expressions from members of the public did not interrupt Rev. Cleveland's comments, nor did they disrupt the meeting.

156.    Defendant Kelly then interrupted Rev. Cleveland, spoke loudly over him, "scold[ed] the social justice advocates in the room", and threatened to kick people out of the meeting.

157.    Defendant Kelly "then shut the meeting down."

158.    During the period of time the meeting had been "halted by the Mayor for no reason", a number of people spoke up, including plaintiff Figuereo, many expressing that the Mayor's actions were improper and racially biased.

159.    Many people were speaking during this time.

160.    Some members of the public were having conversations with members of the City Council.

161.    Defendant Kelly directed members of the Saratoga Springs Police Department who were present at the meeting to threaten plaintiff Figuereo with arrest if he did not leave the meeting.

162.    The police complied with defendant Kelly's direction and threatened plaintiff Figuereo with arrest if he did not leave.

163.    Plaintiff Figuereo did leave the meeting after being threatened with arrest. He was

prevented, based on the threat of arrest, from attending a public meeting of the City Council.

164.   Plaintiff Figuereo was singled out by defendant Kelly and the police to be threatened and to have his First Amendment protected rights limited and curtailed.

165.   The public infringement of plaintiff Figuereo's constitutionally protected rights was intended by defendant Kelly and the police to silence him, penalize him, and to send a message to other Saratoga BLM members and leaders and other racial justice and police accountability activists and advocates at the meeting that their rights to free expression and their right to attend public meetings of the City Council were also at risk of being curtailed at the whim of the Mayor if they continued to speak up.

166.   The Mayor's actions at the meeting were motivated by her perceiving the "gentle mm-hmms" by a few Black people at the meeting as disruptive even though those public expressions of agreement with Rev. Cleveland's comments did not in any manner disrupt the meeting.

167.   Defendant Mayor Kelly's actions at the July 6, 2021 City Council meeting: scolding members of the public (particularly Black members of the public), interrupting Rev. Cleveland as he was speaking, shutting down the meeting, and directing the police to threaten plaintiff Figuereo, violated the rights of plaintiff Figuereo as well as the other plaintiffs.

168.   Defendant Kelly's decisions and actions were necessary based on the race of those expressing approval — not interrupting at all — of Rev. Cleveland's remarks.

169.   Defendant Kelly would not have taken the same actions had those expressing approval been overwhelmingly white.

170.   Defendant Dalton was also present at this meeting in her capacity as Commissioner of Public Safety and as a member of the City Council.

171.   Defendant Dalton took no affirmative steps to intervene, in the face of defendant Kelly's

unconstitutional actions, to protect the constitutional rights of plaintiff Figuereo or other

plaintiffs and activists and, in fact, fully ratified the unconstitutional actions of defendant Kelly.

172.     Defendant Kelly's actions at the July 6, 2021 City Council meeting, ratified by defendant

Dalton, reflected, constituted, and became part of defendant City's unconstitutional official

municipal policy, practice, and/or custom to violate the constitutionally protected rights of

plaintiffs.[6]

        D.     *Police plans related to the Saratoga BLM  July 14, 2021 protest.*

173.     In response to the hostile and unconstitutional statements and threats made by defendant

Catone, with the approval of defendant Dalton, at the June 28, 2021 press conference, and the

subsequent ratification of those statements by defendants City, Crooks, and Kelly, plaintiff

Saratoga BLM, some of the individual plaintiffs and other racial justice and police accountability

activists planned a protest to take place on July 14, 2021 in downtown Saratoga Springs to

express disapproval and rejection of the hostility and threats from the City officials and to

reaffirm their commitment to continuation of their efforts to organize and speaking out for racial

justice and police accountability.

174.     Plaintiffs' actions in planning and organizing the July 14, 2021 protest, and in

participating in the July 14, 2021 protest, were constitutionally protected exercises of their First

Amendment rights to speak, to express themselves, to peaceably assemble, to associate with

others, and to petition the government for redress of grievances.

---

[6] Plaintiff Figuereo, the only person directed by the police to leave the July 6, 2021 City Council meeting, though many other individuals spoke up during the Public Comment period and during the break in the meeting when defendant Kelly arbitrarily and without a basis halted the meeting, was falsely charged two months later by defendant Veitch with the class A misdemeanor of obstructing governmental administration 2nd degree for allegedly disrupting the meeting by preventing defendant Kelly from performing her official functions during a City Council meeting by allegedly continuously yelling over her and forcing her to suspend the meeting. He was the sole person ever charged with an offense related to the July 6th meeting. As set forth below, this false charge was ultimately dismissed.

175.    Defendants Crooks and/or Catone and defendant Jillson prepared, or directed the preparation of, a detailed 30 page law enforcement "operational plan" regarding the planned July 14, 2021 Saratoga BLM protest.

176.    The preparation of this "operational plan" was undertaken with the knowledge, consent, and approval of defendants Kelly and Dalton.

177.    Prior to the planned protest, this "operational plan" was distributed to and reviewed with dozens of law enforcement officers from multiple law enforcement agencies (who had been requested by defendants Dalton, Crooks, and/or Catone or by a subordinate at their direction, to participate in policing the planned July 14, 2021 Saratoga BLM protest). Defendant Jillson conducted the briefing of all officers relating to the "operational plan".

178.    The July 14th "operational plan" contained blatantly false and content-based assertions regarding "safety" issues alleged to have arisen regarding previous protests organized by Saratoga BLM and/or others. For example, the "operational plan", includes the following summary of the framework of the planned protest which makes clear that the City and the police were particularly concerned due to the message or content of the planned protest:

> Marches and protests **bring up safety concerns often due to the number of people involved and the purpose**. Locally the groups focus around concerns of police brutality, more specifically, the death of Darryl Mount. (Emphasis added.) Operational Plan re: July 14, 2021, unnumbered page headed, "Safety Message/Plan (ICS 208)".

179.    The Plan continued with a false assertion that, "the event organizers have been involved in previous events in Saratoga and other jurisdictions that involved violence . . .". Plan, page headed "Safety Message/Plan (ICS)".

180.    The OAG found, in regard to all of the Saratoga BLM or related protests from May 2020

through 2021, that "although they could be raucous, the protests were also peaceful – there were no credible allegations that any BLM protester ever harmed another person or damaged property during a Saratoga Springs protest." OAG 2024 Report, p. 1.

181.    The OAG was correct:  "there were no credible allegations that any BLM protester ever harmed another person or damaged property during a Saratoga Springs protest."

182.    The Operational Plan also specifically targeted plaintiffs Figuereo and Hickenbottom by making false innuendos about them suggesting, in the context of the Operational Plan, that they had a history of engaging in violence, as they were the "group leaders", and further essentially instructed the law enforcement officers who were to be present at or around the July 14th protest to specifically look out for these individuals, whose names and photos were included in the "operational plan". Plan, page headed "Protestor Most Likely Course of Action."

183.    The creation and implementation of such "operational plans" – which by their nature and specific content were premised on false information and narratives about the protests and protestors and which put into place plans to violate the constitutionally protected rights of Saratoga BLM, the named plaintiffs, and other racial justice and police accountability activists – including, specifically the Operational Plan for July 14, 2021 – was an unconstitutional official municipal policy, practice, and/or custom of the City and was approved of and ratified by defendants City, Kelly, Dalton, Crooks, and Catone.

     E.    *July 14, 2021*.

     i.    *Saratoga BLM  protest.*

184.    On July 14, 2021 Saratoga BLM and the individually named plaintiffs (except for plaintiff Elliott) participated in a planned protest in Saratoga Springs along with other racial justice and police accountability activists.

185.   The July 14, 2021 protest was, most immediately, a response by Saratoga BLM and the individually named plaintiffs and other racial justice and police accountability activists to the hostile, threatening, and inappropriate June 28, 2021 Catone and Dalton press conference.

186.   The stated theme of the protest was to "take back the narrative".

187.   Several dozen or so people participated in the July 14, 2021 protest which started with a rally in Congress Park in Saratoga Springs and then included a march north on Broadway.

188.   Throughout the protest, Saratoga BLM members and leaders, including the individual plaintiffs (except for plaintiff Elliott), in fact, assembled peacefully, expressed themselves, associated with each other and with other peaceful protesters, spoke out against racism and the lack of accountability for police misconduct, and demanded change.

189.   Like every other protest planned by Saratoga BLM and the individually named plaintiffs, the July 14, 2021 protest was planned as a peaceful First Amendment protected exercise of the plaintiffs' constitutionally protected rights of freedom of expression, freedom of assembly, freedom of association, and freedom to petition the government for redress of grievances.

190.   Similarly, like every other protest planned by Saratoga BLM and the individually named plaintiffs, the July 14, 2021 protest was, in fact, a peaceful First Amendment protected exercise of the constitutionally protected rights of plaintiffs and other racial justice and police accountability activists.

   ii.   *Vehicles briefly stopped on Broadway by some protesters.*

191.   Some protestors – not the entire group –  stopped on Broadway in front of the Adelphi Hotel on Broadway.

192.   At that location, some protesters gave speeches relating to the history of racism in Saratoga Springs.

193.    This small group, by standing in the street, briefly stopped several vehicles in the south-

bound lane of traffic.

194.   The total time that vehicles were stopped at that location was approximately 13
minutes.

195.    The few vehicles stopped at that location could have safely done U-turns and headed

north on Broadway, and could have easily then proceeded around the block and continued to

proceed south.

196.   Not one person or vehicle was "confined" by the actions of the protesters at that
location.

197.    Not one person or vehicle's movements were restricted by the actions of the

protesters at that location in a manner as to interfere substantially with their liberty.

198.    The police made no arrests of protesters during the time several vehicles were briefly

stopped by the protestors on Broadway near the Adlephi Hotel.

199.    The police did not issue any dispersal order(s) directed to the protesters during the time

several vehicles were briefly stopped by protesters on Broadway near the Adelphi Hotel.

200.    During the time that several vehicles were briefly stopped by protesters on Broadway near

the Adelphi Hotel, a passenger in one of the vehicles called 911 and told the operator that he or

another person in the car needed to get home or back to their hotel to take heart medication.

201.    The protesters allowed that car to pass within less than a minute after learning of the

alleged medical situation.

202.    As the car drove away, the occupants of the car discussed where to go for dinner.

203.    They made no further mention or expression of concern about the alleged heart

condition or the need to get home to take medication.[7]

      iii.   *Police presence at July 14, 2021 protest.*

204.    There was a visible and large police presence throughout the July 14, 2021 protest,

including dozens of officers from the Saratoga Springs Police Department and other law

enforcement agencies, including the NYS Police, and the Saratoga County Sheriff's Department.

      205.   Many of the officers were in riot gear.

      206.   There were also mounted officers.

207.    There were also undercover officers and/or "undercover assets" deployed from the

Saratoga Springs Police Department, the Saratoga County Sheriff's Department, and the NYS

Police with the instruction to engage in surveillance of the protestors and to gather "intelligence"

regarding the exercise of First Amendment protected activities by plaintiff Saratoga BLM, the

individually named plaintiffs, and other racial justice and police accountability activists.

208.    The unjustified large, riot-clad, police presence at the July 14, 2021 peaceful protest was

intended to intimidate and scare Saratoga BLM, its members and leaders (including plaintiffs)

and other racial justice and police accountability activists from engaging in constitutionally

protected exercise of their rights to freedom of expression, freedom of assembly, freedom of

association, and freedom to petition the government for redress of grievances, and was an

unconstitutional practice approved of and ratified by defendants City, Kelly, Dalton, Crooks, and

Catone, and reflected, constituted, and became statements of official unconstitutional municipal

policy, practice, and/or custom of defendant City.

      iv.   *Role of defendants Kelly, Dalton, and Crooks on July 14, 2021:*
             *"bloodlust" and "hate" by public officials lead to arrests of peaceful protesters*

---

[7] The statements of the occupant(s) of this vehicle, and the timing of when the car was able to move, were captured on cell-phone video, which was available to the police when they subsequently investigated this event.

*and determines public policy and governmental actions.*

209.    By July 14, 2021, defendants Kelly and Dalton were so engulfed in their irrational and racist hatred of plaintiff Saratoga BLM and of the individual plaintiffs, that the entire official apparatus of defendant City's governmental structure and operations was infected by their animosity and essentially functioned to carry out their unconstitutional intentions and goals.

210.    They spoke in terms of their "bloodlust"[8] and "hate"[9] in their communications with, for example, defendant Crooks.

211.    Defendants Kelly and Dalton acted with regard to Plaintiffs because of their "bloodlust" and "hate," which was in turn "based on [Plaintiffs] speech" *See, e.g.,* OAG Report at p. 1.

212.    This lined up with Dalton's longstanding approach to BLM protests.

213.    For example, on March 25, 2021, Defendant Dalton texted a Libertarian politician: "Chief just asked me how to handle protestors on Saturday.  I told him to arrest the fucks." OAG Report at p. 4.

214.    She also repeatedly discussed her desire to physically assault specific BLM protesters including Plaintiffs, including:

- "She wrote one colleague that he wanted to 'find [BLM activist] Molly Dunn and kick her in the fucking mouth repeatedly' because of comments Dunn made about Dalton online" *Id.* (alteration in original);

- "She texted another colleague that she wanted to 'punch' BLM activist

---

[8] For example, on July 14th, after five unjustified arrests of peaceful protestors were made – at her direction – texted defendant Crooks, "I still have bloodlust, but great job."

[9] Not to be outdone, defendant Kelly, after the five unjustified arrests of peaceful protesters were made on July 14th, texted defendant Crooks, "I hate these people great job tonight".

Chandler Hickenbottom 'in the mouth' because Hickenbottom had called

police officers murders and Dalton a racist." *Id.*

- "To another colleague she wrote that she wanted to 'punch' James

    Montagnino, then a candidate for commissioner of public safety, 'in the

    face' because he compared the SSPD to George Floyd's murderer." *Id.*

215.    When confronted, apparently Defendant Dalton admitted she texted about a desire to

punch people in the face "frequently." *Id.*

216.    As found in the *Figuereo I MTD*, it is at least plausible (the standard on a motion to

dismiss) that Defendant Dalton was personally involved in earlier constitutional violations

against members of the Saratoga BLM and Plaintiffs.

217.    As set out therein, among other things:

> "Plaintiff has pointed to text messages sent by Defendant Dalton in July 2021 in which
> she said she had "bloodlust" towards the protestors, lending credence to the inference
> that the alleged plan would include the use of force. Rather than relying on pure
> speculation, Plaintiff's allegations are based on the reasonable and circumstantially
> supported belief that the allegedly unconstitutional law enforcement response to the
> protest in question was planned and implemented by the City's law enforcement
> officials."

*Id.* at 25-26.  *See also, e.g., id.* at 36 (the "FAC adequately alleges that Defendants Kelly and

Dalton intended, in bad faith, to injure Plaintiff. Again, drawing all favorable inferences from

the FAC, the plans and policies governing the response on July 30, 2020, which Defendants

Kelly and Dalton are alleged to have created, are alleged to have specifically targeted

Plaintiff. FAC at ¶¶ 39, 40. And again, Defendant Dalton is also alleged to have said that she

had a "bloodlust" towards RJPA protestors at a July 2021 protest.").

218.    Defendant Police Chief Crooks was on the scene in-person during the July 14, 2021

protest and was directly engaged in decision-making and providing direction and orders to the

police officers present.

219.   Defendants Mayor Kelly, Commissioner of Public Safety Dalton, and Police Chief Crooks were engaged in ongoing communication with each other via text, phone, and/or in person throughout the July 14, 2021 protest.

220.   Defendant Dalton texted defendant Crooks at approximately 7:54 pm on July 14, 2021 – after the brief stoppage of traffic was over and the cars had started moving again – "If someone doesn't get arrested I'm going to lose my mind. I know you know that. But I'm just saying it one more time."

221.   Put differently, Defendant Dalton directed Defendant Crooks that Dalton was going to "lose [her] mind" unless arrests happened, regardless of probable cause.

222.   This was one of multiple texts defendant Dalton sent to defendant Crooks that evening as part of her effort to accomplish the goal of violating the constitutional rights of Saratoga BLM, the individual plaintiffs, and other racial justice and police accountability peaceful protesters.

223.   About a half-hour later, she texted him, "Please please please pretty please arrest someone."

224.   Shortly after, she again texted Crooks, saying, "I want them arrested. Clear the streets."

225.   Then, minutes later, she texted him, "ARREST."

226.   Shortly after Dalton's "ARREST" text, and pursuant to direct orders from defendant Crooks, Saratoga Springs police officers in riot gear, accompanied by mounted police officers, rushed in and violently arrested five individuals peaceful protesters.

227.   Those arrests were without probable cause.

228.    Those arrests were carried out at as the official police of the City, implemented by it's a high ranking policy member personally.

229.    Those arrests were directed because of — and in line with — Dalton's long expressed desire to physically harm Plaintiffs and those with similar views.

230.    At the time the arrests occurred the protesters were heading back towards Congress Park.

231.    The protest was winding down.

232.    As the arrests happened, defendant Dalton texted defendant Crooks, "Arrest all those motherfuckers[.] I don't care[.] I will take the heat. Arrest Chandler [plaintiff Chandler M. Hickenbottom] and Elz [plaintiff Alexis A. Figuereo] and I'll throw you a ticker tape parade."[10]

233.    Defendant Crooks responded, "They are on my list."

234.    Dalton responded, They are on my list too. [smirking face emoji]".

235.    Shortly after that text exchange, Crooks texted the police incident commander, "If you can identify anyone that failed to comply you can arrest them. Elz and Chandler", specifically naming and targeting two of the plaintiffs who were leaders of Saratoga BLM for arrest in retaliation for their exercise of their First Amendment protected rights.

236.    Defendant Kelly texted defendant Crooks, "Elz? Jamaica?" inquiring as to whether plaintiff Figuereo or another protester, Jamaica Miles, had been arrested.

237.    Crooks responded, "Warrants."

238.    Neither plaintiff Figuereo nor Ms. Miles were the subject of any warrants at that time, nor did any lawful basis exist to charge them with any offenses.

---

[10] This suit, presumably, is part of the heat that Dalton agreed to take.  *But see generally*, ECF No. 42-2.

239.    On information and belief, defendant Crooks's assertion that certain individuals would be arrested on the basis of warrants, was an indication of a plan already in place or under consideration to seek warrants for the arrests of participants in the July 14th protest who had not been arrested on July 14th.

240.    The decision-making process followed on July 14, 2021, by which police determinations as to whether and when to make arrests of peaceful protesters, how to make such arrests, and whom to seek to arrest was motivated or directed, in part, by demands to the police by elected officials who expressed personal animosity towards individual protesters based on their viewpoint and speech, and who had no standing or training to make such demands or decisions, was an improper and unconstitutional official policy, practice, and/or custom approved of and ratified by defendants City, Kelly, Dalton, Crooks, and Catone, and reflected, constituted, and became statements of municipal policy and practice for defendant City.

241.    Defendants Crooks, Catone, Jillson, and other police supervisors present and/or involved in the police decision-making process during the July 14th protest each had an affirmative individual legal obligation and duty to uphold and protect the constitutional rights of Saratoga BLM, the individual plaintiffs, and the other racial justice and police accountability protesters involved on July 14th .

242.    Defendants Crooks, Catone, Jillson, and other police supervisors present and/or involved in the police decision-making process during the July 14th protest each had an affirmative individual legal obligation and duty to intervene to prevent the violation of constitutionally protected rights of Saratoga BLM, the individual plaintiffs, and the other racial justice and police accountability protesters involved on July 14th .

243.    Defendants Crooks, Catone, Jillson, and other police supervisors present and/or involved

in the police decision-making process during the July 14th protest each had an affirmative individual legal obligation and duty to refuse to carry out or implement unconstitutional orders or directions from defendants Kelly or Dalton.

244.    Defendants Crooks, Catone, Jillson, and other police supervisors present and/or involved in the police decision-making process during the July 14th protest completely and utterly failed to fulfill their legal obligations and duties as set forth above.

   v. *Defendant Kelly's false sworn statement and continued expression of extreme hostility.*

245.    Defendant Mayor Kelly was a passenger in a vehicle on Broadway during at least part of the July 14, 2021 protest.

246.    Defendant Kelly's unconstitutional actions relating to the July 14th protest continued after July 14th.

247.    On July 16, 2021, two days after the protest, defendant Kelly went to the Saratoga Springs Police Department and, in her capacity as Mayor,  provided a made a sworn written statement to defendant Sicko in which she claimed she was "scared to death" while in her car during the protest because she saw plaintiff Figuereo among the protesters, and that her husband "lowered" her seat and had "put a towel over me so they could not see me."

248.    She further said in her July 16, 2021 sworn statement that, "I knew that if Elz [plaintiff Figuereo] saw me in the car, they would have rocked the car over."[11]

249.    She also said, as explanations for her allegations, that plaintiff Figuereo had "posted negative things about her" on social media and had allegedly been "disruptive" at City Council

---

[11] As noted by the OAG, "A review of every police report concerning protests in Saratoga Springs since 2020 found no allegation that a protester had ever rocked a car over." OAG 2024 Report, p. 12.

meetings. OAG 2024 Report, p. 21.

250.    Defendant Kelly made clear that she wanted plaintiff Figuereo arrested because he had allegedly said mean things about her, the Mayor, clearly a violation of plaintiff Figuereo's constitutional rights.

251.    Defendant Kelly's willingness, as Mayor, to make such a patently false and baseless sworn allegation against Mr. Figuereo and the other racial justice and police accountability activists in a statement she provided to the police department of the City she served as Mayor reflects not only her personal views but, as Mayor, an unconstitutional municipal policy and practice of the City of Saratoga Springs.

252.    Her actions in making a false sworn statement also reflects a sense of total impunity, that defendant Kelly felt she could say or do anything regarding Saratoga BLM, no matter how false or misleading or improper, and that she would never have to worry about being held accountable for her statements and actions.

253.    Defendant Kelly knew on July 16, 2021 when she made her false sworn statement suggesting that there was a real possibility that plaintiff Figuereo or others associated with Saratoga BLM would "rock" her car over that there had never been an incident in which Saratoga BLM or any individual associated with Saratoga BLM had ever "rocked" a car over or had engaged in any conduct even remotely similar to that.

254.    On information and belief, defendant Sicko never raised any question as to the truth of defendant Kelly's false sworn statement suggesting that there was a real possibility that plaintiff Figuereo or others associated with Saratoga BLM would "rock" Kelly's car over even though he knew on July 16, 2021 that there had never been an incident in which Saratoga BLM or any individual associated with Saratoga BLM had ever "rocked" a car over or had engaged in any

conduct even remotely similar to that.

255.    Defendant Kelly's action in giving the false sworn statement and defendant Sicko's action in accepting such statement as a legitimate part of his investigation regarding the events of July 14th even though they both knew the suggestion that plaintiff Figuereo or others would engage in violence towards defendant Kelly was completely unsupported by the facts, had the purpose of building a case against plaintiff Figuereo and others associated with Saratoga BLM in court and in the court of public opinion that they engaged in violence when they knew that was false. This was part of defendants' joint efforts to retaliate against Saratoga BLM and the individual defendants and other activists because of the content of their speech.

   vi.    *Defendants Guzek, Miller, Coyner, and Khutoryanskiy's unlawful surveillance, stop and search, of plaintiffs Brown and Filien.*

256.    During the July 14, 2021 protest**,** defendants Police Investigator Guzek and Police Investigator Miller unlawfully surveilled, tracked, and followed  plaintiffs Alexus Brown and Marcus Filien, despite the fact that neither of them had engaged in any actions that could lawfully have provided a basis for this police action. OAG 2024 Report, pp. 13-15, 23-25.

257.     Defendants Guzek's and Miller's actions in surveilling, tracking, and following plaintiffs Brown and Filien were intended to intimidate plaintiffs Brown and Filien and to retaliate against them for their exercise of their constitutionally protected rights and further reflected and were motivated by racial discrimination against plaintiffs Brown and Filien.

258.    Defendants Guzek and Miller continued their attention to plaintiffs Brown and Filien after the protest was over and after Brown and Filien left the downtown area in a vehicle.

259.    Defendants Guzek and Miller discussed their surveillance of Brown and Filien with a supervisory Saratoga Springs police official, whose identity is not known by plaintiffs at this

time, but who is included among the "John Doe" defendants in this case, who authorized a police traffic stop of the vehicle plaintiffs Brown and Filien were in.

260.   The supervisor officer had no lawful grounds to authorize the stop of the vehicle.

261.   Defendants Guzek and Miller then contacted two patrol police officers, defendants Coyner and Khutoryanskiy and instructed them to follow and stop the vehicle in which Brown and Filien were riding and to search the vehicle.

262.   Defendants Guzek and Miller lacked any lawful grounds to direct defendants Coyner and Khutoryanskiy to stop and search the vehicle.

263.   Defendants Coyner and Khutoryanskiy did follow the vehicle through downtown Saratoga Springs, and continued following until they were in a more secluded and poorly lit wooded area, and then signaled with their police lights for plaintiffs Brown and Filien to stop the vehicle, though there was no lawful basis for the stop.

264.   Defendant Khutoryanskiy ordered plaintiff Filien, who was the driver, to get out of the car. Plaintiff Filien complied as it was clear he had no choice. Defendants Khutoryanskiy then questioned plaintiff Filien.

265.   There was no lawful basis to require plaintiff Filien to get out of the car or to question him.

266.    Defendant Khutoryanskiy then ordered plaintiff Brown, who was in the front passenger seat, to get out of the car. Plaintiff Brown complied as it was clear she had no choice. Defendant Khutoryanskiy questioned plaintiff Brown. There was no lawful basis to require plaintiff Brown to get out of the car or to question her.

267.   Defendants Coyner and Khutoryanskiy then conducted a search of the vehicle, though

there was no lawful basis for the search.

268.   No contraband of any kind was found in the vehicle.

269.   During the time that the vehicle was stopped and searched by the side of the road, which was approximately 30 minutes, plaintiffs Brown and Filien were unlawfully and without legal grounds seized and detained by the police. They were not free to leave until the police told them they could leave.

270.   Defendants Coyner and Khutoryanskiy found two disposable respirator masks in a bag in the trunk.

271.   There is nothing illegal or improper about possessing disposable respirator masks.

272.   Defendant Coyner or Khutoryanskiy communicated to defendant Guzek that they had found "gas masks" in the vehicle, who then shared that information with defendant Lt. Robert Jillson, who responded by text, "Awesome. Puts another one on the radar."

273.   Defendant Jillson's "radar" comment indicated his understanding that defendant City, acting through him and other named defendants had an ongoing practice of surveilling and tracking of the activities of Saratoga BLM members when they were engaged in lawful and constitutionally protected activities.

274.   Defendant Jillson's "radar" comment also indicates that the stop of plaintiffs Brown and Filien was not based on any violation or suspected violation of law, but that "its true goal" as correctly determined by the OAG, was to place these individuals on the radar as participants in BLM protests. OAG 2024 Report, p. 24.

275.   The authorization and implementation of the unlawful police stop and search of the vehicle were intended to intimidate plaintiffs Brown and Filien and to retaliate against them for their exercise of their constitutionally protected rights and further reflected and were motivated

by racial discrimination against plaintiffs Brown and Filien.

276.    The authorization and implementation of the unlawful police stop and search of the vehicle, approved and directed by high level supervisory officials of the Saratoga Springs Police Department, was unconstitutional and reflected, constituted, and became statements of municipal policy and practice for defendant City.

277.    Defendants Jillson, Guzek, Miller, Coyner, and Khutoryanskiy each had an individual and affirmative legal obligation and duty to uphold and protect the constitutional rights of Saratoga BLM, plaintiffs, Brown and Filien, the other individual plaintiffs, and the other racial justice and police accountability protesters involved on July 14th .

Defendants Jillson, Guzek, Miller, Coyner, and Khutoryanskiy each had an individual and affirmative legal obligation and duty to intervene to prevent the violation of constitutionally protected rights of Saratoga BLM, plaintiffs, Brown and Filien, the other individual plaintiffs, and the other racial justice and police accountability protesters involved on July 14th.

Defendants Jillson, Guzek, Miller, Coyner, and Khutoryanskiy each had an individual and affirmative legal obligation and duty to refuse to carry out or implement unconstitutional orders or directions from supervisory officers or officials.

278.    Defendants Jillson, Guzek, Miller, Coyner, and Khutoryanskiy each completely and utterly failed to fulfill their legal obligations and duties as set forth above.

vii.    *Impact on plaintiffs of police actions on July 14th.*

279.    The plaintiffs were deeply impacted by the police actions on July 14, 2021, which were scary, emotionally painful, humiliating, intimidating, and demeaning.

280.    They knew the heavy-handed, riot-clad, disproportionate police presence was intended to send a message to them that their exercise of the constitutionally protected rights of expression,

assembly, association, and seeking redress for grievances were under attack and that, in fact, as far as the elected leaders and police officials of Saratoga Springs were concerned, the plaintiffs essentially had no rights.

281.    Knowing that the City and City officials cared so little for protecting the constitutional rights of Saratoga BLM, its members, leaders, and supporters, was humiliating, demeaning, hurtful, and extremely painful for plaintiffs.

282.    In particular, plaintiffs were made to understand that the specific issues they care about and were organizing and advocating for – racial justice, police accountability, an end to police use of excessive force – were deemed by the City leaders and officials to be unworthy of discussion or consideration.

283.    This was extremely painful.

284.    Plaintiffs also understood that they were targets for the heavy-handed and disproportionate police presence and response, in part, due to their racial background (for those plaintiffs who are Black) and for their association with Black people (for those plaintiffs who are not Black).

285.    This too was extremely painful.

286.    While none of the plaintiffs were arrested on July 14th, some witnessed friends and fellow activists being violently attacked without any legal justification by police in riot gear during a peaceful protest.

287.    This was traumatic to witness and was extremely painful.

288.    Plaintiffs Brown and Filien, subjected to a baseless stop and search of their vehicle in a secluded, poorly lit area, were scared, humiliated, and traumatized by this experience, which they knew would not have happened had they not participated in the July 14th Saratoga BLM protest

and would not have happened had they not been Black individuals. While, in the end, they were not arrested, charged, or physically harmed, they did not know while the detention and search were underway how it would proceed and feared that they would be subjected to physical harm and possibly false charges.

289.    In addition to the above, when the plaintiffs later found out – as a result of the Attorney General's investigation and report – about the integral and vicious role played by defendants Mayor Kelly and Commissioner of Public Safety Dalton in how the police response unfolded on July 14th, this new information added significant additional trauma for the plaintiffs, to know, for example, that the Mayor or the Commissioner of Public Safety were hatefully and bizarrely pushing, ordering, directing, and cajoling the police to arrest particular plaintiffs and that these defendant officials wished such harm to be done to them based on exercising First Amendment protected rights and based on their being Black or their association with Black people.

290.    Further, to find out that defendants Kelly and Dalton were so comfortable making such hostile statements, giving such improper and unlawful directives to the police, all without out any apparent recognition of how inappropriate or unconstitutional such statements and actions were, or simply not caring about that, was an indication of their sense of entitlement and impunity, which caused additional pain and trauma to plaintiffs.

    F.    *July 20, 2021 City Council meeting.*

291.    The next City Council meeting after the July 14th protest was July 20, 2021.

292.    As was the case for the July 6th City Council meeting, many people, including Saratoga BLM members, leaders, and supporters, attended this meeting.

293.    Plaintiffs and other community members went to the meeting with their ongoing and longstanding goal of bringing concerns to the defendant City's elected governmental leaders

relating to racial justice, police misconduct, and governmental accountability.

294.    In addition, plaintiffs and other community members had new concerns they wished to address arising out of the excessive and intimidating and improper police conduct on July 14th at which a number of peaceful protesters were arrested violently and the police engaged in harassing conduct towards some protesters, including plaintiffs Brown and Filien.

295.    As was true on July 6th, many people spoke to the Council on July 20th during the time set aside for public comment, including plaintiffs Brown, Dunn, and Figuereo.

296.    Plaintiff Brown courageously described to the City Council the experience she and plaintiff Filien had after the July 14th protest was over of being followed, stopped, detained, and their car searched by Saratoga Springs police officers and described how scary and humiliating it was to have been treated in that manner.

297.    Defendant Kelly repeatedly yelled over plaintiff Brown as she was speaking, saying, "you're done", interrupting Brown as she was trying to finish her comment and preventing her from finishing her comment.

298.    After the formal public comment period, there was a break in the formal meeting, during which time there was active back-and-forth discussion between members of the City Council and the audience, which went on for a while. Many people from the audience asked questions or made statements. Members of the Council responded

299.    During the break in the formal meeting, plaintiff Dunn, who had already spoken during the formal Public Comment period,  stood up and yelled, interrupting City Council members.

300.    She expressed her anger about the police brutality she had witnessed during the July 14th protest, her outrage about the June 28th press conference held by defendants Dalton and Catone,

and her concerns at what appeared to her to be a callous and uncaring attitude by members of the City Council.

301.    She yelled because it was clear to her that the defendant City leaders were not listening and did not care about the harm their actions had caused.

302.    At some point, at the request of defendant Mayor Kelly, police officers ordered some people to leave the meeting room.

303.    Although numerous people of different racial or ethnic backgrounds had spoken out during the period following the end of Public Comment, the police, at the direction of defendant Mayor Kelly, focused on plaintiff Figuereo and other Black activists.

304.    Plaintiff Figuereo and other Black activists were required - at risk of being arrested - to leave the meeting room.

305.    White people, including plaintiff Dunn, and other non-Black individuals who had spoken up and actively engaged with members of the City Council – and, in the case of plaintiff Dunn, had yelled at the City Council – were not asked to leave.

306.    Those people not asked to leave were similarly situated to Plaintiff Figuereo in all relevant respects, except that Plaintiff Figuereo was Black.

307.    Plaintiff Figuereo was threatened with arrest by a police lieutenant, at which time he left the meeting.

308.    No arrest happened that night, but a month and a half later, plaintiff Figuereo was falsely charged by defendant Veitch with the class A misdemeanor of obstructing governmental administration 2nd degree for allegedly disrupting the meeting by allegedly preventing defendant Kelly from performing her official functions during a City Council meeting by allegedly continuously yelling over her and forcing her to suspend the meeting.

309.    Plaintiff Figuereo was the sole person ever charged with an offense related to the July 20th meeting.

310.    Defendants failed to charge any similarly situated person who was not Black, despite many people having engaged in substantially the same conduct.

311.    As set forth below, this charge was ultimately dismissed.

312.    Plaintiff Figuereo had not interfered with defendant Kelly performing her official functions.

313.    The public infringement of plaintiff Figuereo's constitutionally protected rights at the meeting and then in the formal criminal charge was intended by defendant Kelly and the police to silence him, penalize him, and to send a message to other Saratoga BLM members and leaders and other racial justice and police accountability activists and advocates at the meeting that their rights to free expression and their right to attend public meetings of the City Council were also at risk of being curtailed at the whim of the Mayor if they continued to speak up.

314.    Defendant Dalton was also present at this meeting in her capacity as Commissioner of Public Safety and as a member of the City Council.

315.    Defendant Dalton took no affirmative steps to intervene, in the face of defendant Kelly's unconstitutional actions, to protect the constitutional rights of plaintiff Figuereo or other plaintiffs and activists and, in fact, fully ratified the unconstitutional actions of defendant Kelly.

316.    Defendant Kelly's actions at the July 20, 2021 City Council meeting, ratified by defendant Dalton,  reflected, constituted, and became part of defendant City's unconstitutional official municipal policy, practice, and/or custom to violate the constitutionally protected rights of plaintiffs.

       G.     *Defendant Sicko prepares charges against protesters.*

317.    Defendants Kelly and Dalton continued after July 14, 2021 to pressure the police department to make arrests of additional individuals involved in the peaceful July 14, 2021 protest.

318.    Defendant Kelly's July 16, 2021 false sworn statement described above was part of the effort by defendants Kelly and Dalton to make arrests of additional individuals involved in the peaceful July 14th protest, including, in particular, plaintiff Figuereo.

319.    As additional examples, on or about July 29, 2021 defendant Kelly texted defendants Crooks and Catone and told them that plaintiff Dunn had "crossed my line", to which Crooks responded that he had a "plan" in the works to arrest plaintiff Dunn. OAG 2024 Report, p. 15.

320.    At some point after July 14, 2021, defendant Crooks directed defendant Sicko to investigate and identify the individuals who had participated in stopping the vehicle on Broadway during the protest.

321.    At the time defendant Crooks gave that direction to defendant Sicko, they both understood that, under the law, individuals can only be charged with an offense if probable or reasonable cause existed to support the charge.

322.    At the time defendant Crooks gave that direction to defendant Sicko, they both understood that, under the law, they each had the affirmative legal duty and obligation not to knowingly file false charges against individuals or to file charges for which there was no probable or reasonable cause.

323.    At the time defendant Crooks gave that direction to defendant Sicko, they both understood that, under the law, they each were well aware that defendants Kelly and Dalton, among others, were actively pushing for additional arrests to be made, including of particular

individuals who they wished to retaliate against due to the content of their speech and advocacy, including plaintiffs Dunn, Figuereo, and Hickenbottom.

324.    On or about late August of 2021, defendant Sicko prepared and submitted to Saratoga City Court accusatory instruments and requests for the issuance of warrants for the arrests of twelve individuals, including plaintiffs Dunn, Figuereo, Hickenbottom, S. Sangare, and TJ Sangare.

325.    All twelve individuals were charged by defendant Sicko with the non-criminal violation of disorderly conduct (NY Penal Law 240.20[5]) in essentially identical accusatory instruments alleging that they had obstructed traffic in southbound lane of traffic on Broadway at the intersection with Phila Street at about 7:44 pm on July 14th.

326.    Some of the individuals, including plaintiffs Dunn and TJ Sangare, were also charged by defendant Sicko with the class A misdemeanor of unlawful imprisonment 2nd degree (NY Penal Law 135.05), which is punishable by up to 364 days of incarceration, in essentially identical accusatory instruments alleging that at the same date, time, and location as alleged in the disorderly conduct accusatory instruments, they had intentionally restrained the movement of another person by "confining . . .driver and his passenger for several minutes before they were allowed to leave." .

327.    The Saratoga Springs Police Department had never previously charged anyone with the crime of unlawful imprisonment based on an allegation that the person had stopped a car or had blocked traffic in the course of a peaceful protest.

328.    On information and belief, no one in New York State had ever faced such a charge arising out of a peaceful protest such as had occurred in Saratoga Springs on July 14, 2021.

329.    There was a good reason no one had ever been charged with unlawful imprisonment 2nd based on this type of allegation, which is that the facts do not fit the required elements of the charge.

330.    Defendant Sicko's decision to charge some individuals, including plaintiffs Dunn and TJ Sangare, with the criminal charge of unlawful imprisonment 2nd, a decision which, on information and belief,  was ratified and approved by defendants Kelly, Dalton, Crooks, Catone, and City, constituted unconstitutional retaliation against those individuals for their exercise of constitutionally protected rights, and reflected and constituted an official policy, practice, and/or custom of defendant City to violate the constitutional rights of Saratoga BLM member, leaders, and supporters based on the content of their expressive actions.

331.    The accusatory instruments for the disorderly conduct charges and for the unlawful imprisonment charges and/or accompanying sworn statements filed in support of said charges, included false statements of fact and ignored contradictory or exculpatory evidence.

332.    In his investigation and his preparation of and filing of charging documents against plaintiffs Dunn, Figuereo, Hickenbottom, S. Sangare, and TJ Sangare, defendant Sicko intentionally ignored exculpatory information and evidence that contradicted the sworn allegations he included in the accusatory instruments and supporting paperwork he filed.

333.    For example, while defendant Sicko relied on information provided in 911 calls provided by one of the individuals in the car in which a person allegedly had a medical issue, claiming that there was a medical issue and that they needed to get back to their hotel room so the individual could get his medication, he deliberately ignored the contradictions between that  911 call statement and other evidence, such as the passenger's own cell-phone video, which he had access to at the time he prepared the charges, and which contradicted the claim made in the 911 call.

334.    Defendant Sicko ignored the evidence that there was, in fact, no medical emergency, and that the individual who made that assertion had apparently been misleading in his 911 call.

335.    In addition, although the sworn statement from one of the individuals in the car said that there were protesters "carrying pillowcases" which allegedly caused him to fear the protesters were going to attack them with whatever they were carrying in the pillowcases, there were, in fact no protesters carrying pillowcases, as was documented in the car passenger's own cell-phone video and in photographic evidence.

336.    In addition, although the sworn statement claimed that a "young African American kid came towards me in a fighting manner", that, in fact, did not happen as was documented in the cell-phone video and photographic evidence.

337.    And, defendant Sicko ignored evidence clearly indicating that at least some of the individuals he charged, including plaintiffs Figuereo, Hickenbottom, and S. Sangare, were not, in fact, standing in the street at that place and time blocking the car with the alleged medical emergency or any other vehicle.

338.    Defendant Sicko's intentional failure to take all of the evidence, including exculpatory evidence, into account in preparing charges against plaintiffs and others was, upon information and belief, ratified and approved by defendants Kelly, Dalton, Crooks, Catone, and City constituted unconstitutional retaliation against those individuals for their exercise of constitutionally protected rights, and reflected and constituted an official policy, practice, and/or custom of defendant City to violate the constitutional rights of Saratoga BLM member, leaders, and supporters based on the content of their expressive actions.

339.    Defendant Sicko did not inform the Saratoga City Court Judge from whom he requested the issuance of warrants for the twelve individuals he was charging of the existence of

inconsistencies or contradictions in the evidence, or of the existence of exculpatory evidence, despite the clear mandate of constitutional and statutory law that he do so. This meant that he provided false information to the Saratoga Springs City Court Judge in seeking the issuance of warrants and this action by defendant Sicko was, upon information and belief, ratified and approved by defendants Kelly, Dalton, Crooks, Catone, and City constituted unconstitutional retaliation against those individuals for their exercise of constitutionally protected rights, and reflected and constituted an official policy, practice, and/or custom of defendant City to violate the constitutional rights of Saratoga BLM member, leaders, and supporters based on the content of their expressive actions.

340.    Defendant Sicko's decision to seek the issuance of arrest warrants for individuals charged with relatively low level charges, including some charged solely with the non-criminal violation of disorderly conduct, was also an extraordinary deviation from the ordinary procedure, particularly when many of those charged – including plaintiffs Dunn, Figuereo, Hickenbottom, S. Sangare, and TJ Sangare – were known by the Saratoga Springs Police Department to live in or near the City of Saratoga Springs and there was no basis to believe they would not have voluntarily appeared in Court without the issuance and ultimate execution of warrants.

341.    Defendant's Sicko's  decision to seek the issuance of warrants, even for non-criminal charges of disorderly conduct was, on information and belief, ratified and approved by defendants Kelly, Dalton, Crooks, Catone, and City and constituted unconstitutional retaliation against those individuals for their exercise of constitutionally protected rights, and reflected and constituted an official policy, practice, and/or custom of defendant City to violate the constitutional rights of Saratoga BLM member, leaders, and supporters based on the content of their expressive actions.

342.    On information and belief, in late August of 2021 or early September of 2021, a judge of Saratoga City Court signed warrants for the arrests of twelve individuals at defendant Sicko's request and based on the paperwork provided by defendant Sicko, including for the arrests of plaintiffs Dunn, Figuereo, Hickenbottom, S. Sangare, and TJ Sangare.

H.    *Septemeber 7, 2021.*

i.    *Stop and arrest of plaintiff Figuereo.*

343.    On September 7, 2021, at approximately 5:41 pm, on Northline Road in the Town of Milton, in Saratoga County, plaintiff Alexis A. Figuereo was driving and was not committing any moving violation when officers employed by the Saratoga County Sheriff's Department followed him and then pulled him over.

344.    On information and belief, the Sheriff's Department officers had followed plaintiff Figuereo for a considerable distance prior to executing the traffic stop as they had been requested or directed by an officer official of defendant City to find an excuse to stop plaintiff Figuereo and were waiting for an excuse to do so.

345.    Upon being stopped, plaintiff Figuereo was informed by the Sheriff's officers that he was pulled over for allegedly violating NY Vehicle & Traffic Law 1213A, for allegedly having an "obstructed" driver's view.

346.    Plaintiff Figuereo's driver's view was not obstructed.

347.    Plaintiff Figuereo had a small air freshener hanging from his rear-view mirror.

348.    This was the type of small vehicle air freshener that is often provided by car washes and are, likely, present hanging from the rear-view mirrors of millions of drivers.

349.    Countless similarly situated people drive through Defendants' jurisdiction engaged identical conduct.

350.    Upon information and belief, none of those drivers were stopped for that conduct.

351.    Plaintiff Figuereo was seized by the officers upon being stopped by them.

352.    At some point after he was stopped, the officers informed plaintiff Figuereo that there was a warrant for his arrest on a charge of disorderly conduct that had been issued by Saratoga Springs City Court.

353.    The arrest was based on a warrant for his arrest, issued by a Saratoga Springs City Court Judge at the request of defendant Sicko and based on the incomplete and misleading paperwork presented to the Judge by defendant Sicko, one of twelve individuals eventually arrested on the basis of such warrants which resulted from defendant Sicko's faulty purported investigation into the events of July 14, 2021, which had been directed by defendant Crooks and approved by defendants Kelly, Dalton, Catone, and City.

354.    Had defendant Sicko presented all of the information to the Judge, including exculpatory and inconsistent information relating to the facts of the incident and of plaintiff Figuereo's actual involvement or lack of involvement,  it would have been clear there was no lawful basis for the issuance of the warrant and, on information and belief, it would not have been issued.

355.    The officers took plaintiff Figuereo into custody, handcuffed him, and plaintiff Figuereo was then taken to the Saratoga Springs Police Department station located in City Hall.

356.    Plaintiff Figuereo was aware of and conscious of his confinement for the entire period in which he was confined and did not consent to it.

357.    Once at the Police Department, the Saratoga Springs police booked plaintiff Figuereo, took his mug-shots and fingerprints, and took his phone.

358.    At some point, plaintiff Figuereo found out that he was being charged, falsely, with disorderly conduct for allegedly blocking traffic during the July 14, 2021 protest (based on an

accusatory instrument signed by defendant Sicko dated August 23, 2021), and that he was also being charged, falsely, with two counts of the class A misdemeanor of obstructing governmental administration 2nd degree, NY Penal Law 195.05 (each of which was punishable by up to 364 days of incarceration), one count relating to alleged conduct at the July 6, 2021 meeting of the Saratoga Springs City Council and a second count relating to alleged conduct at the July 20, 2021 City Council meeting. Both of the obstructing charges were based on accusatory instruments signed by defendant Veitch on September 7, 2021, which had not been previously filed with the Court and were not the basis of the warrant, which was solely based on a non-criminal disorderly conduct charge.[12]

359.    The disorderly conduct charge against plaintiff Figuereo was a false charge.

360.    The obstructing charges each falsely alleged that plaintiff Figuereo had prevented defendant Kelly from performing her official functions during a City Council meeting by "continuously yelling over her and forcing the Mayor to suspend the meeting until order could be restored."

361.    Saratoga Springs police officers put plaintiff Figuereo in a holding cell, where he was held for hours until finally being brought in front of a Saratoga Springs City Court Judge to be arraigned, after which he was released.

ii.    *Others go to the Saratoga Springs police station to show support for plaintiff Figuereo and are arrested.*

362.    Plaintiff Figuereo's family members and other leaders, members, and supporters of

---

[12] Plaintiff Figuereo was also charged that evening by the Sheriff's Department with driving with an obstructed view (Vehicle & Traffic Law 1213A) in the Town Court of the Town of Milton. He later was informed that there was also allegedly an old speeding ticket in the Town of Milton which he had failed to answer and that his license had allegedly been suspended as a result. Plaintiff Figuereo was not aware his license had been suspended. All three Town of Milton charges – obstructed view, the old speeding charge, and the aggravated unlicensed operation charge from the suspended license - were subsequently dismissed by the Town Court of the Town of Milton.

Saratoga BLM found out about his arrest and went to the Saratoga Springs police station to find out what had happened and to show support for plaintiff Figuereo.

363.    Among the numerous individuals who went to the police station in the evening of September 7, 2021 were plaintiffs Dunn, Elliott, Hickenbottom, and S. Sangare.

364.    A small crowd gathered outside of the police station.

365.    The police refused to provide any information to the activists or to plaintiff Figuereo's family as to why he was arrested and what his status was.

366.    There were Saratoga Springs police officers and officers from the Saratoga County Sheriff's Department, inside the lobby of the police station. It appeared that they were looking at a piece of paper or packets of paper and then pointing to individual activists who were right outside of the station.

iii.    *Plaintiff Hickenbottom was forcibly arrested and held for hours on a disorderly conduct charge.*

367.    Plaintiff Hickenbottom was outside of the police station, was not violating any law, and was suddenly physically seized by police officers, forcibly taken inside the police station, handcuffed, booked and then placed in a holding cell where she was held for hours.

368.    Plaintiff Hickenbottom was aware of and conscious of her confinement for the entire time she was confined and did not consent to it.

369.    The arrest was based on a warrant for her arrest, issued by a Saratoga Springs City Court Judge at the request of defendant Sicko and based on the incomplete and misleading paperwork presented to the Judge by defendant Sicko, one of twelve individuals eventually arrested on the basis of such warrants which resulted from defendant Sicko's faulty purported investigation into the events of July 14, 2021, which had been directed by defendant Crooks and approved by

defendants Kelly, Dalton, Catone, and City.

370.   Had defendant Sicko presented all of the information to the Judge, including exculpatory and inconsistent information relating to the facts of the incident and of plaintiff Hickenbottom's actual involvement or lack of involvement,  it would have been clear there was no lawful basis for the issuance of the warrant and, on information and belief, it would not have been issued.

371.   The disorderly conduct charge against plaintiff Hickenbottom was a false charge.

372.   While held in custody, plaintiff Hickenbottom was in severe physical pain and emotional distress as a result of the arrest, was scared, and was also suffering from longstanding medical conditions which exacerbated her pain and for which she required her medication. She repeatedly asked to be permitted to take her medication, but the Saratoga Police refused.

373.   Plaintiff Hickenbottom was finally brought in shackles in front of a Saratoga Springs City Court Judge to be arraigned, on what turned out to be solely one count of the non-criminal charge of disorderly conduct for allegedly blocking traffic during the July 14, 2021 protest, after which she was released.

iv.   *Plaintiff Samaria Sangare was forcibly arrested and held for hours on a disorderly conduct charge.*

374.   Plaintiff Samira Sangare was also outside of the police station, was not violating any law, and was suddenly physically seized by police officers, forcibly taken inside the police station, handcuffed, booked and then placed in restraints, chained to a bench or wall in a room within the station, where she was held for hours.

375.   Plaintiff Samira Sangare was aware of and conscious of her confinement for the entire time she was confined and did not consent to it.

376.   There was a also warrant for her arrest, issued by a Saratoga Springs City Court Judge at

the request of defendant Sicko and based on the incomplete and misleading paperwork presented to the Judge by defendant Sicko, one of the twelve warrants resulting from the request of defendant Sicko based on defendant Sicko's faulty purported investigation into the events of July 14, 2021, which had been directed by defendant Crooks and approved by defendants Kelly, Dalton, Catone, and City.

377.    Had defendant Sicko presented all of the information to the Judge, including exculpatory and inconsistent information relating to the facts of the incident and of plaintiff Samira Sangare's actual involvement or lack of involvement,  it would have been clear there was no lawful basis for the issuance of the warrant and, on information and belief, it would not have been issued.

378.    The disorderly conduct charge against plaintiff Samira Sangare was a false charge.

379.    While held in custody, plaintiff Samira Sangare was also in physical pain from the arrest, was scared and was experiencing severe emotional distress.

380.    Plaintiff Samira Sangare was finally brought in shackles front of a Saratoga Springs City Court Judge to be arraigned, on what turned out to be solely one count of the non-criminal charge of disorderly conduct for allegedly blocking traffic during the July 14, 2021 protest, after which she was released.

   v.    *Plaintiff Dunn was forcibly arrested and held for hours.*

381.    Plaintiff Molly B. Dunn was also outside of the police station, was not violating any laws, and an officer told her to come inside. She did and was then physically seized by police officers, handcuffed, booked, had mug-shots taken, was fingerprinted, and was then placed in restraints, and chained to a bench or wall in a room within the station, where she was held for hours.

382.    Plaintiff Dunn was aware of and conscious of her confinement for the entire time she was confined and did not consent to it.

383.    There was a also warrant for her arrest, issued by a Saratoga Springs City Court Judge at the request of defendant Sicko and based on the incomplete and misleading paperwork presented to the Judge by defendant Sicko, one of the twelve warrants resulting from the request of defendant Sicko based on defendant Sicko's faulty purported investigation into the events of July 14, 2021, which had been directed by defendant Crooks and approved by defendants Kelly, Dalton, Catone, and City.

384.    Had defendant Sicko presented all of the information to the Judge, including exculpatory and inconsistent information relating to the facts of the incident and of plaintiff Dunn's actual involvement or lack of involvement,  it would have been clear there was no lawful basis for the issuance of the warrant and, on information and belief, it would not have been issued.

385.    The charges brought against plaintiff Dunn were false.

386.    While held in custody, plaintiff Dunn was also in physical pain from the arrest, was scared and was experiencing severe emotional distress.

387.    Plaintiff Dunn was finally brought in shackles in front of a Saratoga Springs City Court Judge to be  arraigned, on what turned out to one count of the non-criminal charge of disorderly conduct for allegedly blocking traffic during the July 14, 2021 protest and one count of the class A misdemeanor of unlawful imprisonment 2nd for allegedly "imprisoning" the individual(s) in the vehicle who had falsely claimed were suffering from a medical emergency, after which she was released.

   vi.    *Plaintiff Elliott was forcibly arrested, torn away from her little children, and held for hours.*

388.    Plaintiff Gabrielle Elliott was also outside of the Saratoga Springs police station in the evening of September 7, 2021. She was there to show support for plaintiff Figuereo and was

there with her two young children, the younger of whom is also plaintiff Figuereo's child. Plaintiff Figuereo also functions in a parental role with the older child.

389.    The children were very frightened as they were told their father, or the person who functions in the role of father, had been arrested by the police.

390.    At some point, officers came out of the station, forcibly grabbed plaintiff Elliott, yanking her away from her two children who were crying and clinging to her, dragged her into the station, slammed her against the wall, placed her in handcuffs, and then booked her, took her mug-shots, fingerprinted her, placed in restraints, chained her to a bench or wall in a room within the station, where she was held for hours.

391.    Plaintiff Elliott's young children experienced having their mother violently torn away from them by police officers who, after violently grabbing their mother and taking her into the police station, left the two young children outside and showed no interest or care as to whether these young children were okay and safe after the police had forcibly removed their mother.

392.    While she was in custody, a Saratoga Springs supervisor police official, whose identity is not known by plaintiffs at this time, but who is included among the "John Doe" defendants in this case,  instructed another officer, whose identity is not known by plaintiffs at this time, but who is included among the "John Doe" defendants in this case,  to call CPS on plaintiff Elliott.

393.    The officer did call CPS to make a complaint.

394.    As correctly determined by the OAG, the complaint was wholly unsubstantiated, not supported by any evidence, and was pretextual and motivated by defendant City's official policy of retaliation for protected speech. OAG 2024 Report, p. 23.

395.    The CPS report was determined to be "unfounded".

396.    Plaintiff Elliott was aware of and conscious of her confinement for the entire time she

was confined and did not consent to it.

397.    While held in custody, plaintiff Elliott was also in physical pain from the arrest, was

scared and was experiencing severe emotional distress, including the distress from not knowing

what was going to happen with her children or with the CPS complaint.

398.    Plaintiff Elliott was finally brought in shackles in front of a Saratoga Springs City Court

Judge to be  arraigned, on what turned out to be three charges, the class A misdemeanors of

resisting arrest and endangering the welfare of a child, and one count of the class B misdemeanor

of attempted assault 3rd degree.

vii.    *Other arrests relating to July 14, 2021, including plaintiff TJ Sangare.*

399.    Plaintiff TJ Sangare was informed on or after September 7, 2021, that there was also a

warrant for his arrest, issued by a Saratoga Springs City Court Judge at the request of defendant

Sicko and based on the incomplete and misleading paperwork presented to the Judge by

defendant Sicko, one of the twelve warrants resulting from the request of defendant Sicko based

on defendant Sicko's faulty purported investigation into the events of July 14, 2021, which had

been directed by defendant Crooks and approved by defendants Kelly, Dalton, Catone, and City.

400.    Had defendant Sicko presented all of the information to the Judge, including exculpatory

and inconsistent information relating to the facts of the incident and of plaintiff TJ Sangare's

actual involvement or lack of involvement, it would have been clear there was no lawful basis for

the issuance of the warrant and, on information and belief, it would not have been issued.

401.    The charges brought against plaintiff TJ Sangare were false.

402.    Plaintiff TJ Sangare was out of state at college at the time he was informed about the

warrant.

403.    Plaintiff TJ Sangare was threatened by the Saratoga Springs police that if he did not

promptly come back to Saratoga Springs to be processed, that the police would come to his college campus to arrest him.

404.    Plaintiff TJ Sangare left school, missing classes, drove back to Saratoga Springs, turned himself in at the Saratoga Springs Police Department, where he was handcuffed, booked, had his mug-shots and fingerprints taken, and was then brought in shackles in front of a Saratoga Springs City Court Judge to be arraigned, where he was informed he was charged with one count of the non-criminal charge of disorderly conduct for allegedly blocking traffic during the July 14, 2021 protest and one count of the class A misdemeanor of unlawful imprisonment 2nd for allegedly "imprisoning" the individual(s) in the vehicle who had falsely claimed were suffering from a medical emergency, after which he was released.

405.    Plaintiff TJ Sangare was aware of and conscious of his confinement and did not consent to it.

406.    In addition to plaintiffs Dunn, Figuereo, Hickenbottom, S. Sangare, and TJ Sangare, who were all arrested on the basis of warrants requested by defendant Sicko based on defendant Sicko's faulty purported investigation into the events of July 14, 2021, which had been directed by defendant Crooks and approved by defendants Kelly, Dalton, Catone, and City, there were seven other individuals who were arrested on the basis of such warrants.

      I.    *Dispositions of July 14, 2021, related charges.*

407.    Every single charge brought against plaintiffs relating in any manner to July 14, 2021 or related events was ultimately dismissed by Saratoga City Court:

        •    Plaintiff Dunn's disorderly conduct and unlawful imprisonment charges related to July 14th were dismissed on December 10, 2021.

        •    Plaintiff Elliott's resisting arrest, endangering the welfare of a

child, and attempted assault charges relating to September 7th were dismissed on November 8, 2021.

• Plaintiff Figuereo's two obstructing governmental administration charges relating to alleged obstruction of City Council meetings in July 2021 were dismissed on April 15, 2022.

• Plaintiff Figuereo's disorderly conduct charge related to July 14th was dismissed on April 22, 2022.

• Plaintiff Hickenbottom's disorderly conduct charge related to July 14th was dismissed on October 19, 2021.

• Plaintiff Samira Sangare's disorderly conduct charge related to July 14th was dismissed on October 19, 2021.

• Plaintiff TJ Sangare's disorderly conduct and unlawful imprisonment charges were dismissed on November 30, 2021.

408. Every single one of these charges was commenced without probable cause.

409. Every single one of these charges was commenced based on malice.

410. Every single one of these charges was commenced without any reasonable expectation that the prosecutions thereon would be successful.

411. Every single one of the July 14, 2021 related charges was commenced by the filing of accusatory instruments and supporting paperwork by defendant Sicko which he knew was incomplete, misleading, and contained inaccurate information.

412. The two obstructing of governmental administration charges relating to July 2021 City Council meetings, were commenced based on the filing of accusatory instruments and supporting paperwork by defendant Veitch which he knew contained incomplete, misleading, and inaccurate information.

413. Every single one of these charges was resolved in favor of the plaintiffs in this case.

414. By filing such faulty and defective paperwork and by failing to inform the Court, from

whom he sought the issuance of warrants for the arrest of the twelve individuals he charged that the information was incomplete, misleading, and inaccurate, defendant Sicko, with the approval and ratification of defendants Crooks, Kelly, Dalton, and Catone, misled the Court and caused the Court to issue warrants which would likely not have been issued had the Court been informed of the full and accurate information.

415.    Defendant Sicko's actions in regard to the preparation, filing, and use of the faulty paperwork to get a Court to issue unjustified warrants, constituted unconstitutional retaliation against those individuals for their exercise of constitutionally protected rights, and reflected and constituted an official policy, practice, and/or custom of defendant City to violate the constitutional rights of Saratoga BLM member, leaders, and supporters based on the content of their expressive actions.

J.    *2023 City Council related charges against plaintiffs Hickenbottom and Figuereo.*

i.    *New City administration.*

416.    Municipal elections were held for defendant City in November 2022 which resulted in new members of the City Council. Among other changes, defendant Kelly was replaced as Mayor by Ron Kim. Defendant Dalton was replaced as Commissioner of Public Safety by defendant Montagnino.

417.    As the city leadership changed hands, there was a period of time during which it appeared there would be opportunities for dialog and constructive engagement between Saratoga BLM, its members, leaders, and supporters and some of the City leadership.

418.    Unfortunately, one of the new council members, defendant Montagnino, continued the extreme and unjustified hostility towards Saratoga BLM, its members, leaders, and supporters as had been the hallmark of the approach of defendants Kelly and Dalton when they were in office.

ii.    *February 2023: Defendant Montagnino falsely charges plaintiff Hickenbottom with disorderly conduct for allegedly disturbing a City Council meeting.*

419.    Defendant Montagnino's hostility manifested itself, among other occasions, in February 2023 by his commencement and prosecution of a false disorderly conduct charge against plaintiff Hickenbottom, for allegedly disturbing the February 7, 2023 City Council meeting and allegedly causing public inconvenience, annoyance or alarm by speaking during the Public Comment period.

420.    Throughout this period, Defendant Montagnino was acting in his official capacity, using the power of his office.[13]

421.    As recorded in the February 7, 2023 Incident Report ("Feb. 7 IR"), "***Commissioner*** JAMES MANTAGNINO h[ad] requested that a complaint be drawn up for PL 240.20 04" with a "Criminal Summons to be requested."  Feb. 7 IR at 2 (emphasis added).

422.    Then, on official Saratoga Springs Police Department Letterhead, the police department said the following, with the Subject line:  "Request of the Commissioner, James Montagnino" (that is, "Commissioner" listed first):

---

[13] In the now-moot motion to dismiss, Montagnino claims his acts were solely "in his capacity as a citizen, even though he was acting as a city commissioner" more generally, further saying "any witness would have been free to file a complaint concerning Figuereo's conduct at the meeting."  ECF No. 42-2 at 9.  As set out above, that claim is not colorable.

 

Saratoga Springs Police Department
5 Lake Avenue
Saratoga Springs, New York 12866
(518) 584-1800
www.saratogapolice.org

# Memo

**TO:** Saratoga Springs City Court

**FROM:** Lt. Warfield

**DATE:** 02.16.2023

**RE:** Request of the Commissioner, James Montagnino

     With regard to the attached accusatory information, Public Safety Commissioner James Montagnino respectfully requests that the Court issue a criminal summons for the defendant, Chandler M. Hickenbottom (04/20/1996).

Respectfully Submitted,

Lt. Warfield, #2213

423.    The accusatory instrument charging Plaintiff Hickenbottom specifically alleges that Defendant Montagnino was "doing business at 474 BROADWAY" (that is, City Hall), suggesting the capacity of the complaint was official.[14]

424.    He also altered the text of the accusatory instrument to add an accusation of "acting antagonistically … TOWARD THE CITY COUNCIL":

---

[14] The initial draft said "residing."  Defendant Montagnino crossed out "residing" and replaced it with "doing business" — rather than correcting the address and maintaining "residing."

> On the above date and time, during the Saratoga Springs City Council Meeting at 474 Broadway, said Defendant with intent to cause public inconvenience, annoyance or alarm did refuse to allow other members of the public to speak during the public comment period of the meeting. Said Defendant was asked repeatedly to surrender the microphone and allow other members of the public who had lawfully gathered to speak. Said Defendant shouted and caused a disturbance by acting antagonistically towards other members of the public and forcing the meeting to come to an abrupt close. Said Defendant's actions caused the City Council to be unable to conduct city business at this lawful gathering of other persons.
>
> & TOWARD THE CITY COUNCIL

425.    He also made changes "any witness" (ECF No. 42-2 at 9) would never be able to, changing what the government was seeking (a warrant to a summons) and "arrest" to "appearance."

426.    All of these changes were accepted.

427.    The Police Department accepted the direction and input of Defendant Montagnino about how to proceed, upon information and belief, because it understood him to be acting in an official capacity.

428.    Plaintiff Hickenbottom, and many other individuals spoke during the Public Comment period of the February 7th meeting. She spoke, among other things, about the efforts of Saratoga BLM, the continued concerns she and Saratoga BLM had regarding racism, police misconduct, and the lack of police accountability, and the continued demands of Saratoga BLM.

429.    As plaintiff Hickenbottom was speaking, Mayor Kim moved to adjourn the meeting, A majority of the Council members agreed.

430.    During the time the meeting was adjourned, there was dialog and conversation between Saratoga BLM, its, members, leaders, and supporters and members of the City Council. There were multiple one-on-one conversations between Council members and members of the public, including Saratoga BLM members, leaders, and supporters.

431.    During this period when there was dialog between members of the City Council and

Saratoga BLM and others, defendant Montagnino left the room. He was the sole member of the

City Council to refuse to engage in the dialog at that time.

432.    At some point the formal meeting continued.

433.    When the formal City Council meeting resumed, Mayor Kim announced that during the

break, and as a result of the dialog that occurred during the break, the City Council had agreed to

meet with Saratoga BLM at a time to be announced later.

434.    Defendant Montagnino subsequently helped to draft an accusatory instrument charging

plaintiff Hickenbottom with disorderly conduct, which he signed as the "complainant", and

caused to be filed in Saratoga Springs City Court.

435.    The Montagnino accusatory instrument falsely alleged that plaintiff Hickenbottom had,

"with the *intent to cause public inconvenience, annoyance, or alarm* did refuse to allow other

members of the public to speak during the public comment period . . . and forcing the meeting to

come to abrupt close" and caused the City Council to be unable to conduct city business at the

council meeting.

436.    It was a false allegation that plaintiff Hickenbottom had the "intent" to cause public

inconvenience, annoyance, or alarm, and it was false that she caused the meeting to come to an

abrupt end or that she prevented the City Council from conducting business.

437.    Plaintiff Hickenbottom was the sole person charged with any offense arising out of the

February 7th City Council meeting, even though numerous other individuals had spoken up

during the meeting and during the break in the formal meeting.

438.    At a subsequent City Council meeting on April 4, 2023, the City Council passed a

Resolution by a vote of 4 in favor and one abstention (Montagnino), declaring that defendant

Montagnino had acted unilaterally and not on behalf of the City Council or the City by filing a charge against plaintiff Hickenbottom and that said action by Montagnino was in violation the City's charter as it was not authorized by the Council.[15]

439.    At the April 4, 2023 meeting, City Council member Dillon Moran stated on the record his belief that defendant Montagnino's action was "disgusting" as he had used "the force of the police to silence a young Black woman for speaking because you didn't like the words."

440.    Councilmember Moran was correct.

441.    At the April 4, 2023 meeting, City Council member Mayor Kim stated on the record his belief that defendant Montagnino's action was "an incredible mistake" and "racist" and that, "free speech is not only free speech that they like but also free speech that they don't like."

442.    Councilmember Kim was correct.

443.    At the April 4, 2023 meeting, City Council member Minita Sanghvi stated on the record her belief that defendant Montagnino's action was, "not just racist it was sexist too."

444.    Council member Sanghvi was correct.

445.    Plaintiff Hickenbottom was required to appear in court on multiple occasions in regard to the false disorderly conduct charge filed against her by defendant Montagnino.

446.    On June 22, 2023, the disorderly conduct charge against plaintiff Hickenbottom was

---

[15] This Resolution was, at least in part, motivated by the goal on the part of four City Council members to separate themselves from the unproductive and retaliatory conduct of defendant Montagnino. It was also to disavow any individual liability by the other Council members or municipal liability on the part of the City for defendant Montagnino's actions. The fact remains that defendant Montagnino was acting in his capacity as Commissioner of Public Safety in helping to prepare the accusatory instrument against plaintiff Hickenbottom, signing such instrument, and attempting to influence how the charge would be addressed in Court. Whether the other City officials, or the City itself, can avoid liability for his actions by issuing a "disavowal" subsequently is doubtful. Either way, Montagnino is liable in his individual capacity for his actions in filing and pursuing the false charge against plaintiff Hickenbottom.

dismissed by Saratoga Springs City Court.

447.    The disposition of this charge was a termination in favor of plaintiff Hickenbottom.

448.    Defendant Montagnino lacked probable cause to initiate the disorderly conduct charge against plaintiff Hickenbottom.

449.    Defendant Montagnino initiated the disorderly conduct charge against plaintiff Hickenbottom based on malice towards her.

450.    Defendant Montagnino lacked any basis to believe his prosecution of plaintiff Hickenbottom on the disorderly conduct charge would be successful.

451.    The actions of defendant Montagnino described above violated plaintiff Hickenbottom's rights as protected by the First Amendment to freedom of expression, freedom of assembly, freedom of association and freedom to petition the government for redress of grievances, her rights as protected by the 4th Amendment to be free from malicious prosecutions by government officials, and her rights as protected by the Fourteenth Amendment to equal protection of the law.

   iii.    *April 2023: At the instigation of defendant Montagnino, plaintiff Figuereo is falsely charged with obstructing governmental administration 2nd and disorderly conduct for allegedly disturbing a City Council meeting.*

452.    Two months later, in April 2023, defendant Montagnino again played a central role in making sure false charges were filed and pursued against a Saratoga BLM activist and leader for allegedly disrupting a City Council meeting.

453.    In this instance, it was plaintiff Figuereo who was charged, falsely, with disorderly conduct and obstructing governmental administration 2nd degree for alleged disruption of a City Council meeting on April 4, 2023.

454.    On April 6, 2023, defendant Montagnino signed a sworn statement, which he provided to

the Saratoga Springs Police Department (which he had oversight over in his role as Commissioner of Public Safety), falsely claiming that plaintiff Figuereo had "physically" taken the microphone (used for public comment) away from another person who was speaking, preventing the other person from addressing the City Council.

455.    Defendant Montagnino's intent in signing the sworn statement against plaintiff Figuereo was that his statement would provide the basis for the arrest and prosecution of Figuereo.

456.    Defendant Montagnino's false sworn statement did, in fact, provide the basis for two accusatory instruments.

457.    Defendant Montagnino knew the statement was false when he made it.

458.    Defendant Barrett  prepared, signed, and filed an accusatory instrument, based on defendant Montagnino's sworn statement, falsely charging plaintiff Figuereo with disorderly conduct.

459.    Defendant Davenport prepared, signed and filed an accusatory instrument, based on defendant Montagnino's sworn statement, falsely charging plaintiff Figuereo with the crime of obstructing governmental administration 2nd.

460.    As a result of the actions of defendants Montagnino, Barrett, and Davenport's,  plaintiff Figuereo was required to turn himself in to the police at the Saratoga Springs Police Department to be processed and booked on these charges, one of which is a class A misdemeanor.

461.    On April 24, 2023, plaintiff Figuereo did voluntarily turn himself in to the police.

462.    He was with his lawyer.

463.    Plaintiff Figuereo was immediately placed in handcuffs and led into the back of the police station, where he was booked.

464.    His lawyer was not permitted to accompany him.

465.    The disorderly conduct accusatory instrument falsely alleges that plaintiff Figuereo, with

the "intent to cause public inconvenience, annoyance or alarm", stood up and interrupted the

public comment period, shouted over another person, took the microphone from the other person,

and continued to shout and stepped up to the council table and refused to stop, causing the

meeting to stop and "forcing the council to enter an executive session."

466.    The obstructing accusatory instrument falsely alleges that plaintiff Figuereo "intentionally

and knowingly" prevented the administration of City Council meeting by taking the microphone

away from another member of the public.

467.    The circumstances of these charges so clearly implicated and violated plaintiff Figuereo's

First Amendment protected rights that the Acting Saratoga Springs City Court Judge assigned to

the case stated in his Decision on plaintiff Figuereo's pretrial motions, that:

> "Charges were levied against the Defendant **because what he said
> during this [public comment] time was unacceptable to certain
> Council members.**"

Decision & Order on Motions, Judge DeStefano, Saratoga Springs City Court, Docket

No. 01110-23, dated September 8, 2023, p. 3(Emphasis added.)

468.    Judge DeStefano subsequently dismissed the obstructing governmental administration 2nd

charge against plaintiff Figuereo.[16]

469.    The dismissal of the obstructing charge was a termination in favor of plaintiff Figuereo.

470.    The obstructing charge was filed and prosecuted by defendants Montagnino and

Davenport in violation of plaintiff Figuereo's First Amendment protected rights, without

probable cause to believe an offense had been committed, based on malice towards plaintiff

---

[16] Decision & Order, Judge DeStefano, Saratoga Springs City Court, Docket No, 01110-23, dated November 19, 2023.

Figuereo, and without any reasonable expectation that the prosecution would be successful.

471.    Plaintiff Figuero was taken into custody, handcuffed, and required to return to court multiple times in regard to the now dismissed obstructing of governmental administration charge.

472.    Plaintiff Figuereo was aware of and conscious of his confinement and did not consent to it.

473.    There was no probable cause for the obstructing governmental administration 2d charge.

474.    The obstructing governmental administration 2d charge was initiated by defendant Montagnino based on malice towards plaintiff Figuereo and with no basis to belief the prosecution of the charge would be successful.[17]

475.    Since that time, the charges against Plaintiff Figuereo went to trial in January 2025.

476.    That trial resulted in an acquittal.

477.    That termination is a favorable termination.

478.    The actions of defendants Montagnino, Barrett, and Davenport described above violated plaintiff Figuereo's rights as protected by the First Amendment to freedom of expression, freedom of assembly, freedom of association and freedom to petition the government for redress of grievances, his rights as protected by the 4th Amendment to be free from malicious prosecutions by government officials, and his rights as protected by the Fourteenth Amendment to equal protection of the law.

479.    Defendants Barrett and Davenport, and any other officer or official involved in preparing,

---

[17] For reasons Plaintiffs find inexplicable, given the Judge's determination that, "Charges were levied against the Defendant because what he said during this [public comment] time was unacceptable to certain Council members" — that is, that plaintiff Figuereo was charged due to his First Amendment protected actions — and despite the fact that the City Court dismissed the obstructing charge, the Court has declined to dismiss the disorderly conduct charge arising at the same time and based on the same facts. That charge remains pending, but Plaintiffs intend to amend to add relevant claims upon dismissal of those charges and the concomitant accrual of those claims.

filing, or pursuing the April 2023 charges against plaintiff Figuereo each had an individual legal obligation and duty to uphold and protect the constitutional rights of plaintiff Figuereo, Saratoga BLM, plaintiffs, the other individual plaintiffs, and other racial justice and police accountability activists in Saratoga Springs.

480.    Defendants Barrett and Davenport, and any other officer or official involved in preparing, filing, or pursuing the April 2023 charges against plaintiff Figuereo each had an individual legal obligation and duty to intervene to prevent the violation of constitutionally protected rights of plaintiff Figuereo, Saratoga BLM, plaintiffs, the other individual plaintiffs, and other racial justice and police accountability activists in Saratoga Springs.

481.    Defendants Barrett and Davenport, and any other officer or official involved in preparing, filing, or pursuing the April 2023 charges against plaintiff Figuereo each had an individual legal obligation and duty to refuse to carry out or implement unconstitutional orders or directions from supervisory officers or officials.

482.    Defendants Barrett and Davenport, and any other officer or official involved in preparing, filing, or pursuing the April 2023 charges against plaintiff Figuereo utterly failed to fulfill their legal obligations and duties as set forth above.

K.    *May 2024: defendant City continues retaliation against Saratoga BLM and plaintiff Figuereo by taking the unprecedented step of commencing charges against plaintiff Figuereo for allegedly violating an unconstitutional City ordinance purporting to require seeking advance permission from the City to engage in First Amendment protected activity.*

483.    The First Amendment generally protects the right of people to engage in First Amendment protected activities without giving advanced notice or seeking advanced permission from a municipality or other governmental entity.

484.    Saratoga Springs City Ordinance Chapter 98 (the "Demonstration Permitting Scheme")

is a prior restraint on speech and expressive conduct protected by the First Amendment to the

United States Constitution and the attendant provisions of the New York State Constitution

that affords defendant City and its officials unbridled discretion to grant or deny permission to

engage in a "demonstration."

485.    The definition of "demonstration" contained in the Demonstration Permitting Scheme

is vague and overbroad.

486.    The Demonstration Permitting Scheme contains no *mens rea* element and allows, on its

face, defendant City and the officials charged with enforcing it to arrest, and prosecute, any

perceived participant(s) in a "demonstration," regardless of their intent and state of mind.

487.    On its face, the Demonstration Permitting Scheme requires people who might want to

organize or participate in a demonstration to comply with dozens of burdensome and chilling

requirements, prohibitions, and restrictions on activities on the part of perceived organizers

and participants, subjecting perceived organizers to liability – and even criminal penalties – for

the potential conduct of perceived "demonstration" organizers and participants alike.

488.    For example, the Demonstration Permitting Scheme prohibits 22 enumerated activities,

including, but not limited to, the possession of "banners"; wearing face or gas masks; carrying

"noxious material" and certain signs; carrying "obscene material"; "blocking" the sidewalk or

interfering with traffic; and "breaking off" from "the main group to stage smaller

demonstrations."

489.    By way of additional example, the Demonstration Permitting Scheme regulates several

other enumerated activities, including, but not limited to, the use of "sound-producing or

amplifying devices," which are prohibited if the sound can be heard at a distance of more than

250 feet from the perimeter of the demonstration, and the use of which must always comply with the Noise Ordinance of the City of Saratoga Springs.

490.     Saratoga Springs City Ordinance Chapter 151 (the "Parade Permitting Scheme") is a prior restraint on speech and expressive conduct protected by the First Amendment to the United States Constitution and the attendant provisions of the New York State Constitution that affords defendant City and its officials unbridled discretion to grant or deny permission to engage in a "parade."

491.     The definition of "parade" contained in the Parade Permitting Scheme is vague and overbroad.

492.     The Parade Permitting Scheme contains no *mens rea* element and allows, on its face, defendant City and the officials charged with enforcing it to arrest, and prosecute, any perceived participant(s) in a "demonstration," regardless of their intent and state of mind.

493.     On its face, the Parade Permitting Scheme requires people who might want to organize or participate in a demonstration to comply with dozens of burdensome and chilling requirements, prohibitions, and restrictions on activities on the part of perceived organizers and participants, subjecting perceived organizers to liability – and even criminal penalties – for the potential conduct of "parade" participants.

494.     For example, the Parade Permitting Scheme prohibits 18 enumerated activities, including, but not limited to, the possession of "banners"; wearing face or gas masks; carrying "noxious material" and certain signs; carrying "obscene material"; "blocking" the sidewalk or interfering with traffic; and "breaking off" from "the main group to stage smaller demonstrations."

495.     By way of additional example, the Parade Permitting Scheme regulates several other

enumerated activities, including, but not limited to, the use of "sound-producing or amplifying devices," which are prohibited if the sound can be heard at a distance of more than 250 feet from the perimeter of the event, and the use of which must always comply with the Noise Ordinance of the City of Saratoga Springs.

496.    On May 1, 2024, plaintiff Saratoga BLM – along with numerous other organizations – planned and held a rally in Saratoga Springs to show solidarity with the Palestinian people of Gaza, to call for a cease-fire in the war being conducted by Israel against the people of Gaza, and to express connections between the struggles of the Palestinian people for justice and the struggles of Black people in the U.S. for justice.

497.    As has been the case for every other rally or event in which Saratoga BLM, its members, or leaders have participated in since 2020, of which there have been dozens, this rally was peaceful.

498.    As has been the case for every other rally which Saratoga BLM has organized or helped to organize in Saratoga Springs since 2020, of which there have been dozens, neither Saratoga BLM nor any other organization provided advanced notice to defendant City of the May 1st rally, nor did anyone seek advanced permission from defendant City to engage in this First Amendment protected activity.

499.    On information and belief, in addition to Saratoga BLM rallies, numerous other organizations have held rallies or marches in Saratoga Springs, both before and since 2020, without providing advanced notice to defendant City or seeking advanced permission from defendant City to engage in First Amendment protected activities.

500.    On information and belief, defendant City has never – prior to May 2024 – commenced charges against any individual or organization for allegedly organizing or holding a rally or

demonstration or march in Saratoga Springs without having provided advanced notice to the City or seeking advanced permission from the City.

501.    Defendant Montagnino also, as detailed above in relation to his August 7, 2023 Proud Boys memorandum, fully understood that "*certain* groups are *routinely* allowed to demonstrate and march in Saratoga Springs without having applied for, qualified for, or been granted parade permits" (emphasis added).

502.    Defendant Montagnino shared that information with other Defendants, and all knew that fact.

503.    Yet, Defendants deliberately and knowingly elected to enforce the Demonstration/Parade Permitting Schemes in a facially discriminatory and selective manner against Plaintiffs.

504.    Indeed, on August 5, 2023, the "Proud Boys" — a far-right group — violated the Demonstration/Parade Permitting Scheme.

505.    In the wake of that event, many sought to have Defendants enforce the Scheme.

506.    Defendant Montagnino prepared a memorandum, dated August 7 2023, responding to a request by the Mayor for analysis.

507.    Defendant Montagnino stated the following:

4) Any departmental recommendations to prevent a repeat of this incident in the future.

I recommend that the organizers of and participants in the August 5, 2023 be charged with violations of the City Charter as outlined above. This will require the Commissioner of Accounts to sign a supporting deposition, as only a person with direct knowledge of the lack of a parade permit application would be competent under the Criminal Procedure Law to sign a facially sufficient accusatory instrument. I pledge the full cooperation of the Department of Public Safety in such a prosecution.

Please note, however, that a prosecution for this particular incident may well be met with a claim of selective prosecution, inasmuch as certain groups are routinely allowed to demonstrate and march in Saratoga Springs without having applied for, qualified for, or been granted parade permits. That said, the proper course of action should include a firm commitment on the part of the City to adhere equitably to the requirements of City Code Title 151 as to any and all groups who wish to demonstrate peacefully in our City.

Respectfully submitted,

*Jim Montagnino*

Jim Montagnino

(highlighting added).

508.    That is, Defendant Montagnino expressed concern that the history of not enforcing the Demonstration/Parade Permitting Schemes would lead (rightly) to a charge of selective enforcement.

509.    His recommendation was to consistently charge everyone.

510.    However, Defendants did not charge the Proud Boys with obvious and facial violation of the Demonstration/Parade Permitting Schemes.

511.    Defendant Montagnino also, as detailed above in relation to his August 7, 2023 Proud Boys memorandum, fully understood that "*certain* groups are *routinely* allowed to demonstrate and march in Saratoga Springs without having applied for, qualified for, or been granted

parade permits" (emphasis added).

512.    Defendant Montagnino shared that information with other Defendants, and all knew that fact.

513.    Yet, Defendants deliberately and knowingly elected to enforce the Demonstration/Parade Permitting Schemes in a facially discriminatory and selective manner against Plaintiffs.

514.    Despite that history and actual knowledge any enforcement would be facially selective enforcement, and the fact that no other person had ever been charged under the Demonstration Permitting Scheme and the Parade Permitting Scheme, both in May 2024 and since, defendant City has enforced, and sought to enforce, the Demonstration Permitting Scheme and the Parade Permitting Scheme against Plaintiffs.

515.    On or about May 20, 2024, defendant City, acting through defendant Streim, prepared two accusatory instruments relating to the May 1st event, charging plaintiff Figuereo, respectively, with allegedly violating Saratoga Springs City Ordinance §98-1(B) (purportedly mandating that no one can "hold or cause to be held any demonstration without first filing a declaration . . ." with the City in advance) and Saratoga Springs City Ordinance §151-5(A) (which says applications for "parades" should be filed with the Commissioner of Accounts.)

516.    On or about May 21, 2024, defendant City, acting through defendant Streim, prepared and caused to be served on plaintiff Figuereo appearance tickets directing him to appear in City Court in regard to the two above-referenced charges.

517.    Pursuant to the City of Saratoga Springs City Code, a violation of either of the above-referenced charges is punishable by up to 15 days in jail, a fine of up to $250.00, or both.

518.    Although many other organizations and individuals were involved in planning and

organizing the May 1st protest, no other individual or organization has been charged with any offense by the City or any other entity relating to the May 1st protest.

519.    Some of the other organizations involved in planning and organizing the May 1st event have memberships mostly made up of white people, as compared with Saratoga BLM, whose membership consists primarily of Black people and other people of color.

520.    In response to this unprecedented targeting of Saratoga BLM and plaintiff Figuereo for prosecution, which appears to be racially targeted as well as a continuation of the particular unconstitutional retaliation against Saratoga BLM, Saratoga BLM and numerous other organizations held a press conference and a march on May 25, 2024 to protest this latest action by the City and City officials to unjustifiably target, penalize, stigmatize, and harm Saratoga BLM and plaintiff Figuereo.

521.    Again, as has been the case for every other rally or event in which Saratoga BLM, its members, or leaders have participated in since 2020, of which there have been dozens, the May 25th event was peaceful.

522.    And, again, as has been the case for every other rally in which Saratoga BLM has organized or helped to organize in Saratoga Springs since 2020, of which there have been dozens, neither Saratoga BLM nor any other organization provided advanced notice to defendant City of the May 25th event, nor did anyone seek advanced permission from defendant City to engage in this First Amendment protected activity.

523.    On or about May 29, 2024, the City, acting through defendant Reside, caused an accusatory instrument and an appearance ticket to be prepared charging plaintiff Figuereo with allegedly violating Saratoga Springs City Ordinance 98-1(B) relating to the May 25, 2024 march.

524.    Again, as was the case regarding the May 1st event, although many other organizations

and individuals were involved in planning and organizing the May 25th event, no other

individual or organization has been charged with any offense by the City or any other entity

relating to the May 25th event.

525.    And, as was the case regarding the May 1st event, some of the other organizations

involved in planning and organizing the May 1st event have memberships mostly made up of

white people, as compared with Saratoga BLM, whose membership consists primarily of Black

people and other people of color.

526.    Plaintiff was required to appear in Saratoga Springs City Court to be arraigned in

on the two sets of charges issued by the City and other defendants relating to allegedly violating

portions of the City Code.

527.    These matters remain pending as of the date of this Complaint.

528.    On information and belief, the commencement and prosecution of these charges against

plaintiff Figuereo was the direct consequence of decisions made by defendants City, Mayor

Safford, Commissioner of Public Safety Coll, and Police Chief McIntosh.

529.    The decision by defendants City, Mayor Safford, Commissioner of Public Safety Coll,

and Police Chief McIntosh, which was carried out by defendants Streim and Reside, to charge

plaintiff Figuereo with these City Code charges is intended to intimidate, isolate, stigmatize,

penalize, and retaliate against Saratoga BLM, plaintiff Figuereo, and the other plaintiff leaders of

Saratoga BLM, for their exercise of First Amendment protected rights based on the content of

their speech and expression, which the City and the defendant City officials do not like.

530.    The decision by defendants City, Mayor Safford, Commissioner of Public Safety Coll,

and Police Chief McIntosh, which was carried out by defendants Streim and Reside, to charge

plaintiff Figuereo with these City Code charges is further intended to intimidate and scare other

individuals and organizations and to "chill" the exercise of first Amendment rights by others based on the content of their speech and expression, which the City and the defendant City officials do not like.

531.    The decision by defendants City, Mayor Safford, Commissioner of Public Safety Coll, and Police Chief McIntosh, which was carried out by defendants Streim and Reside, to charge plaintiff Figuereo with these City Code charges constitutes official City policy to unconstitutionally interfere with and penalize Saratoga BLM, plaintiff Figuereo, and the other plaintiffs for their exercise of First Amendment protected rights based on the content of their speech and expression.

532.    The NYS Office of the Attorney General ("OAG") issued a letter, dated June 13, 2024, to defendant City's attorneys, expressing OAG's concern that "the City of Saratoga Springs has resumed its unconstitutional retaliation against protesters" in light of issuing tickets to an alleged protest organizer alleging "violations of Saratoga Springs ordinances that purportedly require individuals to give notice to the City before engaging in First Amendment-protected activity." A copy of the OAG June 13, 2024 letter is attached as Exhibit B and is incorporated herein.

533.    Additionally, defendants have continued to enforce and to seek to enforce the Demonstration Permitting Scheme and the Parade Permitting Scheme against plaintiffs, including plaintiffs Figuero and Saratoga BLM – but not against others whom defendants perceive to be organizers of "demonstrations" and "parades."

534.    For example, on March 24, 2025, defendant Coll wrote counsel for Mr. Figuerero and Saratoga BLM, stating, in pertinent part: "I am informed that your client Mr. Figuereo, the leader of Saratoga BLM, may be part of organizing a demonstration to take place in the City of Saratoga Springs on March 27, 2025. I am respectfully requesting [counsel] to ask that Mr.

Figuereo and/or other organizers that you are aware of, to complete and file

a Demonstration Declaration with the City."

    L.    *None of the individual defendants have been subjected to any discipline by defendant City for their improper and unconstitutional actions as described herein has caused significant harm, establishing municipal liability.*

535.    Although each of the individually named defendants has engaged in conduct and taken

actions which have been improper and have violated the constitutionally protected rights of the

plaintiffs, defendant City has taken no steps to hold any of the individually named defendants

accountable for their actions.

536.    The failure or refusal on the part of defendant City to hold their officials and employees

accountable for such misconduct has allowed such misconduct to occur and continue and has, in

effect, given the City's stamp of approval for all such acts of misconduct, causing harm to

plaintiffs and others.

537.    The failure or refusal on the part of defendant City to hold their officials and employees

accountable for such misconduct has encouraged and emboldened the officials and employees to

continue to engage in such misconduct, causing harm to plaintiffs and others.

538.    The failure or refusal on the part of defendant City to hold their officials and employees

accountable for misconduct is a manifestation of official unconstitutional municipal policy,

practice, and/or custom of defendant City to have city employees and officials violate

constitutional rights.

    M.    *City's failure to properly train and supervise employees regarding First Amendment rights has resulted in significant harm and further establishes municipal liability.*

539.    Defendant City has utterly failed to provide proper training and supervision to its

employees, particularly within the police department regarding how to respond in a constitutional manner to protests and other First Amendment protected activities.

540.    The failure or refusal on the part of defendant City to  provide proper training and supervision to its employees, particularly within the police department regarding how to respond in a constitutional manner to protests and other First Amendment protected activities has allowed violations of constitutional rights to occur and continue and has, in effect, given the City's stamp of approval for all such acts of misconduct, causing harm to plaintiffs and others.

541.    The failure or refusal on the part of defendant City to provide proper training and supervision to its employees, particularly within the police department regarding how to respond in a constitutional manner to protests and other First Amendment protected activities has encouraged and emboldened the officials and employees to continue to violate constitutional rights, causing harm to plaintiffs and others.

542.    The failure or refusal on the part of defendant City provide proper training and supervision to its employees, particularly within the police department regarding how to respond in a constitutional manner to protests and other First Amendment protected activities is a manifestation of official unconstitutional municipal policy, practice, and/or custom of defendant City to have city employees and officials violate constitutional rights.

>   N.      _Punitive damages are appropriate in this case due to the malicious, willful, and wanton actions of the individual defendants._

543.    As described above, the individual defendants have acted towards plaintiffs in a manner that has been malicious, wanton, and willful and with a complete disregard for plaintiffs' constitutionally protected rights, justifying an award of punitive damages as against each individual defendant in favor of each individually named plaintiff.

544.    By way of example, Defendant Dalton's conduct was extraordinary.

545.    Defendant Dalton:

•    Admitted "it was improper for her to involve herself in specific police investigations, and she had no expertise or training on probable cause to arrest" (OAG Report at p. 20);

•    Nonetheless, "intervened at least twice in May 2021 to order protester arrests even after police officers had determined there was no cause for arrest" (*id.*);

•    Repeatedly expressed violent and unlawful urges towards Plaintiffs, saying among other things, *in writing she knew would be reviewed*:

> • "Arrest all those motherfuckers"[18] (*id.*);

> • "Please please please pretty please arrest someone" (*id.*);

> • "Repeatedly described her desire to physically assault protesters in texts", including (*id.*):

> • Saying she wanted to "find [BLM activist] Molly Dunn and kick her in the fucking mouth repeatedly" (*id.* at 4);

> • Saying she wanted to "punch" Plaintiff Hickenbottom "in the mouth" (*id.*);

> • Saying she wanted to "punch" a candidate for Commissioner of Public Safety taking similar views to Plaintiffs "in the face" (*id.* at 4-5);

> • "I told him to arrest the fucks" (*id.* at ___)

•    "[L]iterally demand[ed] [Crooks'] resignation" if he did not follow her unlawful orders "exactly" (*id.* at 20-21);

•    Noted the "the PBA police union was 'very happy to hear that I instruct d the Chief to arrest people'" (*id.* at 4);

•    After arrests, said "Rock on . I still have bloodlust, but great job" (*id.* at 11).

---

[18] The demand to arrest "all those motherfuckers" is particularly constitutionally suspect, given that any use of the collective conduct of a group as probable cause for individuals is well-settled to be unconstitutional. *See, e.g., Papineau v. Parmley*, 465 F.3d 46, 59 (2d Cir. 2006) (holding that officers could not have thought that indiscriminate arrests were lawful when "a few individuals within [a protesting] crowd had violated the law at an earlier time and then desisted"); *see also, Fogarty v. Gallegos*, 523 F.3d 1147, 1158 (10th Cir. 2008) ("The Fourth Amendment plainly requires probable cause to arrest Fogarty as an individual, not as a member of a large basket containing a few bad eggs."). This seems to, perhaps, be part and parcel of Defendant Dalton's admitted lack of knowledge or training about probable cause.

546.    Defendant Dalton also lied about these facts during the OAG's investigation, falsely

claiming — despite her extensive writings — "claimed she had no animus against BLM

protesters and repeatedly denied ever having 'bloodlust' to arrest them," and even "repeatedly

denied giving orders to arrest protesters even when confronted with evidence that she had."

OAG Report at p. 20.

547.    Again, by way of example, Defendant Dalton has thoroughly demonstrated that there is

a need for punitive damages to deter future unlawful conduct and to tamp down and deter her

admitted "bloodlust" and willingness to lie about things she has put in writing.

      O.    *Expenditures and injury in fact to Saratoga BLM*

548.    Saratoga BLM has, because of Defendants' actions, had to expend funding, resources,

time, and the like that it would not have otherwise.

549.    Those expenditures by Saratoga BLM include, but are not limited to, the following:

> •    At least $5,000.00 for representation related representing Plaintiff Figuereo[19] in relation to the 2021 charges, 2023 charges, and 2024 charges, including allegations of violating the unlawful parade ordinances;

> •    $1,500.00 for representing Plaintiff Hickenbottom in relation to the charges detailed above;

550.    Saratoga BLM has also had to cancel events it would have otherwise held, and

reallocated organizing efforts and resources to address Defendants conduct.

551.    That includes, but is not limited to:

> •    Saratoga BLM has canceled events scheduled for the same day or close in time to court appearances described above;

> •    Saratoga BLM has reallocated personnel and organizing efforts to arrange for support at court appearances, as well as to hold press conferences and address media generated by Defendants' misuse of the legal system;

---

[19] To be clear, Saratoga BLM made these expenditures.

552.    Saratoga BLM also has members who have ceased attending events because of Defendants' actions.  For example, one couple with a young child used to regularly attend events, until the July 30, 2020 rally where Defendants assaulted protesters with pepper balls, and has — because of Defendants' conduct at that rally and thereafter — ceased coming to any events.

## FIRST CLAIM FOR RELIEF

**Violation of First Amendment Rights and Fifth Amendment Overbreadth/Vagueness/Lack of Standards**

**All Plaintiffs against All Defendants**

*Pursuant to 42 U.S.C. §1983 (and Monell v. Dep't. of Social Services, 436 U.S. 658 (1978) as to Defendant City) for Defendants' Violations of Plaintiffs' Rights Under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution*

553.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

554.    Defendants, individually and jointly, intentionally engaged in multiple actions starting on July 14, 2021 and continuing to the present which had the intentional goal and purpose of interfering with each plaintiff's exercise of rights protected by the First, Fifth, and Fourteenth Amendments to the U.S. Constitution, by retaliating against plaintiffs, individually and collectively, for the exercise of their rights, by arresting individually named plaintiffs without legal cause, by subjecting plaintiffs to unlawful surveillance, by subjecting plaintiffs to unlawful seizures, by stigmatizing and humiliating plaintiffs, all because the defendants did not like the content of plaintiffs' message.

555.    Defendants continued their retaliatory violations of plaintiffs' First Amendment and

Fourteenth Amendment protected rights even after they had been informed by the NYS Attorney General's office that defendants' actions constituted violations of plaintiffs' constitutionally protected rights.

556.    Defendants violated Plaintiffs' rights of freedom of speech, freedom of expression, freedom of assembly, freedom of association, and freedom to petition the government for redress of grievances.

557.    As concluded by the OAG Report, "Saratoga Springs had an official policy of retaliating against BLM protesters based on their message."  OAG Report at p. 19.

558.    As also concluded by the OAG Report, Defendant Dalton personally, "repeatedly ordered the SSPD to arrest protesters based on their message" and without probable cause. OAG Report at p. 20.

559.    As also concluded by the OAG Report, Defendant Kelly personally "sought arrests of protesters and filed complaints against protesters based on their message."  OAG Report at p. 21.

560.    As also concluded by the OAG Report, Defendant Crooks, "directed the arrests of protesters based on their message." *Id.*

561.    Likewise, Defendants falsified a family investigation that was "pretextual and motivated by Saratoga Springs's official policy of retaliation for protected speech."  OAG Report at p. 22.

562.    Defendants sought by their actions to intimidate plaintiffs from continuing to organize, speak, assemble, associate with each other and with other activists, and continuing to make their grievances known to the leaders of the City of Saratoga Springs.

563.    Defendants also sought by their actions to threaten and "chill" the exercise of constitutionally protected rights by other racial justice activists by defendants' public acts of

intimidation of the plaintiffs in this case. This violated plaintiffs' rights by interfering with their protected right of association with others.

564.    Defendants' Demonstration/Parade Permitting Schemes were also constitutionally overbroad, vague, and permit effectively unbridled discretion without giving notice of what is illegal (*see, e.g., City of Chicago v. Morales*, 527 U.S. 41 (1999)), such that they are unconstitutional.

565.    The facts pleaded in this Complaint describe the policies, practices, and customs of defendant City to violate the constitutionally protected rights of plaintiffs to freedom of speech, freedom of expression, freedom of assembly, freedom of association, and freedom to petition the government for redress of grievances and demonstrate defendant City's deliberate indifference to plaintiff's constitutionally protected First, Fifth, and Fourteenth Amendment rights.

566.    Additionally, defendant City's Demonstration Permitting Scheme, and Parade Permitting Scheme, violate the First, Fifth, and Fourteenth Amendment to the United States Constitution, and the attendant provisions of the New York State Constitution, both facially, and as applied.

567.    As a result of defendants' acts and omissions, defendants deprived each plaintiff of their federally protected rights, caused each individually named plaintiff physical injury (except for plaintiffs Brown and Filien), pain, suffering, psychological and/or emotional injury, humiliation, damage to reputation, caused plaintiffs to expend costs and expenses, and/or otherwise damaged and injured plaintiffs.

## SECOND CLAIM FOR RELIEF

### Violation of Fourth Amendment Rights Individually

### Named Plaintiffs Against All Defendants

### *Pursuant to 42 U.S.C. §1983  (and Monell v. Dep't. of Social Services, 436 U.S. 658 (1978)*

*as to Defendant City) for Defendants' Violations of Plaintiffs' Rights*
*to be Free From Unlawful Seizures, False and Unlawful Arrests, and Malicious Prosecutions*
*Under the Fourth and Fourteenth Amendments to the U.S. Constitution*

568.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

569.    Defendants, individually and jointly, intentionally engaged in multiple actions starting on July 14, 2021 and continuing to the present which violated the individually named plaintiffs' rights protected by the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unlawful or unreasonable seizures, to be free from the use of unreasonable or excessive force, and to be free from false, malicious, and unlawful charges, arrests, and prosecutions.

570.    Plaintiffs Dunn, Elliott, Figuereo, Hickenbottom, Samira Sangare, and TJ Sangare each were subjected to unlawful and unconstitutional seizures, arrests, and malicious prosecutions by defendants in violation of their Fourth Amendment rights.

571.    Plaintiffs Brown and Filien were subjected to an unlawful and unconstitutional seizure by defendants in violation of their Fourth Amendment rights.

572.    Each of the individually named plaintiffs were aware of and conscious of their confinement and did not consent to the confinement.

573.    As concluded in the OAG Report, "[b]y Dalton's own admission, it was improper for her to involve herself in specific police investigations, and she had no expertise or training on probable cause to arrest."  OAG Report, at p. 20.

574.    Yet, as concluded in the OAG Report and set out above, Dalton personally ordered the arrests described herein.  *Id.* at 9-10.

575.    In fact, Dalton expressed it was her decision and that she would "take the heat" for the decision, and that she "d[id]n't care" whether there was probable cause.

*Id.*

576.    As further concluded in the OAG Report, "SSPD pursued unsupportable charges based on false evidence." OAG Report, at p. 22.

577.    The facts pleaded in this Complaint describe the policies, practices, and customs of defendant City to violate the rights of plaintiffs protected by the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unlawful or unreasonable seizures, to be free from the use of unreasonable or excessive force, and to be free from false, malicious, and unlawful charges, arrests, and prosecutions and demonstrate defendant City's deliberate indifference to plaintiff's constitutionally protected Fourth and Fourteenth Amendment rights.

578.    As a result of defendants' acts and omissions, defendants deprived each individually named plaintiff of their federally protected rights, caused each such plaintiff bodily injury (except for plaintiffs Brown and Filien), pain, suffering, psychological and/or emotional injury, humiliation, damage to reputation, caused plaintiffs to expend costs and expenses, and/or otherwise damaged and injured plaintiffs.

## THIRD CLAIM FOR RELIEF

**Violation of Fourteenth Amendment Right to Equal Protection**

**All Plaintiffs Against All Defendants**

*Pursuant to 42 U.S.C. §1983 (and Monell v. Dep't. of Social Services, 436 U.S. 658 (1978) as to Defendant City) for Defendants' Violations of Plaintiffs' Right to Equal Protection of the Law Under the Fourteenth Amendments to the U.S. Constitution*

579.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

580.    Defendants, individually and jointly, intentionally engaged in multiple actions starting on July 14, 2021 and continuing to the present which had the intentional goal and purpose of

discriminating against plaintiffs based on race and depriving plaintiffs of the equal protection of

the law as guaranteed Fourteenth Amendments to the U.S. Constitution, by retaliating against

plaintiffs, individually and collectively, for the exercise of their rights, by arresting individually

named plaintiffs without legal cause, by subjecting plaintiffs to unlawful surveillance, by

subjecting plaintiffs to unlawful seizures, by stigmatizing and humiliating plaintiffs, all because

of defendants' unlawful prejudice and bias against plaintiffs based on race.

581.    Defendants sought by their actions to intimidate, belittle, demean, stigmatize, and isolate

plaintiffs based on race.

582.    Defendants sought by their actions to intimidate, belittle, demean, stigmatize, and isolate

plaintiffs based on plaintiffs' political beliefs.

583.    As set out in more depth above, Defendants treated other, similarly situated people

differently than plaintiffs.

584.    As concluded by the OAG Report, Defendant Dalton, the final relevant policymaker,

"repeatedly ordered the SSPD to arrest protesters *based on their message*."  OAG Report, at p.

20 (emphasis added).

585.    Defendants also sought by their actions to threaten and "chill" the exercise of

constitutionally protected rights by other racial justice activists by defendants' public acts of

intimidation and racial discrimination towards the plaintiffs in this case.

586.    The facts pleaded in this Complaint describe the policies, practices, and customs of

defendant City to violate the rights of plaintiffs protected by the Fourteenth Amendment to the

U.S. Constitution to equal protection of the law and demonstrate defendant City's deliberate

indifference to plaintiff's constitutionally protected Fourteenth Amendment rights.

408.    Additionally, defendant City's Demonstration Permitting Scheme, and Parade Permitting

Scheme, violate the First, Fifth, and Fourteenth Amendment to the United States Constitution,

and the attendant provisions of the New York State Constitution, both facially, and as applied,

including because defendants have selectively enforced the Demonstration Permitting Scheme

and the Parade Permitting Scheme against plaintiffs, but not against similarly situated others, in

retaliation for plaintiffs' protected speech and conduct.

409.    As a result of defendants' acts and omissions, defendants deprived each plaintiff of their

federally protected rights, caused each individually named plaintiff physical injury (except for

plaintiffs Brown and Filien) , pain, suffering, psychological and/or emotional injury, humiliation,

damage to reputation, caused plaintiffs to expend costs and expenses, and/or otherwise damaged

and injured plaintiffs.

## FOURTH CLAIM FOR RELIEF

### Conspiracy to Deprive Plaintiffs of Equal Protection of the Laws

### All Plaintiffs Against All Defendants

#### Pursuant to 42 U.S.C. §1985(3) for Defendants' Conspiring to Deprive Plaintiffs of Equal Protection of the Laws

410.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following

paragraphs as if fully set forth herein.

411.    Defendants, individually and jointly, conspired for the purpose of depriving, either

directly or indirectly, each and every plaintiff of the equal protection of the laws or of the equal

privileges and immunities under the law based on race, advocacy for racial justice, and/or

engagement in First Amendment protected activities seeking racial justice starting on July 14,

2021 and continuing to the present.

412.   Each defendant engaged in at least one overt act in furtherance of this conspiracy.

413.   Each plaintiff was injured as a direct result of the conspiracy by being deprived of rights and privileges of a citizen of the United States, specifically their rights and privileges as protected by the First Amendment, the Fourth Amendment, and the Fourteenth Amendments.

414.   Each individually named plaintiff was further injured as a direct result of the conspiracy by being arrested without legal cause, by being subjected to unlawful surveillance, by being subjected unlawful seizures, and/or by being subjected to unlawful and malicious arrests and prosecutions.

415.   As a result of defendants' acts and omissions, defendants deprived each plaintiff of their federally protected rights, caused each individually named plaintiff physical injury (except for plaintiffs Brown and Filien) , pain, suffering, psychological and/or emotional injury, humiliation, damage to reputation, caused plaintiffs to expend costs and expenses, and/or otherwise damaged and injured plaintiffs.

## FIFTH CLAIM FOR RELIEF

**Interference With Family Relationships – Plaintiffs Elliott and Figuereo Against All Defendants**

***Pursuant to 42 U.S.C. §1983 (and <u>Monell v. Dep't. of Social Services</u>, 436 U.S. 658 (1978) as to Defendant City) for Defendants' Interference With Plaintiffs' Family relationships By filing or causing to be filed False Child Protective Report(s)***

416.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

417.   Defendants, individually and jointly, intentionally engaged in multiple actions starting on July 14, 2021specifically intended to interfere with plaintiffs Elliott and Figuereo's family relationships with each other and with their children, by falsely filing or causing to be filed

knowingly false and baseless complaint(s) against plaintiffs Elliott and/or Figuereo with the New York State child protective services agency triggering an investigation into plaintiffs Elliott and/or Figuereo and their young children.

418.    Defendants engaged in these actions because of their unfounded hostility towards plaintiffs Elliott and Figuereo due to their advocacy for racial justice and other exercises of their constitutionally protected rights. continued their retaliatory violations of plaintiffs' First Amendment and Fourteenth Amendment protected rights.

419.    Defendants sought by these actions to intimidate plaintiffs from continuing to organize, speak, assemble, associate with each other and with other activists, and continuing to make their grievances known to the leaders of the City of Saratoga Springs.

420.    The complaint(s) filed against plaintiffs Elliott and/or Figuereo to Child Protective Services were determined to be "unfounded".

421.    As concluded in the OAG Report, "The SSPD referred a BLM protester to Child Protective Services without cause."  OAG Report at p. 23.

422.    These charges were "pretextual and motivated by Saratoga Springs's official policy of retaliation for protected speech."  *Id.*

408.    As a result of these actions, defendants deprived plaintiffs Elliott and Figuereo of their federally protected rights to family integrity and caused them pain, suffering, psychological and/or emotional injury, humiliation, damage to reputation, and expenses, and/or otherwise damaged and injured plaintiffs.

## SIXTH CLAIM FOR RELIEF

### Deprivation of Property Without Due Process  - Plaintiff Figuereo

### Pursuant to 42 U.S.C. §1983 (and Monell v. Dep't. of Social Services, 436 U.S. 658 (1978)

***as to Defendant City) for Defendants' Violations of Plaintiff Figuereo's
Property Without Due Process of Laws and Interference with the First Amendment
Rights of All Plaintiffs
Under the First, Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution***

477.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following

paragraphs as if fully set forth herein.

478.    Defendants, individually and jointly, on or about September 7, 2021 seized plaintiff

Figuereo's cell-phone without any legal basis or justification, deprived him of his cell-phone for

a period of more than six months, during which time defendants turned the cell-phone over to the

FBI which engaged in a forensic examination of the cell-phone which constituted an intrusion

and interference into plaintiff Figuereo's rights as protected by the First Amendment.

479.    Defendants' actions further violated plaintiff Figuereo's rights protected by the Fourth

Amendment and the Fourteenth Amendment.

480.    Defendants sought by their actions to intimidate plaintiff Figuereo — and in connection

with that, the other plaintiffs — from continuing to organize, speak, assemble, associate with

other plaintiffs and with other activists, and continuing to make his  grievances known to the

leaders of the City of Saratoga Springs.

481.    The facts pleaded in this Complaint describe the policies, practices, and customs of

defendant City to violate the rights of plaintiffs protected by the First, Fourth, and Fourteenth

Amendments to the U.S. Constitution to deprive plaintiff Figuereo of his property without due

process of law and to interfere with the First Amendment protected rights of all plaintiffs and

demonstrate defendant City's deliberate indifference to plaintiffs constitutionally protected

rights.

482.    As a result of defendants' acts and omissions, defendants deprived plaintiff Figuereo of

his  federally protected rights, caused each plaintiff, pain, suffering, psychological and/or

emotional injury, humiliation, damage to reputation, and/or otherwise damaged and injured

plaintiffs.

## **DEMAND FOR JURY**

Plaintiffs hereby demand that this case be tried by a jury.

## **DEMAND FOR RELIEF**

**WHEREFORE,** plaintiffs each demand the following relief against defendants, jointly and

severally:

> (a)    compensatory damages in an amount just and reasonable to be determined and in conformity with the evidence at trial;

> (b)    punitive damages as against each individually named defendant in an amount to be determined and in conformity with the evidence at trial;

> (c)    a judgment declaring that defendant City's Demonstration Permitting Scheme and Parade Permitting Scheme are unconstitutional on their face and as applied to plaintiffs;

> (d)    injunctive relief sufficient to protect plaintiffs from future, similar violations;

> (e)    attorneys' fees;

> (f)    costs and disbursements of this action;

> (g)    interest; and

> (h)    such other and further relief as this Court deems just and proper.

Dated: Albany, New
York April 7, 2025

MARK S. MISHLER, ESQ.
Bar roll # 102213

/s/ MARK S. MISHLER

_____

Law Office of Mark S. Mishler, P. C.
744 Broadway
Albany, NY 12207
(518-462-6753
mishlerlaw@gmail.com

**COHEN&GREEN P.L.L.C.**

By:_____/s/_____
    J. Remy Green
    Elena L. Cohen

1639 Centre Street, Suite 216
Ridgewood, NY 11385
(929) 888-9480
elena@femmelaw.com
remy@femmelaw.com

**GIDEON ORION OLIVER**

_____
277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

*Attorneys for Plaintiffs*