UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X
**SARATOGA BLACK LIVES MATTER, INC.;**
**ALEXUS BROWN;**
**MOLLY B. DUNN;**
**GABRIELLE C. ELLIOT;**
**ALEXIS A. FIGUEREO;**
**MARCUS FILIEN;**
**CHANDLER M. HICKENBOTTOM;**
**SAMIRA K. SANGARE;**
**TIEMOGO J. SANGARE;**

                                    Plaintiffs,

        -against-
**THE CITY OF SARATOGA SPRINGS; et al.,**

                                    Defendants.
------------------------------------------------------------------------------X

# EXHIBIT A TO COMPLAINT

**NYS Office of the Attorney General**
**A Report on the Saratoga Spring's Police Department's**
**Response to Protests in 2021**
**February 20, 2024**

Letitia James, Attorney General

New York State Office of the Attorney General

Civil Rights Bureau and Law Enforcement Misconduct Investigative Office

A Report on the Saratoga Springs Police Department's Response to Protests in 2021

February 20, 2024

## CONTENTS

EXECUTIVE SUMMARY ................................................................................................. 1

FACTUAL FINDINGS .................................................................................................... 2

    In 2020, a wave of social justice protests caught Saratoga Springs police unprepared. ............. 2

    In March 2021, the SSPD prepared for more protests with mandatory training ........................ 3

    In March 2021, Commissioner of Public Safety Robin Dalton demanded protester arrests when no offenses had taken place ................................................................................................................. 3

    Dalton publicly criticized SSPD officers for not arresting protesters and continued demanding arrests. ................................................................................................................... 5

    Dalton demanded arrests on May 16 ......................................................................................... 5

    Dalton demanded arrests on May 25 ......................................................................................... 6

    Assistant Chief Catone threatened to stop the BLM protesters' "narrative" and was not disciplined. ............................................................................................................. 6

    On July 14, 2021, BLM protesters protested Catone's remarks. ............................................... 7

    Dalton demanded arrests on July 14. ........................................................................................ 9

    Mayor Kelly also instructed Crooks to arrest protesters. ....................................................... 11

    An SSPD surveillance team targeted a protester and ordered his car to be stopped ................ 13

    In the ensuing weeks, Crooks continued promising protester arrests. ..................................... 15

    Sgt. Timothy Sicko filed complaints against protesters containing false statements. .............. 15

    The SSPD arrested protesters nearly two months after the protest. .......................................... 17

    The SSPD blocked access to the arraignment court and falsely blamed another agency. ........ 17

    The SSPD's arrests of protesters harmed the public. ............................................................... 18

LEGAL FINDINGS ....................................................................................................... 19

    I.    Saratoga Springs had an official policy of retaliating against BLM protesters based on their message. ................................................................................................................. 19

    II.    The SSPD and Dalton failed to adequately investigate and punish officer misconduct. 25

    III.    Saratoga Springs, Shane Crooks, and Meg Kelly failed to adequately respond to the Attorney General's subpoenas. ................................................................................................. 26

RECOMMENDATIONS ................................................................................................ 28

ACKNOWLEGEMENTS ............................................................................................... 28

# EXECUTIVE SUMMARY

For more than a year beginning May 31, 2020, the City of Saratoga Springs saw regular Black Lives Matter protests on its downtown streets. The protests criticized city officials and called to "defund" the Saratoga Springs Police Department. Although they could be raucous, the protests were also peaceful—there were no credible allegations that any BLM protester ever harmed another person or damaged property during a Saratoga Springs protest.

On June 26, 2021, at a press conference, Saratoga Springs Assistant Police Chief John Catone threatened the BLM protesters that he would "pull out every single connection my family has made over the last 130 years, and I will stop your narrative." Catone said aloud what other Saratoga Springs officials expressed only privately: that the city should use its police force to silence the BLM protesters.

Weeks later, during a July 14 rally protesting Catone's remarks, Mayor Meg Kelly and Commissioner of Public Safety Robin Dalton each ordered Police Chief Shane Crooks to arrest protesters. Dalton demanded that Crooks "Arrest all those motherfuckers." Kelly texted, "I hate these people," and called for a Child Protective Service investigation of Lexis Figuereo, a Black Lives Matter leader. Crooks replied that he had a "list" of protesters to arrest and would get arrest warrants for the BLM leadership.

Nearly two months after the July 14 protest, local law enforcement arrested twelve BLM protesters for minor offenses allegedly committed during the protest. Consistent with Kelly's instructions, an SSPD officer initiated a Child Protective Service investigation against the mother of Figuereo's children. That inquiry was unfounded, and all charges against the protesters were dismissed.

Following complaints from the public, the Office of the Attorney General investigated under Executive Law § 75(3). The OAG issued subpoenas to Saratoga Springs, Dalton, Kelly, Crooks, and other individuals, reviewed approximately 276,809 documents, took 9 sworn oral examinations, and interviewed members of the public.

The Attorney General concludes that, in 2021, Dalton, Kelly, and Crooks implemented an unconstitutional official policy of retaliating against BLM protesters based on their speech. The sweeping arrests violated the police department's written policies to protect protesters' First Amendment rights. But they were conceived of and approved by the highest decisionmakers in city government. Because those arrests were caused by official hostility to the protesters and their message, they violated the First Amendment.

To prevent these circumstances from ever recurring, the Attorney General recommends permanent policy changes to be monitored over time by the OAG.

1

## FACTUAL FINDINGS[1]

### In 2020, a wave of social justice protests caught Saratoga Springs police unprepared.

Beginning on May 31, 2020, Saratoga Springs saw a wave of social justice demonstrations sparked by George Floyd's murder by Minneapolis police.[2] Between May 31 and July 30, 2020, the SSPD responded to seven protests. They made no arrests and reported no weapons, violence, injuries, or damage to property.[3] Protesters sometimes occupied the roadway and stopped in intersections to give speeches. When that happened, SSPD officers redirected traffic to keep protesters safe and did not interfere with the protest activity.[4]

Initially, community members and city officials marched together in protest, but tensions soon emerged. Some BLM protesters drew comparisons between the Floyd murder and the death of Darryl Mount, a biracial man who died from injuries sustained while fleeing the SSPD in 2013. (A civil jury later determined that the SSPD was not responsible for Mount's death.) Some protesters called to "defund" the SSPD and criticized elected officials by name.[5] Others engaged in verbal confrontations with SSPD officers on the streets.

On July 30, 2020, a pro-police group held a rally called "Back the Blue," and BLM protesters showed up to counter-protest. There were reports of verbal altercations between the two groups of marchers, and BLM protesters alleged that pro-police marchers had assaulted them.

After the pro-police groups left downtown, BLM protesters occupied Broadway. Video shows some protesters shouting insults at police.[6] The SSPD and other police agencies responded with horse-mounted police, dozens of officers in riot gear, and an armored vehicle designed for combat in Iraq.[7] Officers from various agencies fired pepper balls, shoved, tackled, and forcibly dispersed protesters.[8] Police arrested three people, including a 16-year-old girl, for minor, nonviolent offenses.[9]

---

[1] The Office of the Attorney General recites these factual findings under the preponderance-of-the-evidence standard based on evidence reviewed and testimony taken during its investigation.

[2] *See* NYS Incident Report, Case No. SS-01419-20, Incident No. 20-012743, Reporting Officer Jason Mitchell; NYS Incident Report, Case No. SS-01459-20, Reporting Officer Sean Briscoe; NYS Incident Report, Case No. SS-01460-20, Reporting Officer Sean Briscoe; NYS Incident Report, Case No. SS-01491-20, Incident No. 20-013355, Reporting Officer Robert Jillson; NYS Incident Report, Case No. SS-01766-20, Incident No. 20-015408, Reporting Officer Jason Mitchell; NYS Incident Report, Case No. SS-02055-20, Incident No. 20-017673, Reporting Officer Jason Mitchell.

[3] The OAG reviewed all police reports provided by the SSPD concerning protests since 2020 and found only one allegation of property damage—and that turned out to be false. A woman alleged that her tire was slashed on July 30, 2020, but an SSPD officer examined the tire and found no evidence that it had been slashed. NYS Incident Report, Case No. SS-02149-20, Incident No. 20-018361, Reporting Officer Stephanie Herman.

[4] *Id.*

[5] *Id.*

[6] Press Release, Saratoga Springs Police Department, Protest Videos (Aug. 3, 2020).

[7] Press Release, Saratoga Springs Police Department, Updated Press Release re Events of July 30, 2020 (Aug. 4, 2020) (describing SSPD's response to the to the July 30 protest).

[8] *See, e.g.*, Lucas Willard, *Three Arrested After 'Back the Blue' Rally in Saratoga Springs*, WAMC Northeast Public Radio (July 31, 2021); Press Release, Saratoga Springs Police Department, Protest Videos (Aug. 3, 2020)

[9] NYS Incident Report, Case No. SS-02114-20, Incident No. 20-018049, Reporting Officer Kateri Marotta.

The press condemned the SSPD's response as excessive. One journalist wrote that it "widened the schism and mistrust between police and those fighting for racial justice."[10]

### In March 2021, the SSPD prepared for more protests with mandatory training.

When asked what the SSPD needed to improve their performance after the 2020 protests, one officer said, "More training."[11] Before 2020, the SSPD had never offered specific training on policing large demonstrations.[12]

Responding to that need, in March 2021, the SSPD gave mandatory trainings on the tiered-response protocol for policing protests. This protocol authorized arrests only after giving protesters multiple opportunities to comply with police instructions. Its goal was to protect the First Amendment and minimize "negative outcomes" from improper protest policing.[13]

The first tier was activated if a protest caused a public safety hazard. It required two or three SSPD officers to personally engage protest leaders and request voluntary compliance.[14] If the first tier was ineffective, the second tier authorized the SSPD to approach the crowd and read audible dispersal warnings in five-minute intervals.[15] The third tier authorized an additional police squad to move into place if the public safety hazard continued.[16] Remaining squads were required to stay in the rear to give protesters an opportunity to comply with the dispersal orders.[17] The fourth tier authorized the SSPD to arrest—but only once three audible warnings had been read, five minutes had passed after the third warning, and command staff had approved.[18]

### In March 2021, Commissioner of Public Safety Robin Dalton demanded protester arrests when no offenses had taken place.

From January 2020 until January 2022, Robin Dalton was the elected commissioner of public safety with exclusive authority over the SSPD. Under Saratoga Springs's commission form of government, Dalton was one of five coequal elected officials, and the Saratoga Springs Charter gave Dalton the exclusive power to hire, fire, and discipline police officers.[19] Under the charter, Dalton's "policies, rules, regulations, and orders" superseded those of the police chief.[20]

---

[10] Wendy Liberatore, *Black Lives Matter Protesters in Saratoga Springs Upset by Police Tactics*, Times Union (Aug. 3, 2020).

[11] Subpoena Interview with Timothy Sicko at 158:4–7.

[12] Subpoena Interview with Robert Jillson at 60:6–21, 61:10–15; Subpoena Interview with Jason Mitchell at 117:6–9; Sicko at 157:5–12, 158:4–7.

[13] Training Announcement, Saratoga Springs Police Department, Crowd Management Training (Mar. 8, 2021; Training Activity Report, Saratoga Springs Police Department, NYSP In-Service De-Escalation Webinar (Mar. 2, 2021); Jillson 64:20–67:18.

[14] PowerPoint Presentation, Saratoga Springs Police Department, Mobile Field Force Operations (July 14, 2021); Jillson at 129:25–130:11.

[15] PowerPoint Presentation, Saratoga Springs Police Department, Mobile Field Force Operations (July 14, 2021); Jillson at 129:12–19.

[16] *Id.* at 131:9–132:12.

[17] *Id.* at 132:8–21.

[18] PowerPoint Presentation, Saratoga Springs Police Department, Mobile Field Force Operations (July 14, 2021); Jillson at 132:22–133:19.

[19] Saratoga Springs Charter tit. 6(A).

[20] *Id.* at tit. 6.1.2.

In March 2021, Dalton believed that SSPD officers had "pent-up anger" at protesters and "anticipated some kind of clash between protesters and police."[21] She testified that as commissioner of public safety, her responsibility was to restrain the police from clashing with protesters and making arrests.[22]

Dalton was also a candidate for mayor in the 2021 Saratoga Springs mayoral race. In that capacity, Dalton discussed with political allies how she should position herself regarding the ongoing BLM protests, which were a contested issue in the election.[23]

On March 7, Dalton texted Jason Golub, then co-chair of the Saratoga Springs police reform task force, to discuss the issue. She warned Golub that that SSPD officers had "bloodlust" to arrest protesters and claimed that she wanted to "avoid a protest that ends with police arrests."[24]

But two weeks later, Dalton texted a very different message to Rob Arrigo, a Libertarian Party head and BLM opponent.[25] She told Arrigo that when the police chief asked her how to handle protesters at an upcoming rally, "I told him to arrest the fucks."[26]

From: ████████ Robin Dalton (owner)
Timestamp: 3/25/2021 8:18:25 AM(UTC-4)
Source App: Native Messages
Body:
Chief just asked me how to handle protestors on Saturday
----------------------------
From: ████████ Robin Dalton (owner)
Timestamp: 3/25/2021 8:18:32 AM(UTC-4)
Source App: Native Messages
Body:
I told him to arrest the fucks

She continued, claiming that the PBA police union was "very happy to hear that I instructed the Chief to arrest people."[27] In testimony, Chief Shane Crooks confirmed that Dalton explicitly ordered him to make arrests in March 2021.[28]

In texts to others, Dalton used violent language to criticize specific BLM protesters.[29] She wrote one colleague that she wanted to "find [BLM activist] Molly Dunn and kick her in the fucking mouth repeatedly" because of comments Dunn made about Dalton online.[30] She texted another colleague that she wanted to "punch" BLM activist Chandler Hickenbottom "in the mouth" because Hickenbottom had called police officers murderers and Dalton a racist.[31] To another colleague, she wrote that she wanted to "punch" James Montagnino, then a candidate for

---

[21] Subpoena Interview with Robin Dalton at 110:15–22, 113:16–114:3.
[22] Dalton at 113:16–114:3.
[23] Text Message from Robin Dalton (Mar. 7, 2021).
[24] Text Message from Robin Dalton (Mar. 7, 2021).
[25] Dalton at 115:19–21, 116:9–20.
[26] Text Message from Robin Dalton (Mar. 25, 2021).
[27] *Id.*
[28] Subpoena Interview of Shane Crooks at 100:23–101:14, 103:13–17, 104:14–16.
[29] Dalton at 162:9–11, 193:22–25.
[30] Text Message from Robin Dalton (Apr. 1, 2021); Dalton at 197:24–198:17.
[31] Text Message from Robin Dalton (July 14, 2021); Dalton at 210:10–211:3.

commissioner of public safety, "in the face" because he compared the SSPD to George Floyd's murderer.[32]

Dalton asked a city-retained attorney if Saratoga Springs could take "some kind of legal action" to stop the protesters from accusing the SSPD of misconduct—which she called "misinformation."[33] The attorney told Dalton that she couldn't sue the protesters because the First Amendment protected their speech.[34]

### Dalton publicly criticized SSPD officers for not arresting protesters and continued demanding arrests.

In the ensuing months, Dalton repeatedly called upon SSPD officers to arrest protesters—even when officers on the scene had determined there was no cause for arrest.

### Dalton demanded arrests on May 16.

During a planned but unpermitted May 16, 2021 rally, BLM protesters marched down Broadway and occupied the intersection of Broadway and Lake to give speeches.[35] After a time, SSPD Lieutenant Robert Jillson sought to clear the intersection by implementing the first tier of the tiered-response protocol. He personally asked protesters to disperse.[36] They voluntarily left the roadway and went back to Congress Park.[37] Jillson testified that once the protesters had retreated, there was "absolutely no reason to arrest anybody."[38]

But others did not share that view. While Jillson dispersed the crowd, Arrigo texted Dalton, "Arrest them." Dalton replied, "Well, happy for you I have a police department that doesn't want to police."[39]

Later that day, Dalton criticized SSPD officers for not making arrests.[40] Dalton interrupted a meeting in Crooks's office between Crooks and other command staff and asked why arrests had not been made. She left the building, found a group of officers in the parking lot outside, and yelled at them, asking, "How come we didn't arrest anybody?"[41]

Jillson testified that it was "embarrassing" for the elected commissioner of public safety to yell at him about not arresting protesters when the police had done everything by the book.[42] He testified:

---

[32] Text Message from Robin Dalton (Jun. 7, 2021); Dalton at 192:25–193:13. When shown these texts, Dalton testified, "I've never punched anyone in the face. I don't know why I text that so frequently, but I've never hit anyone or acted physically aggressive towards anyone in my life." Dalton at 209:2–4.
[33] Text Message from Robin Dalton (Jun. 7, 2021); Dalton at 194:2–195:5.
[34] Dalton at 195:12–16.
[35] Jillson at 108:9–109:3.
[36] *Id.* at 108:7–14, 112:3–20.
[37] *Id.* at 109:9–14.
[38] *Id.* at 111:22–112:2, 112:10–23.
[39] Text Message from Robin Dalton (May 16, 2021).
[40] Jillson at 110:7–10, 114:25–17.
[41] *Id.* at 109:15–111:3.
[42] Jillson at 110:22–23, 113:8–15.

> [W]e had resources there, but we had no offenses that took place.
> We're not arresting anybody. She didn't care for that, I guess. And
> she went off. And I mean, she was super angry....[43]

The next day, Dalton admitted to a local blogger that her behavior was "unprofessional" and that "I am just angry with watching that BLM group, and I took it out on [the police.]"[44]

### Dalton demanded arrests on May 25.

A week and a half later, on May 25, BLM protesters held another planned but unpermitted rally. When protesters again occupied the street, Lieutenant Jason Mitchell asked them to leave, consistent with the first tier of the tiered-response protocol.[45] The protesters voluntarily complied, and Mitchell and his officers made no arrests and used no force.[46] In his report, Mitchell wrote that the event "remained calm and non-violent."[47] In Mitchell's view, "cops...shouldn't interfere with [protesters'] right to peacefully protest."[48]

Once again, Dalton disagreed. During the protest, she told Crooks that she wanted protesters arrested.[49] Crooks conveyed that order to Mitchell, but Mitchell refused to arrest because it wasn't "the right thing to do."[50] When asked, Dalton couldn't recall this incident but had "no reason to doubt" Crooks and Mitchell's testimony that it happened.[51]

### Assistant Chief Catone threatened to stop the BLM protesters' "narrative" and was not disciplined.

On June 28, 2021, at a press conference about an unrelated downtown shooting, SSPD Assistant Chief John Catone threatened BLM protesters that he would "pull out every single connection my family has made over the last 130 years, and...stop your narrative."[52] He warned, "You're either with us or you're not. And if you're not, then you're part of the problem."[53]

Catone's speech violated three different written policies concerning public statements by officers. By opposing the BLM "narrative," Catone violated the SSPD's official prohibition against opposing or contradicting any social issue.[54] By criticizing the positions of candidates running for office, Catone violated the prohibition against endorsing, supporting, or contradicting

---

[43] *Id.* at 111:10–13.
[44] Text Message from Robin Dalton (May 16, 2021); Dalton at 147:4–12.
[45] Mitchell at 107:6–17, 114:2.
[46] *Id.* at 107:6–22, 114:2–8.
[47] NYS Incident Report, Incident No. SS-01274-21, Reporting Officer Jason Mitchell.
[48] Mitchell at 111:20–21. Mitchell could not recall the date of the protest described in his testimony, but based on a review of SSPD incident reports, the May 25 protest was the only protest Mitchell supervised during the timeframe he described.
[49] *Id.* at 97:7–18, 106:5–10; Crooks at 116:4–9.
[50] Mitchell at 106:5–10, 107:6–22, 114:2–8.
[51] Dalton at 152:22–153:7.
[52] City of Saratoga Springs, *Response to Recent Violence in Saratoga Springs*, Facebook (Jun. 28, 2021); Crooks at 82:5–6; Dalton at 90:2–24; Jillson at 88:9–23.
[53] City of Saratoga Springs, *Response to Recent Violence in Saratoga Springs*, Facebook (Jun. 28, 2021).
[54] SSPD Policy 1030.4.1(b); Crooks at 84:3–6.

6

any political campaign.[55] And, by inflaming public opinion against the SSPD, Catone violated the prohibition against compromising the reputation or professionalism of the SSPD.[56]

Dalton sat next to Catone during the entire press conference but did nothing to interrupt him.[57] Shortly after the press conference, Dalton texted Conservative Party leader Dave Buchyn, saying Catone "Killed it."[58]

```
From: [redacted] Dave Buchyn
Timestamp: 6/28/2021 2:30:35 PM(UTC-4)
Source App: Native Messages
Body:
Catone nailed it            .

------------------------------------------
From: [redacted] Robin Dalton (owner)
Timestamp: 6/28/2021 2:30:48 PM(UTC-4)
Source App: Native Messages
Body:
Killed it

------------------------------------------
From: [redacted] Robin Dalton (owner)
Timestamp: 6/28/2021 2:30:56 PM(UTC-4)
Source App: Native Messages
Body:
Like
```

Neither Dalton nor Crooks took any action to discipline Catone.[59] And, even after members of the public and local media condemned Catone in print and statements to City Council, neither Dalton nor Crooks made any public statement to disavow Catone's speech or to reassure the public of the SSPD's impartiality.[60]

On July 14, 2021, shortly before a planned protest of the speech, Catone stated in a press release, "I allowed anger and frustration to interfere with my intended message" due to "misinformation" that had eroded trust in the police.[61] The press release made no direct apology and did not unequivocally retract the statements Catone made during the press conference.

**On July 14, 2021, BLM protesters protested Catone's remarks.**

On July 14, 2021, BLM activists held a protest to denounce Catone's threatening statements. The event attracted a few dozen protesters who marched from Congress Park to City Hall, just as they had during many previous protests.[62]

---

[55] SSPD Policy 1030.4.1(a); Crooks at 84:7–12.
[56] SSPD Policy 1030.4(a); Crooks at 83:15–20.
[57] Dalton at 91:4–14.
[58] Text Message between Robin Dalton and Dave Buchyn (Jun. 28, 2021); Dalton at 102:13–19.
[59] Dalton at 95:22–97:4; Crooks at 84:13–17.
[60] *See* Gazette Editorial Board, *Sniping Won't Help Solve Saratoga Springs' Summer Problems*, Daily Gazette (July 3, 2021); Times Union Editorial Board, *It's Not Safety vs. Justice*, Times Union (July 2, 2021); City of Saratoga Springs City Council Meeting Regular Agenda (July 6, 2021) (documenting citizen's comments about Catone's speech); Dalton at 105:3–15; Crooks at 84:23–86:11.
[61] Press Release, Saratoga Springs Police Department, John Catone re: Jun. 28, 2021 Press Conference (July 14, 2021).
[62] NYS Incident Report, Case No. SS-01881-21, Incident No. 21-014314, Reporting Officer Frederick Warfield (describing the time); Lauren Stanforth, *Saratoga Police and BLM protesters Clash on Wednesday Night*, Times Union (July 15, 2021) (estimating that 30 protesters attended).

Before the protest began, SSPD officers were briefed on the SSPD's tiered-response framework.[63] Jillson, who oversaw the briefing, had no reason to doubt that all officers fully understood the framework's requirements.[64]

Although Jillson was the nominal incident commander, he had to "step back" while Crooks personally directed police operations from the police station.[65] Crooks communicated directly with officers on the scene and was in regular communication with Dalton in person, on the phone, and by text.[66]

Protesters described the July 14 protest as one like many others before. The event began, as they usually did, with music and chanting in Congress Park. Protesters then marched up Broadway, following their usual route. A group of protesters stopped in front of the Adelphi Hotel to discuss Saratoga Springs's history. Jamaica Miles described how wealthy horse owners brought enslaved people to the racetrack even after New York had abolished slavery.

During the speeches, protesters briefly stopped at least three vehicles traveling on Broadway.[67] Video and photos of the incident show protesters standing a few feet away from the cars and asking drivers to remain quiet during the speeches.



---

[63] Jillson at 128:21–29:17; Crooks at 122:20–123:2.
[64] Jillson at 136:4–17.
[65] *Id.* at 178:2–20.
[66] *Id.* at 178:2–20; Crooks at 93:17–21.
[67] NYS Incident Report, Incident No. SS-01872-21, Reporting Officer Robert Jillson (July 26) (detailing internal preparation and response to the July 14 protest); *Full Video from Driver Blocked by Protesters*, Produced to the OAG by the City of Saratoga Springs (July 14, 2021).

After approximately 13 minutes, SSPD officers implemented the first tier of the tiered-response protocol and requested that the protesters allow cars to pass.[68] The protesters complied, and the SSPD did not issue dispersal orders or make any arrests at that time.[69]

While stopped, the passenger of one vehicle called 911 and told the operator that he needed to get home to take heart medication.[70] Video taken by the passenger shows that protesters allowed his car to pass less than 45 seconds after they first learned of his alleged heart condition.[71] Driving away, the passenger and his driver discussed where to go for dinner, with no further mention of the passenger's heart medication.[72]

### Dalton demanded arrests on July 14.

At 7:50 p.m., as the cars started moving again, Buchyn, the Conservative Party leader, texted Dalton, "Time to arrest Lexus," referring to BLM leader Lexis Figuereo.[73] Dalton replied, "This feels like a minimal disruption, do you think we should be making arrests[?]"[74] Buchyn did not agree it was a minimal disruption.[75]

Four minutes later, at 7:54 p.m., Dalton texted Crooks, "If someone doesn't get arrested I'm going to lose my mind. I know you know that. But I'm just saying it one more time."[76] In testimony, Dalton denied that this text was an instruction to Crooks to arrest but rather "an expression of my emotional state."[77]

At 8:29 p.m., Dalton texted Crooks, "Please please please pretty please arrest someone."[78] Meanwhile, according to police notes, the SSPD read its first dispersal warning.[79] Nine minutes later, Dalton texted Crooks "I want them arrested. Clear the streets," and, when Crooks texted that the third warning had been read, she replied "ARREST."[80]

Sometime between 8:38 and 8:43 p.m., as the crowd was slowly retreating down Broadway toward Congress Park, SSPD officers in riot gear rushed in and arrested five protesters. Video shows some protesters fleeing from officers mounted on horses. Protester Adam Walker was thrown to the ground by an officer, and a photograph taken shortly after his arrest shows abrasions on his face.[81]

---

[68] *Id.* at 7.
[69] Jillson 181:23–182:11.
[70] City of Saratoga Springs, *Video #1*, Facebook (Jun. 28, 2021) (showing the passenger making the call to 911); City of Saratoga Springs, *Video #4*, Facebook (Jun. 28, 2021) (depicting audio of that 911 call).
[71] *Full Video from Driver Blocked by Protesters*, Produced to the OAG by the City of Saratoga Springs (July 14, 2021).
[72] *Id.*
[73] Text messages from Robin Dalton to Dave Buchyn (July 14, 2021); Dalton at 157:24–158:14.
[74] Text messages between Robin Dalton and Dave Buchyn (July 14, 2021); Dalton at 159:8–16.
[75] Text messages between Robin Dalton and Dave Buchyn (July 14, 2021).
[76] Text messages between Robin Dalton and Shane Crooks (July 14, 2021); Dalton at 161:3–17.
[77] Dalton at 161:18–162:3.
[78] Text messages between Robin Dalton and Shane Crooks (July 14, 2021).
[79] NYS Incident Report, Incident No. SS-01872-21, Reporting Officer Robert Jillson at 7.
[80] Text Message between Robin Dalton and Shane Crooks (July 14, 2021).
[81] Body Worn Camera Footage, Axon Body 2 X81457624, Saratoga Springs Police Department (July 15, 2021) (showing arrest of Walker on July 14, though the footage is dated to July 15); Photograph of Adam Walker (July 14, 2021).

As the arrests happened, Dalton texted Crooks, "Arrest all those motherfuckers[.] I don't care[.] I will take the heat. Arrest Chandler and Elz [Lexis Figuereo] and I'll throw you a ticker tape parade."[82] Crooks responded, "They are on my list," and Dalton replied, "They are on my list too 😊 ."[83]

> From: ▓▓▓▓▓▓ Robin Dalton (owner)
> Timestamp: 7/14/2021 8:43:16 PM(UTC-4)
> Source App: Native Messages
> Body:
> Arrest all those motherfuckers I don't care I will take the heat
>
> ----------------------------------------
> From: ▓▓▓▓▓▓ Robin Dalton (owner)
> Timestamp: 7/14/2021 8:44:03 PM(UTC-4)
> Source App: Native Messages
> Body:
> Arrest Chandler and Elz and I'll throw you a ticker tape parade
>
> ----------------------------------------
> From: ▓▓▓▓▓▓ Shane Crooks
> Timestamp: 7/14/2021 8:44:16 PM(UTC-4)
> Source App: Native Messages
> Body:
> They are on the list
>
> ----------------------------------------
> From: ▓▓▓▓▓▓ Robin Dalton (owner)
> Timestamp: 7/14/2021 8:44:29 PM(UTC-4)
> Source App: Native Messages
> Body:
> They are on my list too 😊

Minutes later, Crooks texted the SSPD incident commander, "If you can identify anyone that failed to comply you can arrest them. Elz and Chandler."[84] Crooks testified that he named Figuereo and Hickenbottom because "[t]hose are the leaders" and he "assumed" they would be arrested for disorderly conduct or disrupting traffic.[85]

As the arrests took place, Dalton reassured a friend who asked whether Figuereo had been arrested: "Not yet but Chief says they're on the list 😊 ."[86]

---

[82] Text messages between Robin Dalton and Shane Crooks (July 14, 2021).
[83] *Id.*
[84] Text message from Shane Crooks (July 14, 2021); Crooks at 148:7–149:5.
[85] Crooks at 149:13–150:16.
[86] Text message from Robin Dalton (July 14, 2021).

From: ▮▮▮▮▮ Robin Dalton (owner)
Timestamp: 7/14/2021 8:43:43 PM(UTC-4)
Source App: Native Messages
Body:
Three arrests so far
------------------------------
From: ▮▮▮▮▮▮ ▮▮▮
Timestamp: 7/14/2021 8:47:40 PM(UTC-4)
Source App: Native Messages
Body:
Please tell me Elz is one!
------------------------------
From: ▮▮▮▮▮ ▮▮▮
Timestamp: 7/14/2021 8:51:42 PM(UTC-4)
Source App: Native Messages
Body:
▮▮▮▮▮▮▮▮▮▮▮▮
------------------------------
From: ▮▮▮▮▮ Robin Dalton (owner)
Timestamp: 7/14/2021 8:53:33 PM(UTC-4)
Source App: Native Messages
Body:
Not yet but Chief says they're on the list 🙄

As the event wound down, Crooks told Dalton that the SSPD had made five arrests. Dalton responded, "Rock on. I still have bloodlust, but great job."[87]

From: ▮▮▮▮▮▮ Shane Crooks
Timestamp: 7/14/2021 10:32:04 PM(UTC-4)
Source App: Native Messages
Body:
5 arrest. No injuries
------------------------------
From: ▮▮▮▮▮▮ Robin Dalton (owner)
Timestamp: 7/14/2021 10:33:01 PM(UTC-4)
Source App: Native Messages
Body:
Rock on
------------------------------
From: ▮▮▮▮▮▮ Robin Dalton (owner)
Timestamp: 7/14/2021 10:33:19 PM(UTC-4)
Source App: Native Messages
Body:
I still have bloodlust, but great job

**Mayor Kelly also instructed Crooks to arrest protesters.**

Crooks was also texting with Mayor Kelly on July 14. After the SSPD had finished making arrests, Kelly texted Crooks, "I hate these people good job tonight" and asked "Elz? Jamaica?" inquiring whether Figuereo and Miles had been arrested. Crooks responded, "Warrants."[88] Neither Figuereo nor Miles had outstanding warrants on July 14.

---

[87] Text messages between Shane Crooks and Robin Dalton (July 14, 2021); Dalton 175:11–18.
[88] Text messages between Meg Kelly and Shane Crooks (July 14, 2021).

Kelly also instructed Crooks to "call CPS to make sure [Figuereo's] kids are being cared for correctly."[89] Dalton testified that it was "horrifying" and "disgusting" that Kelly ordered a CPS investigation without cause.[90] Crooks agreed that Kelly's demand was inappropriate.[91]



Two days later, Kelly swore a criminal complaint against Figuereo to seek a warrant for his arrest. She claimed that she had been driving with her husband along Broadway at 8:30pm on July 14 "when we came upon a crowd of people who had blocked the roadway" and she "immediately knew that there was a protest taking place." She claimed that she was "scared to death" to see Figuereo among the other protesters because he was "disruptive" at city council meetings and "posted negative things" about her on social media[92] Kelly's complaint alleged no injury or threats by protesters. But Kelly claimed her husband threw a towel over her head as they drove because they feared the protesters "would have rocked the car over" if they saw her.[93]

A review of every police report concerning protests in Saratoga Springs since 2020 found no allegation that a protester had ever rocked a car over.

---

[89] Text messages between Meg Kelly and Shane Crooks (July 14, 2021).
[90] Dalton at 78:10–21, 178:22–179:14.
[91] Crooks at 154:3–12.
[92] Meg Kelly, Voluntary Statement, Saratoga Springs Police Dep't (July 16, 2021).
[93] Id.

**An SSPD surveillance team targeted a protester and ordered his car to be stopped.**

During the July 14 protest, a "surveillance group" of SSPD officers sought to identify BLM organizers to keep an eye on.[94] The group understood that its mission was to identify "persons of interest" and to look for anybody "suspicious."[95] They took photographs of protesters, ran license plates, and communicated the location of Figuereo and other BLM leaders.[96] The group included Investigators Matthew Miller and John Guzek, two experienced narcotics officers familiar with conducting surveillance of drug operations.[97]

As the protest unfolded, Guzek and Miller began following Protester 1, a tall, Black man they spotted at the outskirts of the protest.[98] Protester 1 kept to the fringes of the protest and did not join the protesters in blocking intersections.[99] He carried a brown paper shopping bag. Others in the crowd, including at least one white woman, also carried shopping bags.

Miller and Guzek gave contradictory reasons for pursuing Protester 1. According to Miller, Protester 1 was suspicious because he was standing on the perimeter and not interacting with other protesters.[100] But Guzek testified that Protester 1 would go back and forth talking to the protest organizers.[101]

They gave other reasons for their suspicion: Protester 1 was holding his shopping bag too close to his chest; the shopping bag itself was suspicious; and it was suspicious to run away from the police after being ordered to disperse.[102]

Miller and Guzek followed Protester 1 to his car, where they thought it was suspicious that he put his shopping bag in the trunk.[103] According to Guzek, "a normal person would just get in the car with the bag."[104] They also thought it was suspicious that Protester 1 drove his car around downtown before parking it again and that he parked too far away from his destination on Broadway.[105] Guzek thought that Protester 1 was trying to evade the police like a drug dealer would.[106]

Based on their observations, Miller and Guzek believed they had reasonable suspicion to search Protester 1's bag.[107] Miller thought Protester 1 may have been carrying a weapon.[108] Guzek "just wanted to know what was in the bag."[109]

---

[94] Subpoena Examination of John Guzek at 85:20–86:6.
[95] *Id.* at 60:6–61:5.
[96] *Photos of Protester 1*, Produced to the OAG by the City of Saratoga Springs (July 14, 2021); NYS Incident Report, Incident No. SS-01882-21, Reporting Officer Matthew Miller; Guzek at 60:22–61:15.
[97] Subpoena Examination of Matthew Miller at 37:23–38:3, 57:17–21; Guzek at 38:24–39:7, 50:11–53:15.
[98] NYS Incident Report, Incident No. SS-01882-21, Reporting Officer Matthew Miller at Pg. 1.
[99] *Id.*
[100] Miller at 107:19–109:3.
[101] Guzek at 81:11–23.
[102] Miller at 125:12–127:16, 128:15–20; Guzek at 79:10–21.
[103] Miller at 125:17–18; Guzek at 78:19–79:9.
[104] Guzek 78:19–79:9.
[105] Miller at 125:19–20; Guzek at 79:24–80:9.
[106] Guzek at 80:14–81:8.
[107] Miller at 124:7–13; Guzek at 73:9–15.
[108] *Id.* at 124:7–13.
[109] Guzek at 77:21–78:4.

After a supervisor evaluated their observations and authorized a car stop, Guzek contacted two patrol officers and instructed them to stop Protester 1's car.[110] The patrol officers made the stop based on Guzek's representation that there was reasonable suspicion; neither patrol officer observed Protester 1 during the protest nor saw any violation of the Vehicle and Traffic Law.[111]

Once stopped, Protester 1 and his passenger allowed the officers to search the car's trunk. The officers found Protester 1's shopping bag, which contained two disposable respirator masks, a bottle of water, a rain jacket, and a pair of goggles.[112] Protester 1 told the officers he got the bag from Figuereo.[113] Having found no contraband, the officers let Protester 1 and his passenger go.[114]

Shortly after the stop, Guzek texted Jillson, "Bag of gas masks in the vehicle.... Puts another one on the radar."[115] Jillson wrote, "Awesome."[116] According to Guzek's testimony, finding the masks confirmed that Protester 1 was involved with "the main group of organizers."[117]



[110] Miller at 64:13–25, 113:21–114:15; Guzek at 74:2–6, 84:4–6; NYS Incident Report, Case No. SS-01882-21, Incident No. SS-01882-21, Reporting Officer William Coyner.
[111] NYS Incident Report, Incident No. SS-01882-21, Reporting Officer Matthew Miller at Pg. 3–4; NYS Incident Report, Incident No. SS-01882-21, Reporting Officer William Coyner.
[112] NYS Incident Report, Incident No. SS-01882-21, Reporting Officer Matthew Miller at Pg. 4.
[113] NYS Incident Report, Incident No. SS-01882-21, Reporting Officer Matthew Miller at Pg.
[114] NYS Incident Report, Incident No. SS-01882-21, Reporting Officer Matthew Miller at Pg. 3–4; Subpoena Examination of William Coyner at 108:9–14.
[115] Text messages between John Guzek and Robert Jillson (July 14, 2021).
[116] Id.
[117] Guzek at 85:20–86:10.

Five days later, after reading press reports on activists' claims that the stop was unjustified, Commissioner Dalton texted Chief Crooks that she was "not upset," just "freaking annoyed with all this goddamn media bullshit."[118] Dalton demanded an investigation to stop public criticism of one of the patrol officers.[119]

Three and half months after the stop, an SSPD lieutenant issued a one-paragraph report finding that allegations that the stop was not supported by reasonable suspicion were "unfounded."[120] The lieutenant did not interview any of the involved officers, Protester 1, or his passenger, and appears to have conducted no investigation beyond reviewing the police reports and body-worn camera footage of the stop.[121]

### In the ensuing weeks, Crooks continued promising protester arrests.

In the weeks following July 14, Crooks continued texting with Saratoga Springs officials about the plan to arrest BLM protesters.

On July 26, the Chief Deputy of the Saratoga County Sheriff's Office asked Crooks, "Did you guys arrest Elz [Figuereo], Jamaica [Miles] and the others from the protest?"[122] Crooks responded, "That is the plan."[123] Days later, Mayor Kelly told Crooks that BLM leader Molly Dunn "crossed my line," and Crooks responded that he had a plan "in the works" to arrest Dunn early the next week.[124]

### Sgt. Timothy Sicko filed complaints against protesters containing false statements.

On August 9, 2021, Crooks assigned Sergeant Timothy Sicko to identify the protesters who stopped the vehicle on July 14.[125] Crooks testified that he felt the SSPD had "failed" the passenger who told a 911 operator that he needed heart medication after protesters stopped his car.[126] (When shown video of the incident under oath, Crooks admitted that it did not appear the passenger was in actual medical distress.)[127]

Crooks picked Sicko because he was a "go-to guy" who would not push back against the order.[128] Sicko took the case himself, instead of assigning it to a junior investigator, because he knew this was a "situation that was probably going to escalate" and he did not want his subordinates to be deposed as part of a lawsuit or investigation.[129]

Sicko understood his obligation to accurately document his investigation and produce exculpatory information to the prosecutor.[130] If Sicko discovered, during an investigation, that a

---

[118] Text messages between Robin Dalton and Shane Crooks (July 19, 2021).
[119] Dalton 213:14–18; Text messages between Robin Dalton and Shane Crooks (Oct. 11, 2021).
[120] SSPD Internal Memorandum IA-07/14/21 at 1 (Nov. 11, 2021)
[121] Crooks at 204:5–205:5; Jillson at 206:7–22.
[122] Text message from Shane Crooks (July 26, 2021).
[123] Id.
[124] Text Messages between Meg Kelly, John Catone, and Shane Crooks (July 29, 2021).
[125] Sicko at 237:8–16, 240:15–24, 242:12–24; Crooks at 177:7–24.
[126] Crooks at 180:11–15.
[127] Crooks at 167:10–168:10
[128] Id. at 182:22–183:3, 183:16–19; Sicko at 214:11–215:6.
[129] Sicko at 220:23–221:4, 221:18–222:6.
[130] Id. at 130:3–15.

witness had given a false statement, he understood that fact was exculpatory information that must be produced.[131]

On August 31, 2021, Sicko submitted complaints to the prosecutor charging six protesters with unlawful imprisonment for stopping the motorist with the alleged heart condition.[132] This was unusual because the SSPD had never before charged anybody with unlawful imprisonment for stopping a car.

An unlawful imprisonment charge required showing that the protesters used either physical force or intimidation.[133] Sicko admitted the protesters hadn't used force "in the ordinary sense," and therefore had to show that the protesters had intimidated the motorists.[134]

To establish intimidation, Sicko submitted a written statement from the passenger who called 911. The passenger claimed that protesters "were carrying pillowcases" and he was "afraid they were going to attack us…with whatever they were carrying."[135] The passenger also reported more direct intimidation. According to his statement, a "young African American kid came towards me in a fighting manner."[136]

But, as Sicko admitted, the passenger's own video contradicts both allegations.[137] Nowhere can any protester be seen with a pillowcase, and at no point does any person, Black or otherwise, approach the passenger in a "fighting manner."[138] Photographic evidence confirms that no protester could be seen carrying a pillowcase or approaching the vehicle in a threatening way.

Sicko did not investigate why the video and photographic evidence contradicted the passenger's statement.[139] Nor did Sicko flag those inconsistencies for the prosecutor or provide the prosecutor with video and photos that would have shown the inconsistencies.[140] Sicko submitted only the warrant to be signed, the accusatory instrument, and the passenger's statement.[141]

Figuereo and Hickenbottom were among those charged in Sicko's complaint, even though they did not block the vehicle, are not on the video of the incident, and, therefore, were not among the protesters Sicko had purportedly been assigned to identify.[142]

---

[131] *Id.* at 132:3–8.
[132] SSPD Case No. SS-01881-21, Incident No. SS-01881-21.014.014.
[133] Sicko at 279:17–25, 282:9–16.
[134] *Id.* at 281:4–14.
[135] NYS Arrest Report, Case No. SS-01881-21, Arrest No. SS-0620-21 (Dunn).
[136] *Id.*
[137] Sicko at 297:14–21, 298:3–12.
[138] *Id.* at 297:14–21, 298:3–12.
[139] *Id.* at 298:3–24.
[140] *Id.* at 270:7– 271:14.
[141] *Id.* at 270:7–12.
[142] *Full Video from Driver Blocked by Protesters*, Produced to the OAG by the City of Saratoga Springs (July 14, 2021).

### The SSPD arrested protesters nearly two months after the protest.

On September 7, 2021, police pulled Figuereo over and arrested him on a warrant based on Sicko's complaint.[143] He was charged with disorderly conduct and obstructing governmental administration for alleged conduct during the July 14 protest and two city council meetings.[144] According to SSPD records and testimony from SSPD officers, the SSPD had never previously gotten a warrant to arrest anybody for disruptive behavior at a city council meeting. When BLM activists gathered outside of City Hall to support Figuereo, the SSPD arrested Hickenbottom, Dunn, and Samira Sangare on warrants issued based on Sicko's complaint.[145]

Officers also arrested the mother of Figuereo's children after she allegedly threw a Gatorade bottle at police at City Hall as the activists were arrested.[146] An SSPD official told the arresting officer that Figuereo was the father of the woman's child, and a supervisor instructed the officer to call CPS.[147] The arresting officer then charged the woman with endangering the welfare of a child.

On September 8, the SSPD issued a press release naming all the protesters arrested on September 7 and detailing their charges.[148] The press release included the name of the mother of Figuereo's children and the allegation that she endangered her child's welfare. It warned that the protest investigation was "still ongoing and additional arrests are likely."[149]

Between September 7 and September 21, the SSPD arrested seven more protesters. In total, 12 protesters were arrested in September 2021. All charges against the protesters were ultimately dismissed.

### The SSPD blocked access to the arraignment court and falsely blamed another agency.

On September 21, while BLM protesters were being arraigned, SSPD officers closed the courtroom to the public. When confronted by the press, Jillson inaccurately said that it was state court officials, not the SSPD, who had closed the courtroom. A court official immediately denied responsibility, and Jillson acknowledged that the SSPD had closed the courtroom.[150]

Crooks and an SSPD lieutenant investigated the court closure incident. The two officers who had closed the court claimed that a sergeant told them to do so. The sergeant claimed that the two officers misunderstood his order. When the officers learned of that statement, they contended that the sergeant had explicitly ordered the courtroom closed.

Crooks credited the sergeant's version of events, concluded that he and the other officers had a "miscommunication," and gave the sergeant a simple admonishment for "fail[ing] to

---

[143] *See* NYS Arrest Report, Case No. SS-01881-21, Arrest No. SS-0624-21.

[144] *See id.*; NYS Arrest Report, Case No. SS-02631-21, Arrest No. SS-0622-21; NYS Arrest Report, Case No. SS-02632-21, Arrest No. SS-0623-21.

[145] *See* NYS Arrest Report, Case No. SS-01881-21, Arrest No. SS-0621-21 (Hickenbottom); NYS Arrest Report, Case No. SS-01881-21, Arrest No. SS-0620-21 (Dunn); NYS Arrest Report, Case No. SS-01881-21, Arrest No. SS-0619-21 (Sangare).

[146] NYS Arrest Report, Case No. SS-02639-21, Arrest No. SS-0618-21

[147] Rigano at 60:13–21, 82:23–83:4.

[148] Press Release, Saratoga Springs Police Dep't (Sept. 8, 2021).

[149] *Id.*

[150] *Id.*

17

recognize what was occurring," without further discipline.[151] Crooks did not question two on-duty supervisors: Assistant Chief Catone and an SSPD lieutenant.

**The SSPD's arrests of protesters harmed the public.**

Protesters told the Attorney General's Office that the arrests had the intended effect of shutting down their narrative. After being arrested on September 7, 2021, Molly Dunn hasn't protested again and would be "too anxious to go to a protest now." Alexus Brown, who was stopped with Protester 1 on July 14, 2021, told the OAG that she has also curtailed her protesting. "I used to love City Council meetings," she said, "but they are ruined for me now." Jamaica Miles had to take a "pause" She told us, "I have children, and I had to make a decision." Although Miles had been an activist for decades, she stopped showing up to BLM events because after the arrests "it felt like they weren't safe." Lexis Figuereo told the OAG, "It makes me feel powerless—If I can't speak, then what can I do?"

Both Figuereo and Chandler Hickenbottom described declining participation in BLM activities following the arrests. Figuereo said that people were less likely to show up to BLM meetings and that support for BLM "fizzle[d] out because people realized they could actually be arrested." Hickenbottom concurred, saying that the arrests "made our followers more apprehensive."

When Catone gave his threatening press conference, the BLM protesters felt personally targeted. Samira Sangare, who was arrested on September 7, described the speech as a "call to action." Hickenbottom said, "It emboldened the SSPD and gave them the ability to abuse us." BLM protester Alex Patterson, who was arrested on September 8, said, "Bullies [like Catone] cannot get away with stomping oppressed communities without having people in the streets."

On July 14, some protesters had trepidation even before arrests began. Samira Sangare described "tons of cops" wearing riot gear and said, "It felt like it was a throwback to the [19]60's." Patterson feared that police would "come out swinging" after hearing about a union official's statement urging police to make arrests.

Multiple witnesses testified that it was hard to make out the SSPD's dispersal warnings, but all agreed that the crowd began dispersing once the orders were made. They described their confusion when SSPD officers continued advancing even after they had begun retreating. In past protests, they had been permitted to disperse voluntarily.

Dunn was "shocked" when police charged the crowd, adding "the fact they charged us when we were doing what they asked us to do was terrifying."

Adam Walker described fearing for his life when officers threw him to the ground to arrest him. "They restrained my legs and back and kept saying 'stop resisting!' even though I was limp…. I was afraid they would kill me by accident."

The arrests on September 7, coming nearly two months after the July 14 protest, left many puzzled and alarmed. Dunn described receiving a text that Figuereo was in custody and thinking it didn't make sense. She immediately headed to City Hall, where police were pointing

---

[151] SSPD Internal Memorandum IA-09/21/21 (Oct. 6, 2021) at 7; *see also* Zachary Matson, *Saratoga Springs Police Cite 'Misunderstanding' After Acknowledging Improper Barring of Court Access,* Daily Gazette (Oct. 7, 2021).

at her, Hickenbottom, and Samira Sangare. When they arrested Dunn, she kept asking, "What for?"

Those arrested reported being humiliated when the SSPD published their names along with the allegation that they had blocked a man from getting heart medication. As they saw it, one tenet of the BLM movement was to care for those in need—whether or not they agreed with the BLM message. According to Hickenbottom, BLM had a safety team that would "keep everyone safe and make sure everyone is seen and heard." Protesters said they were trained on first aid, safety planning, and emergency response and claimed they would never have ignored a person in cardiac distress or requesting medication.

Dunn said, "There is still a number of people…who believe that I blocked somebody from getting medical attention." She told the OAG that this false impression had damaged her professional reputation.

News of the September 7 arrests increased the BLM community's apprehension. Those who hadn't been arrested were concerned they could be arrested at any time. They had good reason to be. Patterson was arrested while delivering a pizza for work and held in custody overnight. TJ Sangare was forced to drive back to Saratoga from his college in Vermont after the SSPD threatened to send state troopers to arrest him in class. "I had to explain to my professors that I'm not some dangerous guy—I'm just an activist," he said.

Despite the chilling effect the arrests had on many protesters, some continued to protest. Walker said, "I am here to make the world a little bit better, even if that means state retaliation. To make real change, you have to make sacrifices, and that is something I accept." Patterson agreed, saying, "I feel like my purpose on this earth is to make it a little bit better—even if it brings state retaliation."

## LEGAL FINDINGS

I.    **Saratoga Springs had an official policy of retaliating against BLM protesters based on their message.**

The First Amendment prohibits law enforcement from targeting people for arrest in retaliation for protected speech. "[W]hen retaliation against protected speech is elevated to the level of official policy, there is a compelling need for an avenue of redress."[152] Under the law, any decision by a final policymaker constitutes a municipality's official policy, and "municipal liability may be imposed for a single decision."[153]

Three of Saratoga Springs's highest policymakers—Dalton, Kelly, and Crooks—made a series of decisions that deprived BLM protesters of their First Amendment rights. They collectively targeted BLM protesters for arrest based on their speech. In threatening BLM protesters that he would "stop" their "narrative," Assistant Chief Catone said aloud what his supervisors discussed only in private messages—the SSPD should use its coercive power to end the BLM's protests in Saratoga Springs.

Following Crooks's orders, SSPD officers implemented this unconstitutional policy in ways that violated the SSPD's written policies and procedures. They caused the arrests of

---

[152] *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018).
[153] *Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (cleaned up).

protesters in accordance with Dalton, Kelly, and Crooks's policy of retaliation but based on flimsy allegations and, in some cases, false evidence.

### A. Commissioner Dalton, the final civilian policymaker for the SSPD, ordered the arrests of protesters based on their message.

Dalton, the charter-designated civilian policymaker for the SSPD, repeatedly ordered the SSPD to arrest protesters based on their message. Dalton found the protesters' message to be corrosive to public support for the SSPD and countering that message to be politically expedient. She had personal animosity against individual protesters who had spread "misinformation" and publicly insulted her. She explicitly asked Crooks to make arrests, pressured him indirectly through the PBA, and berated her subordinate officers when arrests were not made. And Dalton looked for other ways to silence protesters, asking an attorney if the city could bring a civil action against them.

By Dalton's own admission, it was improper for her to involve herself in specific police investigations, and she had no expertise or training on probable cause to arrest. But Dalton intervened at least twice in May 2021 to order protester arrests, even after police officers had determined there was no cause for arrest. In both cases, the SSPD officers had cleared the streets by implementing the SSPD's tiered-level response protocol. Dalton, however, did not simply want protesters cleared from the streets—she wanted them to be arrested.

During the July 14 protest, Crooks yielded to Dalton's demands to make arrests. Within moments of Dalton's text to "Please please please pretty please arrest someone," the SSPD read its first dispersal warning. As Dalton ordered Crooks to "Arrest all those motherfuckers," the SSPD rushed into the retreating crowd and made arrests. When Dalton told Crooks to arrest Figueroa and Hickenbottom, Crooks reassured her they were on his "list" and instructed the incident commander to arrest them. And when Dalton still had "bloodlust" after Figueroa, Hickenbottom and other BLM leaders were not arrested on July 14, Crooks ordered an investigation resulting in 12 arrests of BLM protesters nearly two months later.

Under oath, Dalton claimed she had no animus against BLM protesters and repeatedly denied ever having "bloodlust" to arrest them. She characterized promises she made to political supporters to arrest protesters as harmless examples of a politician telling people what they wanted to hear. She repeatedly denied giving orders to arrest protesters even when confronted with evidence that she had.

But Dalton's other words and actions show a consistent hostility toward the BLM protesters and their message. She repeatedly described her desire to physically assault protesters in texts. Under oath, she admitted her personal animosity toward protesters who criticized her. When a political supporter asked about Catone's statement that he wanted to stop the BLM "narrative," she replied that he "killed it," and took no action to discipline him. And on July 14, she explicitly texted Crooks she had "bloodlust" for more arrests—directly contradicting her testimony to the OAG that she never had such "bloodlust."

In testimony, Dalton repeatedly claimed that she had no power to order arrests. But it is undisputed that she outranked Crooks when it came to policymaking and had the power to fire or discipline him and other officers. The Saratoga Springs Charter explicitly subordinates the police chief to the commissioner of public safety. And even outside of official discipline, she could

exert substantial pressure, such as calling for Crooks's resignation, if he disobeyed her. And she threatened to exercise that power—texting one colleague that if Crooks did not follow her orders "exactly" she would "literally demand his resignation."

Although she now claims that Crooks would view her texts as "sarcasm," Crooks testified that he understood her texts to be orders. He repeatedly relayed her instructions to officers in the field—on May 25 to Mitchell, who disobeyed her, and on July 14 to the officers who ultimately arrested protesters that day. And Dalton herself understood that Crooks would obey her—on July 14, Dalton bragged to a friend that Crooks had put Figuereo "on the list" to arrest.

**B.     Mayor Kelly, the chief executive officer of the city, sought arrests of protesters and filed complaints against protesters based on their message.**

As mayor of Saratoga Springs, Kelly was the "chief executive officer and official representative of the city." Saratoga Springs Charter Tit. 3(A). She was responsible for establishing the city's policy. She convened city council meetings and set the agenda. And she had considerable influence over others in city government, including Crooks.

Like Dalton, Kelly also had hostility toward BLM protesters and their message. On July 14, she texted Crooks that she "hate[d]" BLM protesters, demanded their arrests, and requested a CPS investigation of Figuereo. She also told Crooks that protester Molly Dunn had "crossed my line" and obtained Crooks's assurance that Dunn would be arrested. The SSPD eventually carried out all of Kelly's orders.

Kelly also filed a complaint to arrest Figuereo because he had been "disruptive" at city council meetings and "posted negative things about her" on social media. Her complaint included no bona fide allegations of criminal misconduct but sent the clear message to the SSPD that the mayor of Saratoga Springs wanted BLM protesters to be arrested.

**C.     Chief Crooks directed the arrests of protesters based on their message.**

As chief of police, Shane Crooks was the highest uniformed policymaker of the SSPD and implemented Dalton and Kelly's unlawful demands to arrest protesters based on their message.

Crooks testified that it was inappropriate for Dalton to get involved in specific police operations and that she had no expertise or training on when to make arrests. Yet, as early as March 2021, Dalton demanded that Crooks arrest protesters. Those demands continued, with specific incidents in May when Dalton twice demanded protester arrests even after SSPD officers found no cause to arrest.

The SSPD officers who refused to arrest protesters were following the SSPD's written policy and its past practice. Between May 31, 2020, and July 14, 2021, unpermitted protesters occupied the streets at least 11 times. During many protests, the SSPD redirected traffic to keep the protesters safe. With one exception—the July 30, 2020 Back the Blue protest—SSPD officers managed the protests without making arrests. So, on May 25, 2021, when Lt. Mitchell refused Dalton's direct order to arrest, it was in his view "the right thing to do" to protect the protesters' First Amendment rights.

Things changed on July 14, when Crooks personally directed SSPD field operations. On Crooks's orders, the officers read dispersal orders shortly after Dalton demanded "pretty please

21

arrest someone." And, on Crooks's orders, police rushed into the peacefully retreating crowd while Dalton texted, "Arrest all those motherfuckers." After Dalton promised a "ticker tape parade" if Figuereo and Hickenbottom were arrested, Crooks replied they were on his "list" and explicitly told officers to arrest them because "those were the leaders" and he "assumed" they had committed a crime.

Crooks understood that his promise to arrest protesters was improper. In his disclosures to the Attorney General, he did not produce the text messages where he discussed with Dalton his "list" to arrest. (Dalton produced the entire exchange.) When asked why he hadn't produced those texts, which appear to have been selectively excerpted, Crooks testified that he may have deleted them because they were "inappropriate."[154]

Nearly two months later, Crooks delivered the arrests he had promised, and twelve protesters were arrested. Crooks's claim under oath that he authorized those belated arrests only following a full investigation of the stopped cars does not stand up to scrutiny. Crooks told Dalton, Kelly, and other officials that he planned to issue warrants for Figuereo, Hickenbottom, Miles, and Dunn on July 14 and 26 and August 5—well before Sicko took his first investigative step on August 9. Further, Figuereo and Hickenbottom and four others who were arrested were not charged with stopping the cars and were not visible on the video of the car stop. Had the arrests been the result of the car-stop investigation, they should not have been named. Yet, they still ended up on the list for arrest for lesser offenses.

Crooks's claim that he ordered the investigation because of the car passenger's purported heart condition is equally suspect. For one, the protesters who stopped the car complied with officers' first-tier instructions to disperse—and, therefore, under SSPD's written policy should not have been arrested. But Crooks also admitted, after watching the passenger's video under oath, that the passenger did not appear to be in any true medical distress. He conceded that even if the passenger had been in distress, the protesters let the car leave less than 45 seconds after learning of the passenger's purported heart condition. Contrary to what the SSPD later insinuated to the press, the protesters did not put the passenger in harm's way.

### D.    The SSPD pursued unsupportable charges based on false evidence.

In implementing Crooks's demand to arrest protest leaders, the SSPD filed false affidavits with the prosecutor for charges the facts could not support.

Sicko's complaint improperly charged six protesters with "unlawful imprisonment," a charge which had never been used against somebody for stopping traffic. The facts did not support the charge. As Sicko admitted under oath, the protesters did not use physical force. Nor did the protesters intimidate the motorists. Protesters never threatened any of the motorists and even invited them out of their cars to join the protest. After reviewing the video, Sicko admitted under oath that he had seen no evidence of intimidation.

The unlawful imprisonment charge was supported by false statements in a witness affidavit. The affidavit falsely stated that protesters carried "pillowcases" with possible weapons and falsely stated that a "young African American kid" approached the passenger "in a fighting

---

[154] Crooks 144:15–145:13.

manner." As Sicko admitted under oath, all available evidence, including a video taken by the passenger himself, show those allegations to be false.

Sicko admitted that he viewed the video before submitting the affidavit and that he knew he was under an obligation to flag the inconsistencies to the prosecutor. But, before applying for the arrest warrant, he did nothing to indicate to the prosecutor that the affidavit was false. Nor did he forward the video or other photos that would alert the prosecutor to the affidavit's falsehoods. These failures violated SSPD policy, Sicko's training, and the constitutional rights of the protesters.

### E.    The SSPD referred a BLM protester to Child Protective Services without cause.

As Chief Crooks testified, it would be "utterly inappropriate" to refer a protester for a CPS investigation simply because Mayor Kelly ordered it. Yet, when the mother of Figuereo's children was arrested on September 7, a supervisor instructed the arresting officer to call CPS. The CPS complaint was wholly unsubstantiated, and the allegation that the mother had committed child endangerment was not supported by any evidence.

In justifying these charges, the arresting officer gave multiple, conflicting descriptions of the mother's behavior, first asserting that the mother endangered the child by holding onto the stroller during her arrest, and later claiming the mother endangered her child by standing on the edge of the road. A video of the incident shows that the mother remained a safe distance from the road throughout her encounter with police and did nothing to put her child in harm's way during the arrest.

Because the CPS charges were not supported by evidence, but instead ordered in compliance with Kelly's instructions to refer Figuereo to CPS, the Attorney General concludes that they were pretextual and motivated by Saratoga Springs's official policy of retaliation for protected speech.

### F.    The SSPD violated its own written policies by conducting surveillance of protesters to ascertain their identities.

During the July 14 protest, the SSPD deployed a "surveillance team" to identify individuals involved in BLM protests. The surveillance team identified individuals by running license plates, taking photographs, and, in at least one instance, physically detaining suspected protesters. Such surveillance violated SSPD's written policy—the SSPD forbids officers from recording the identity of those involved in First Amendment activity unless they are suspected of a crime.

The surveillance team consisted of experienced narcotics investigators like Miller and Guzek who had little training on the First Amendment. They used their deep experience in identifying, following, and apprehending individuals involved in clandestine criminal operations. But their training had no application to the Saratoga Springs BLM protests. Although a July 14 confidential briefing painted BLM protesters as violent, no protester had ever been arrested in Saratoga Springs for violent conduct, weapons possession, or even damaging property. Further, the SSPD had no evidence—beyond rumors—that any person had possessed an unlawful weapon or any other contraband during a protest in Saratoga Springs. There was no justification for policing the protesters with the same surveillance techniques used in narcotics investigations.

23

Applying their training and experience in narcotics policing, Miller and Guzek called for the unjustified stop of Protester 1. That stop was not based on a violation of law—its true goal was to put Protester 1 "on the radar" as a participant in BLM protests.

In New York, police may stop a vehicle based on reasonable suspicion only when there is "objective evidence of criminal activity," and a "[m]ere 'hunch' or 'gut reaction' will not do."[155] Reasonable suspicion "may not rest on equivocal or 'innocuous behavior' that is susceptible of an innocent as well as a culpable interpretation."[156]

No police officer reported any weapons, contraband, or violent crime at any point during the July 14 protest. Miller and Guzek both admit that they never saw Protester 1 or anybody else in possession of weapons or contraband on July 14. They therefore had no basis to believe that criminal activity was afoot, let alone that Protester 1 was involved in it. And they had no basis to believe that Protester 1 had any contraband in his grocery bag.

The justifications Miller and Guzek did give were not credible. Miller and Guzek offered contradictory reasons for following Protester 1—Miller claimed he was suspicious for not talking to other protesters and Guzek claimed he was suspicious because he was talking to the protest's organizers. Protester 1 could not have been both avoiding protesters and actively engaging them.

But even if Protester 1 had been actively engaging with other protesters, that did not give Miller and Guzek reasonable suspicion. None of the other protesters were observed with weapons or other contraband that could have ended up in Protester 1's bag. But even if they had been, mere association with other individuals suspected of crimes does not give rise to reasonable suspicion.[157]

The officers' other assertions simply describe innocuous behavior. Miller claimed Protester 1 was suspicious for fleeing police—but admitted under oath that Protester 1 was one of many protesters fleeing after the SSPD ordered them to disperse. Complying with a police directive is not suspicious behavior.

Miller claimed Protester 1 was suspicious for clutching the shopping bag to his chest—and Guzek claimed the bag itself was suspicious. But there is nothing suspicious about carrying a shopping bag in a public place. Other protesters can also be seen carrying shopping bags but did not attract the same scrutiny. And even if Protester 1 did clutch the bag to his chest, there is nothing suspicious about Protester 1 keeping his belongings close during the chaos of a protest.

Miller and Guzek claimed it was suspicious that Protester 1 put his bag in the trunk, but even Guzek admitted that putting a bag in a car's trunk is not suspicious behavior.

Finally, Miller and Guzek claimed that it was suspicious that Protester 1 drove his car around the city blocks and Guzek thought it was suspicious that he parked far from Broadway. But parking too far away from a destination is not indicative of whether a person possesses a weapon, and it's not suspicious to avoid parking on a street where police action is taking place, as it was on Broadway in the aftermath of the protest.

---

[155] *People v. Sobotker*, 43 N.Y.2d 559, 564 (1978).
[156] *People v. Brannon*, 16 N.Y.3d 596, 602 (2011).
[157] *See, e.g.*, *People v. Terrell*, 185 A.D.2d 906, 908 (2d Dep't 1992).

The stop of Protester 1 was not based on reasonable suspicion but instead a pretextual stop motivated by Saratoga Springs's official policy of retaliation against BLM protesters.

## II.    The SSPD and Dalton failed to adequately investigate and punish officer misconduct.

The Attorney General's investigation has revealed serious gaps in the SSPD's internal affairs investigations and disciplinary process. Despite abundant violations of SSPD policy, Dalton and Crooks repeatedly failed to take adequate disciplinary action against officers for their misconduct.

### A.    Assistant Chief Catone violated three different SSPD policies and was not disciplined.

There is no dispute that Assistant Chief John Catone's June 28, 2021 speech violated SSPD policies and eroded public trust in the police department. Crooks, and every SSPD supervisor we interviewed, admitted that the speech violated three separate written SSPD policies. They admitted that Catone's bellicose speech damaged the SSPD's reputation and harmed officer morale. And Dalton admitted in testimony that Catone's speech used a "racist dog whistle" and that the only adequate discipline was dismissal.

Yet, neither Dalton nor Crooks took any action to discipline Catone.

In testimony, Dalton attempted to excuse that failure by claiming that she would have lost control over the SSPD if she had disciplined the "widely respected" Catone. But, by failing to discipline Catone, Dalton and Crooks sent the message that retaliation against BLM protesters would be tolerated. Catone's high profile within and without the department, and the influence he exerted on SSPD officers, should have given Dalton more reason to correct his misconduct—not less.

### B.    The SSPD failed to adequately investigate the July 14 stop of BLM protesters.

The SSPD's investigation of the July 14 stop of Protester 1 and his passenger did not meet the SSPD's standards or adequately probe the incident. The investigating officer did not take a single witness statement, including from the complainants or the officers involved in the stop. Nor did she complete the SSPD's personnel complaint form or assemble the packet SSPD policy required for internal investigations. As Jillson testified, her conclusory single paragraph report did not meet SSPD standards: "we have a whole packet on internal investigation and personnel complaints…and none of those documents are in here."[158]

The investigation missed evidence of misconduct. Written SSPD policy prohibits officers from collecting information on lawful protesters, but the admitted purpose of the stop, supported by Guzek's contemporaneous text message, was to identify BLM protesters and "put[] another one on the radar." When probed, Guzek and Miller gave conflicting justifications for the stop— one said that Protester 1 could harm protesters and the other said he was working with the protest's leadership—that further call their credibility into question. And many justifications are not indicative of suspicious behavior at all, including running from the street when given an

---

[158] Jillson at 206:14–17.

order to disperse, placing the grocery bag in the trunk, and parking too far away from his destination.

A thorough internal affairs investigation should have identified these problems and recommended appropriate action be taken.

### C.   The SSPD and Chief Crooks failed to adequately investigate the September 21 court closure.

Chief Crooks's investigation of the officer who ordered the September 21 court closure fell far short of best practices for internal affairs investigations and the SSPD's own policies and training. The SSPD requires internal affairs investigators to remain impartial and resolve inconsistencies between witnesses. A reliable internal affairs investigation should apply the same level of scrutiny to officers' credibility that would be applied to that of any other witness.

Crooks concluded that line officers "misunderstood" a sergeant's order and mistakenly closed the courtroom. But during the investigation, the line officers repeatedly claimed that the sergeant had misrepresented what happened. In a written statement, one officer wrote that he was "beyond pissed off that [the sergeant] directed us to stop protesters entering Court, [and] now he is denying it."[159]

When shown the stark contradiction between the sergeant's account and the line officers', Crooks could not explain why he credited the sergeant over the line officers. Neither Crooks nor any other investigator recorded what the sergeant supposedly ordered or what the "misunderstanding" consisted of. When questioned, Crooks could not remember what the order supposedly was or how it had been misunderstood.

Crooks's investigation was also insufficient to rule out misconduct by other officers present during the incident. Crooks admitted that he did not investigate the on-duty lieutenant after Catone unilaterally determined that the lieutenant was not involved in the incident. But, when shown inconsistencies between Catone's report, the lieutenant's written statement, and video evidence, Crooks admitted that there was a possibility that Catone had covered up misconduct. An adequate investigation would have left no question about whether misconduct by other officers caused the court closure.

### III.   Saratoga Springs, Shane Crooks, and Meg Kelly failed to adequately respond to the Attorney General's subpoenas.

Saratoga Springs, Shane Crooks, and Meg Kelly failed to adequately respond to the Attorney Generals' subpoenas. SSPD staff were not adequately trained on their responsibilities in complying with an investigative subpoena, and the SSPD's document retention system was not adequate to preserve key evidence, including text messages. Crooks admittedly failed to comply with the subpoena by producing key evidence—a text exchange with Dalton where he claimed to have put Figuereo and Hickenbottom on a "list" to arrest. Kelly failed to turn over key text messages obtained from other sources and refused to cooperate in the scheduling of her oral examination.

---

[159] SSPD Internal Memorandum IA-09/21/21 at 21.

## A. The City of Saratoga Springs and Chief Crooks failed to fully comply with the Attorney General's subpoenas.

Lt. Mitchell, the SSPD designee in charge of organizing the SSPD's subpoena response, admitted that he received no training on how to respond to a subpoena. Instead, he relied on his own "good sense and judgment" and voluntary compliance from his fellow officers. Mitchell didn't secure and search any phones or computers because the subpoena wasn't "a search warrant or something like that."[160] He did not track compliance in any way and failed even to determine whether every officer involved in the July 14 protest response had responded to his requests. (A review of the documents revealed that many did not.) Those text messages that were turned over consisted of screenshots without metadata, requiring considerable analysis to determine the sender, recipient, time, and date sent.

The SSPD's lack of document management and subpoena compliance training resulted in the spoliation of evidence relevant to this investigation. As just one example, Crooks failed to produce a text exchange between him and Dalton promising to put Figuereo and Hickenbottom on a "list" to arrest. When shown the exchange, which Dalton had turned over, Crooks admitted that he either deleted the text or failed to turn it over on accident. But, as he also admitted, the text was highly inculpatory. The Chief of Police's own lack of compliance with the subpoena is troubling and raises the possibility that the Attorney General did not receive other important evidence.

## B. Meg Kelly failed to fully comply with the Attorney General's subpoena.

Kelly provided only limited compliance with the Attorney General's subpoena. In her document production, Kelly turned over only 268 text messages across 53 pages. (Dalton, by contrast, turned over more than 37,000 pages of text messages.) Her production did not include many of the most inculpatory texts, including the text she sent to Crooks ordering a CPS investigation of Figuereo. Kelly's attorney represented that some of the texts Kelly sent may have been stored on a city-issued cell phone that had been wiped, but the Office of the Attorney General did not have the opportunity to question Kelly on these assertions under oath. After the examining attorney had to reschedule the original date for her oral examination, Kelly's attorney refused to provide dates for an adjourned hearing and stopped responding to emails.

---

[160] Mitchell at 53:18–24.

## RECOMMENDATIONS

To prevent the recurrence of the violations of law described above, the City of Saratoga Springs must implement reforms including but not limited to the following:

1.    The SSPD should be required to enhance and make mandatory its framework for responding to protests that prioritizes the First Amendment.
2.    The SSPD should be required to implement rigorous restrictions on investigating and arresting individuals engaged in activity protected by the First Amendment, including during City Council meetings.
3.    The SSPD should be prohibited from conducting surveillance of protesters.
4.    Saratoga Springs's elected officials should be prohibited from ordering the investigation or arrest of specific individuals, and SSPD should institute protocols to protect the independence of its investigations.
5.    The SSPD should be required to maintain documentation of all communications between SSPD and Saratoga Springs elected officials during protests.
6.    The SSPD should mandate after-action reports following any police response to protest activity.
7.    The SSPD's internal affairs investigations and officer discipline process should be improved.
8.    The City of Saratoga Springs should implement document control protocols consistent with the SSPD's criminal discovery and FOIL obligations.

## ACKNOWLEDGEMENTS

This report was prepared by the OAG's Civil Rights Bureau and Law Enforcement Misconduct Office. A special thanks to: Sandra S. Park, Chief, Civil Rights Bureau; Tyler Nims, Chief, LEMIO; Rick Sawyer, Section Chief, Civil Rights Bureau; Kyle Rapiñan, Assistant Attorney General, Civil Rights Bureau; Joseph Antonio Flores, Research Analyst, Civil Rights Bureau; Casandra Walker, Associate Director of Legislative Affairs.